No. 25-02398

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

Joseph Jones et al.,

*Plaintiffs-Appellants,*

v.

Blackstone Medical Services, LLC

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of Illinois
No. 1:24-CV-01074-JEH-RLH
Hon. Jonathan E. Hawley

---

## APPELLANT'S BRIEF

---

Abbas Kazerounian (CA Bar No. 249203)
ak@kazlg.com
Ryan L. McBride (CA Bar No. 297557)
ryan@kazlg.com
*Kazerouni Law Group, APC*
*245 Fischer Avenue, Suite D1*
*Costa Mesa, CA 92626*
*(800) 400-6808*

*Interim Lead Attorneys for Plaintiffs-*
*Appellants and the Putative Class*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2398

Short Caption: Steidinger et al v. Blackstone Medical Services

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☒    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Joseph Jones, Natasha Koller, and Seth Steidinger, individually and on behalf of all others similarly situated.

    (revised parties, representing as interim lead class counsel)

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Kazerouni Law Group, APC.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Ryan L. McBride    Date: 10/21/25

Attorney's Printed Name:  Ryan L. McBride

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☒  **No** ☐

Address:  2221 Camino Del Rio S., Suite 101

    San Diego, CA 92108

Phone Number: (800) 400 - 6808    Fax Number:  (800) 520 - 5523

E-Mail Address: ryan@kazlg.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................ 2

ISSUE PRESENTED .................................................................................... 2

STATEMENT OF THE CASE ....................................................................... 3

SUMMARY OF THE ARGUMENT ............................................................... 5

ARGUMENT ................................................................................................. 7

    I.     Standard of Review ......................................................................... 7

    II.    Text Messages are Undoubtedly Encompassed within Section 227(c) .. 7

          A.    The FCC is Clear: Text Messages are Calls Under the TCPA .... 9

          B.    Statutory Interpretation Supports the Inclusion of Text Messages in Section 227(c) of the TCPA .................................... 15

          C.    The Vast Majority of Courts have Held that Text Messaging Applies to Section 227(c) ............................................................ 19

          D.    The Inclusion of Text Messages Supports Public Policy ............ 25

    III.   The District Court Made Legal and Analytical Errors in its Ruling ... 26

CONCLUSION .............................................................................................. 33

**Cases**

*Abboud v. Circle K Stores Inc.*,
    No. CV-23-01683-PHX-DWL,
    2025 U.S. Dist. LEXIS 13605 (D. Ariz. 2025) .................................................. 20

*Ashland Hosp. Corp. v. SEIU*,
    708 F.3d 737 (6th Cir. 2013) ............................................................................. 31

*Barr v. Am. Ass'n of Political Consultants*,
    591 U.S. 610 (2020) ...................................................................................... 8, 22

*Barton v. Temescal Wellness, LLC*,
    525 F. Supp. 3d 195 (D. Mass. 2021) ................................................... 21, 22, 25

*Bradshaw v. CHW Grp., Inc.*,
    763 F. Supp. 3d 641 (2025)................................................................................ 21

*Busbee v. Servicetoday!*,
    No. 4:24-cv-00364-P,
    2024 U.S. Dist. LEXIS 181623 (N.D. Tex. Oct. 4, 2024)................................. 20

*Campbell-Ewald Co. v. Gomez*,
    577 U.S. 153 (2016) .................................................................................... 17, 22

*Charvat v. Echostar Satellite, LLC*,
    630 F.3d 459 (6th Cir. 2010) ............................................................................. 29

*Connor v. Servicequick Inc.*,
    No. 1:24-cv-02286-CNS-NRN,
    2025 U.S. Dist. LEXIS 199578 (D. Colo. Oct. 8, 2025) .................................... 20

*Davis v. CVS Pharm., Inc.*,
    No. 4:24-cv-477-AW-MAF,
    2025 U.S. Dist. LEXIS 167366 (N.D. Fla. Aug. 26, 2025) ......... 6, 21, 23, 24, 25

*Dawson v. Porch.com*,
    No. 2:20-cv-00604-RSL,
    2024 U.S. Dist. LEXIS 206363 (W.D. Wash. Nov. 13, 2024).......................... 17

*Diamond v. Chakrabarty*,
    447 U.S. 303 (1980) .......................................................................................... 31

*Facebook, Inc. v. Duguid*,
   592 U.S. 395 (2022) ............................................................ 7, 22

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ............................................................... 16

*FDA v. Wages & White Lion Invs., LLC*,
   145 S. Ct. 898 (2025) .............................................................. 29

*Forest Grove Sch. Dist. v. T.A.*,
   557 U.S. 230 (2009) ............................................................... 17

*Forrest v. Genpact Servs., LLC*,
   962 F. Supp. 2d 734 (M.D. Pa. 2013) ................................... 31

*Gadelhak v. AT&T Servs.*,
   950 F.3d 458 (7th Cir. 2020) ................................................ 17

*Gulden v. Liberty Home Guard LLC*,
   No. CV-20-02465-PHX-JZB,
   2021 U.S. Dist. LEXIS 33833 (D. Ariz. Feb. 23, 2021) ................ 19

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995) ............................................................... 17

*Hall v. Smosh Dot Com, Inc.*,
   72 F.4th 983 (9th Cir. 2023) ................................................ 19

*Hively v. Ivy Tech Cmty. Coll.*,
   853 F.3d 339 (7th Cir. 2017) ................................................ 31

*Hudson v. Palm Beach Tan, Inc.*,
   2024 U.S. Dist. LEXIS 165676 (M.D.N.C. Aug. 12, 2024)........ 11, 19

*Hudson v. Ralph Lauren Corp.*,
   385 F. Supp. 3d 639 (N.D. Ill. May 1, 2019)........................ 20

*Jackson v. Blitt & Gaines, P.C.*,
   833 F.3d 860 (7th Cir. 2016) ................................................ 23

*K Mart Corp. v. Cartier, Inc.*,
   486 U.S. 281 (1988) ............................................................... 16

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ............................................................... 15

*Lorillard v. Pons*,
   434 U.S. 575 (1978) ............................................................... 18

*Lozano v. Twentieth Century Fox Films Corp.*,
　702 F. Supp. 2d 999 (N.D. Ill. 2010) ................................... 10, 18, 31

*Mais v. Gulf Coast Collection Bureau, Inc.*,
　768 F.3d 1110 (11th Cir. 2014) ........................................ 29

*Mantha v. Quotewizard.Com, LLC*,
　347 F.R.D. 376 (D. Mass. 2024) ....................................... 20

*Marks v. Crunch San Diego, LLC*,
　904 F.3d 1041 (9th Cir. 2018) ........................................ 18

*McLaughlin Chiropractic Assocs. v. McKesson Corp.*,
　606 U.S. 146 (2025) ............................................. 14, 25, 28

*Mims v. Arrow Fin. Servs., LLC*,
　565 U.S. 368 (2012) ................................................. 7, 8, 9

*Misner v. Empire Auto Protect, LLC*,
　No. 2:24-cv-1282,
　2024 U.S. Dist. LEXIS 202146 (S.D. Ohio Nov. 6, 2024)................ 20

*New Prime Inc. v. Oliveira*,
　586 U.S. 105 (2019) ................................................. 16, 18

*Pepper v. GVG Capital LLC*,
　677 F. Supp. 3d 638 (S.D. Tex. June 9, 2023) ................................ 19

*Perrin v. United States*,
　444 U.S. 37 (1979) ................................................. 16

*Reimer v. Kohl's, Inc.*,
　No. 23-CV-597-JPS,
　2023 U.S. Dist. LEXIS 168078 (E.D. Wis. Sept. 21, 2023) ............................ 19

*Satterfield v. Simon & Schuster, Inc.*,
　569 F.3d 946 (9th Cir. 2009) ................................... 12, 16, 17, 19, 31

*Saunders v. Dyck O'Neal, Inc.*,
　319 F. Supp. 3d 907 (W.D. Mich. 2018) ........................... 31

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
　145 S. Ct. 1497 (2025) ......................................... 14, 28, 29

*Skidmore v. Swift & Co.*,
　323 U.S. 134 (1944) ................................................. 15

*Squillacote v. United States,*
    739 F.2d 1208 (7th Cir. 1984) ............................................................. 18

*Stamper v. Manus-Northwestern Oral Health Ctr., Ltd.,*
    No. 23 C 05660,
    2025 U.S. Dist. LEXIS 138094 (N.D. Ill. July 17, 2025) ................................ 20

*U.S. Venture, Inc. v. United States,*
    2 F.4th 1034 (7th Cir. 2021) ............................................................. 16

*United States v. Melvin,*
    948 F.3d 848, 851 (7th Cir. 2020) ......................................................... 7

*Warciak v. Subway Rests., Inc.,*
    949 F.3d 354 (7th Cir. 2020) ............................................................. 19

*Wilson v. MEDVIDI Inc.,*
    No. 5:25-cv-03996-BLF,
    2025 U.S. Dist. LEXIS 198827 (N.D. Cal. Oct. 7, 2025) ........................... 20, 22

*Wilson v. Skopos Fin., LLC,*
    No. 6:25-cv-00376-MC,
    2025 U.S. Dist. LEXIS 138638 (D. Or. July 21, 2025) .................................. 20

*Wis. Cent. Ltd. v. United States,*
    585 U.S. 274 (2018) ..................................................................... 31

*Zimmer Radio of Mid-Missouri, Inc. v. FCC,*
    145 F.4th 828 (8th Cir. 2025) ........................................................... 29

**Statutes**

28 U.S.C. § 1291 ............................................................................ 2

28 U.S.C. § 1331 ............................................................................ 2

28 U.S.C. § 2342 ........................................................................... 28

47 U.S.C. § 227 ......................................................................... 1-31

47 U.S.C. § 227 (F) ....................................................................... 27

47 U.S.C. § 227(a)(3) ..................................................................... 23

47 U.S.C. § 227(a)(4) ......................................................... 5, 8, 15, 31

47 U.S.C. § 227(b) ............................................................ 5, 8, 15, 17

47 U.S.C. § 227(b)(1)(A) ............................................................ 5, 8, 23

47 U.S.C. § 227(b)(1)(A)(iii) ......................................................... 5, 8

47 U.S.C. § 227(b)(1)(C) ............................................................... 5, 8

47 U.S.C. § 227(c) .................... 1, 4, 8, 9, 14, 17, 19, 23, 24, 25, 26, 27, 28, 30, 31, 32

47 U.S.C. § 227(c)(1) ............................................................ 8, 15, 26

47 U.S.C. § 227(c)(1)(D) ................................................................ 23

47 U.S.C. § 227(c)(3) .................................................................... 27

47 U.S.C. § 227(c)(3)(B) ................................................................ 27

47 U.S.C. § 227(c)(4)(B)(i) ............................................................. 27

47 U.S.C. § 227(c)(5) .................... 1, 2, 4, 5, 9, 11, 15, 19, 20, 21, 26, 27, 29, 30, 33

47 U.S.C. § 227(f) ....................................................................... 27

47 U.S.C. § 227(G) ...................................................................... 27

47 U.S.C. § 227(L) ...................................................................... 27

47 U.S.C. §§ 227(c)(1)(C)-(D) ......................................................... 27

Bipartisan Budget Act of 2015, Pub. L. No. 114-74 (November 2, 2015) ................. 17

Junk Fax Prevention Act of 2005, Pub. L. No. 109-21 (July 9, 2005) ...................... 17

Pallone- Thune TRACED Act, Pub. L. No. 116-105 (December 30, 2019) ............... 17

Telephone Consumer Protection Act of 1991,
    Pub. L. No. 102-243, 105 Stat. 2394 (December 20, 1991) .............................. 23

Truth in Caller ID Act of 2009, Pub. L. No. 111-331 (December 22, 2010) .............. 17

**Other Authorities**

Oxford English Dictionary, 2d Ed. (1989) ................................................ 23

Paging Network, Inc., Annual Report (1993) .............................................. 24

The New Merriam-Webster Dictionary (1989) ............................................ 23

Webster's College Dictionary (1991) ...................................................... 23

## Rules

7th Cir. R. 32(b) ........................................................................... 1

7th Cir. R. 32(c) ........................................................................... 1

Fed. R. App. P. 32(a)(5) ............................................................... 1

Fed. R. App. P. 32(a)(6) ............................................................... 1

Fed. R. App. P. 32(a)(7)(B)(i) ...................................................... 1

Fed. R. Civ. P. 58(d) .................................................................... 2

## Regulations

18 FCC Rcd 14014 (2003) ....................................... 5, 10, 11, 12, 17, 25, 27

27 FCC Rcd 1830 (2012) .............................................................. 12

30 FCC Rcd 7961 (2015) .......................................................... 12, 18

38 FCC Rcd 12247 (2023) ................... 4, 6, 12, 13, 14, 15, 25, 27, 29, 30, 32

47 C.F.R. § 64.1200(c) ................................................. 2, 3, 19, 26, 27, 30

47 C.F.R. § 64.1200(c)(2) ....................................................... 3, 19

47 C.F.R. § 64.1200(c)-(e) ...................................................... 2, 30

47 C.F.R. § 64.1200(d) .............................................................. 26

47 C.F.R. § 64.1200(d)(3) ............................................................ 3

47 C.F.R. § 64.1200(e) ................................................ 4, 5, 10, 27, 29

47 C.F.R. §§ 64.1200(c)(2)(D)-(E) ............................................... 27

88 Fed. Reg. 20800 (2023) ......................................................... 13

89 Fed. Reg. 5098 (2023) ........................................................... 30

# INTRODUCTION

Appellants Joseph Jones, Seth Steidinger, and Natasha Koller ("Appellants") request the Court to reverse the District Court's ruling on the order granting Defendant Blackstone Medical Services, LLC's ("Defendant") Motion to Dismiss Counts I-IV of the Consolidated Class Action Complaint based upon an erroneous finding that 47 U.S.C. § 227(c) of the Telephone Consumer Protection Act ("TCPA") does not apply to text messages. Appellants' position is supported by a plain reading of the statutory text, its legislative history and purpose, subsequent rulings by the FCC, sound public policy, and nearly every other federal circuit that has addressed this issue. Moreover, the District Court made several errors in its reasoning, including a failure to address the Federal Communication Commission's ("FCC") 2023 final rule which codified text messages under the adopted federal regulations and applying an incorrect judicial framework of analysis over regulatory decisions. Additionally, the District Court did not address several arguments made in briefing and used a modern interpretation of the word "call" over its historical definition as a "*communication* with a person by telephone."

When applied under the correct judicial framework and analyzed in context, Section 227(c) of the TCPA undoubtedly includes text messages. Accordingly, Appellants request this Court to find that text messages are covered under 47 U.S.C. § 227(c)(5).

# JURISDICTIONAL STATEMENT

The District Court maintained subject-matter jurisdiction under 28 U.S. Code § 1331, which grants "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. As Plaintiffs alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*., federal question jurisdiction is proper.

Under 28 U.S.C. § 1291, "[t]he courts of appeals…shall have jurisdiction of appeals from all final decisions of the district courts of the United States…except where a direct review may be had in the Supreme Court." On July 21, 2025, the District Court entered its Order granting Defendant's Motion to Dismiss. ER 128. On August 11, 2025, Plaintiffs filed their Notice of Appeal. ER 140. On August 20, 2025, Plaintiffs and Defendant filed a Joint Request for Entry of Judgment Pursuant to Fed. R. Civ. P. 58(d). ER 142. The District Court granted the request and entered final Judgment on August 21, 2025. ER 145. As the final judgment closed the case, all of the parties' claims have been disposed and are ripe for review by this Court of Appeals.

# ISSUE PRESENTED

Did the District Court err when holding that text messages are not calls as applied under 47 U.S.C. § 227(c)(5) and its corresponding Federal regulations codified in 47 C.F.R. § 64.1200(c)-(e)?

## STATEMENT OF THE CASE

On February 14, 2024, Plaintiff Seth Steidinger filed a complaint against Defendant for violations of the Telephone Consumer Protection Act, 47 U.S.C. §§ 227, *et seq*. and its corresponding Federal Regulations, 47 C.F.R. § 64.1200(c)(2), (d)(3). ER 1. Similarly, Plaintiff Natasha Koller and Joseph Jones filed separate actions in the Middle District of Florida. *See Natasha Koller v. Blackstone Medical Services, LLC*, No. 8:24-cv-00433-TPB-NHA; *Joseph Jones v. Blackstone Medical Services, LLC*, No. 6:24-cv-00986-PGB-EJK. On April 5, 2024, Plaintiffs Seth Steidinger and Natasha Koller filed a First Amended Complaint (ER 19) and on January 7, 2025, the District Court consolidated Joseph Jones into the instant Case No. 24-1456 (ER 149). On April 15, 2025, Plaintiffs filed the operative Consolidated Class Action Complaint ("CCAC"). ER 54.

Plaintiffs alleged that Defendant repeatedly placed text messages to solicit home sleep tests despite repeated "STOP" requests. ER 55-56, ¶¶ 3-5. For Plaintiff Jones, Defendant began to spam him with text messages in September of 2022. ER 62, ¶ 34. On May 10, 2023, Plaintiff Jones had enough and "responded 'No' to Defendant's inquiries" over whether he had any interest in a sleep study. ER 63, ¶ 35. Defendant then asked Plaintiff Jones to provide a reason. *Id*. Plaintiff Jones refused to respond and "Defendant restarted their unending barrage of texts." *Id*. On three other occasions, Plaintiff Jones requested Defendant to "Stop" contacting him. ER 63-65, ¶¶ 36-38. Unfortunately, Defendant refused to abide by these requests. ER 65, ¶¶ 38-39. Similarly, Plaintiffs Steidinger and Koller repeatedly requested

Defendant to "Stop" text messaging them and expressed disinterest in Defendant's solicitations. ER 67-70, ¶¶ 53-57; ER 73-75, ¶¶ 73-81. Defendant did not adhere to Plaintiffs' requests. *Id.*

Plaintiffs also included evidence of other individuals who complained about Defendant's "aggressive telemarketing and failure to abide by 'stop' requests." ER 56 ¶ 6, ER 76-78, ¶ 84. Many individuals described Defendant's solicitations as harassment. *Id.*

On May 13, 2025, Defendant filed a Motion to Dismiss Counts I-IV of the Consolidated Class Action Complaint. ER 95. Relevant here, Defendant argued that "Counts I-IV, brought under the TCPA, must be dismissed because Plaintiffs raise only claims relating to text messages under § 227(c), which does not impose any liability for sending text messages." ER 96. In response, Plaintiffs explained that (1) text messages had not been invented when Congress enacted the TCPA; (2) a textualist analysis of the statute supports including text messages; (3) the federal regulations unambiguously include text messages in 47 C.F.R. § 64.1200(e) as promulgated by the Federal Communication Commission's ("FCC") 2023 Report and Order, which is promulgated through Section 227(c); (4) case law universally holds that text messages are calls within the TCPA; and (5) public policy demands that text messages apply to Section 227(c). *See* ER 113-121. On July 21, 2025, the District Court Granted Defendant's Motion to Dismiss (the "Order"), finding that text messages do not apply to Section 227(c)(5) of the TCPA. ER 128-139.

# SUMMARY OF THE ARGUMENT

The District Court erred in holding that text messages are not "calls" under 47 U.S.C. § 227(c)(5) of the TCPA. The correct statutory interpretation, reinforced by the FCC and consistent case law, demonstrates that text messages fall squarely within the statute's scope.

First, the statutory text and structure of the TCPA reveal Congress's intent to broadly protect consumers from intrusive telemarketing. Section 227(c) regulates "telephone solicitations," defined as "the initiation of a telephone call or message." *See* 47 U.S.C. § 227(a)(4). The absence of any exclusion for text messages—combined with the TCPA's remedial purpose—indicates that Congress intended to cover all forms of telephonic communication, not only voice calls. In fact, the TCPA specifically covers "calls" made to a "paging service" (47 U.S.C. § 227(b)(1)(A)(iii)) along with telephone facsimile machines (47 U.S.C. § 227(b)(1)(C)), the closest technology to today's text messaging.

Second, the FCC's long-standing interpretation explicitly includes text messages as "calls" under the TCPA. Beginning with its 2003 Order and reaffirmed through 2012 and 2015 rulings, the FCC has consistently held that "calls" encompass both voice and text communications. In 2023, the FCC codified this position in its final rule, amending 47 C.F.R. § 64.1200(e) to extend Do-Not-Call ("DNC") protections to text messages. This interpretation is reasonable, consistent, and entitled to deference under the Administrative Procedure Act's arbitrary-and-capricious standard.

Third, statutory and historical interpretation support this view. At the time of enactment in 1991, "call" meant "to communicate with or try to communicate with a person by telephone." Text messages are precisely that—a modern means of telephonic communication. Courts in this Circuit and others have applied this reasoning, holding that text messages are calls for TCPA purposes. Congress, through affirmative acts, has adopted this interpretation as well.

Fourth, the overwhelming weight of judicial authority aligns with this position. Nearly every federal court to address the issue—across multiple circuits—has found that unsolicited text messages violate the TCPA's Do-Not-Call provisions. Only one recent outlier, *Davis v. CVS Pharmacy, Inc.*, diverges, but that decision ignored both historical meaning and the FCC's 2023 rulemaking.

Fifth, public policy demands inclusion of text messages within Section 227(c). Excluding text messages would create a regulatory loophole allowing mass unwanted solicitations via text message, defeating Congress's intent to protect consumer privacy from emerging telecommunication abuses.

Finally, an analysis of the District Court's Order here reveals several legal and analytical errors. Not only did the District Court, like *Davis*, fixate upon a modern interpretation of the word "call," it ignored various aspects of Plaintiffs' briefing—including the FCC's 2023 Order, cited case law, and an analysis of public policy.

In sum, a wholistic approach to statutory interpretation should lead this Court to only one conclusion: text messages constitute "calls" under the TCPA. Still, the Court need not rely on this facet alone—the FCC, courts, and even Congress agree.

To hold otherwise, jeopardizes the privacy and comfort of nearly every American that Congress sought to protect.

## ARGUMENT

### I. Standard of Review

The issue presented relates to a question of statutory interpretation, i.e., a question of law. The Seventh Circuit Court of Appeals will "review questions of statutory interpretation and of rule interpretation *de novo*." *United States v. Melvin*, 948 F.3d 848, 851 (7th Cir. 2020).

### II. Text Messages are Undoubtedly Encompassed within Section 227(c)

Congress enacted the Telephone Consumer Protection Act of 1991 ("TCPA") "to address 'the proliferation of intrusive, nuisance calls' to consumers and businesses from telemarketers." *Facebook, Inc. v. Duguid*, 592 U.S. 395, 399 (2022) (citing § 2, ¶¶ 1, 6, 105 Stat. 2394). Recognizing the rapid advancement of communication technology and its growing intrusion into everyday life, Congress sought to protect consumers from emerging forms of unsolicited and disruptive communications. *See id.* ("Advances in automated technology made it feasible for companies to execute large-scale telemarketing campaigns at a fraction of the prior cost, dramatically increasing customer contacts"); *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370-71 (2012) ("Voluminous consumer complaints about abuses of telephone

technology…prompted Congress to pass the TCPA").[1] As the TCPA's sponsor, Senator Hollings, remarked, such communications were "the scourge of modern civilization," and he hoped that consumers would be empowered with meaningful remedies. *Mims*, 565 U.S. at 384. The Supreme Court has also emphasized the broad public consensus behind the TCPA's mission, noting that "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls." *Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 610, 613 (2020).

In pursuit of its goals to "ban[] certain practices invasive of privacy," Congress "direct[ed] the Federal Communications Commission (FCC or Commission) to prescribe implementing regulations." *Mims*, 565 U.S. at 371. These implementing regulations—authorized under Section 227(c) of the TCPA—underscore "the need to protect residential telephone subscribers' privacy rights and to avoid receiving ***telephone solicitations*** to which they object." 47 U.S.C. § 227(c)(1) (emphasis added). Notably, Congress defined "telephone solicitation" to mean "the initiation of a telephone call or message…" 47 U.S.C. § 227(a)(4). This definition is critical. Section 227(c) refers to "telephone solicitation[s]" ten times—firmly anchoring the section in the context of unsolicited communications that disturb the privacy of consumers. By contrast, Section 227(b) makes no mention of this term, implying a structural

---

[1] The TCPA's concern over emerging communicative technologies is evidenced through the different forms of communication it sought to protect against prior to the advent of text messaging. Specifically, the TCPA included protections against "any call…to any telephone number assigned to a paging service," 47 U.S.C. § 227(b)(1)(A)(iii) and "telephone facsimile machines" 47 U.S.C. § 227(b)(1)(C).

distinction within the statute. This is especially relevant because Section 227(c)(5) provides "a private right of action for a violation of the FCC's implementing regulations." *Mims*, 565 U.S. at 375, n.5. Given that the central aim of Section 227(c)'s regulations is to shield consumers from intrusive telephone solicitations, it naturally follows that the private right of action in Section 227(c)(5) was enacted to serve that same purpose. While some confusion may arise from Section 227(c)(5)'s use of the phrase "telephone call," any ambiguity is readily resolved by examining the FCC's Orders.

Since 2003, the FCC has issued a series of rulings that expressly included text messages within the scope of the TCPA's "Do-Not-Call" (DNC) regulations as promulgated by Congress through Section 227(c). These Orders reflect a reasoned interpretation consistent with both the statutory text and the statute's underlying purpose. Moreover, the FCC's approach has received widespread judicial support, with courts routinely interpreting the term "call" to include text messages. The inclusion of text messages is further bolstered by principles of statutory construction, congressional ratification through later amendments, and fundamental public policy considerations aimed at adapting consumer protection laws to modern methods of communication.

A.     **The FCC is Clear: Text Messages are Calls Under the TCPA**

Starting in 2003, the FCC explicitly stated that text messages constitute calls under the TCPA. Since then, the FCC repeatedly addressed and confirmed this

interpretation. Finally, in 2023, the FCC codified text messages into its Do-Not-Call protections under 47 C.F.R. § 64.1200(e).

In 2003, the FCC made its first major revisions to telemarketing regulations in over a decade—its most significant update since adopting rules in response to Congress's directives under the TCPA. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* (the "2003 Order"), 18 FCC Rcd 14014, ¶ 2. These changes came as "the telemarketing industry ha[d] undergone significant changes in the technologies and methods used to contact customers." *Id*. At the time of the TCPA's enactment, as relevant here, text messaging did not yet exist. *See Lozano v. Twentieth Century Fox Films Corp.*, 702 F. Supp. 2d 999, 1005 (N.D. Ill. 2010). The FCC acknowledged that the rise in new technologies had "heightened public concern about unwanted telemarketing calls…" 2003 Order at ¶ 8. It further observed that, "[a]s evidenced by the persistent consumer complaints regarding unwanted telephone solicitations," additional enforcement around DNC protections was warranted. *Id*. at ¶ 18. The FCC concluded that "a national [DNC] list would provide consumers with a one-step method for preventing unwanted telemarketing calls." *Id*. Notably, in its discussion of the DNC provisions, the FCC repeatedly used the terms "unwanted calls", "telephone solicitations", and "telemarketing" interchangeably. *See id*. at ¶¶ 18-21. Ultimately, the FCC determined that the record supported "the establishment of a single national database of telephone numbers of residential subscribers who object to receiving telephone solicitations." *Id*. at ¶ 25. Thus, under the new regulations, Consumers could "(1) place their number on the national do-not-call list;

(2) continue to make do-not-call requests of individual companies on a case-by-case basis; and/or (3) register on the national list, but provide specific companies with express permission to call them." *Id.* at ¶ 26. The FCC "emphasize[d] that there will be one centralized national do-not-call database of telephone numbers." *Id.* at ¶ 27. The FCC *did not* create a separate national do-not-text database. *See id.* at ¶ 28 ("Pursuant to our authority under section 227(c), we adopt a national do-not-call registry that will provide residential consumers with a one-step option to prohibit unwanted telephone solicitations").

Furthermore, while speaking within the context of Section 227(b), the FCC applied its prohibitions to "both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls[.]" *Id.* at ¶ 165. As such, the 2003 Order stands for the proposition that, under the TCPA, text messages qualify as "calls." The Middle District of North Carolina summed it up nicely:

> The fact that the FCC uses 'voice,' 'text' and 'short message service (SMS)' to modify 'calls' itself indicates that voice calls, text calls, and SMS calls are all types of calls, and thus, necessarily, calls. Subsection 227(c)(5) grants a private right of action to a 'person who has received more than one telephone call within any 12-month period.' The statute does not specify that it must be a voice call or a live telephone solicitation or a live telemarketing call: it simply applies to telephone calls broadly. Because the FCC recognizes text calls as a type of call, a text message would presumably be a form of a telephone call under § 227(c)(5).

*Hudson v. Palm Beach Tan, Inc.*, 2024 U.S. Dist. LEXIS 165676, at *19-20 (M.D.N.C. Aug. 12, 2024) (internal citation omitted).

Subsequent FCC Orders have echoed this conclusion. In 2012, the FCC reaffirmed its 2003 Order as it related to "both voice and text calls, including short

message service (SMS) calls[.]" *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991* (the "2012 Order"), 27 FCC Rcd 1830, 1832 ¶ 4 (Feb. 15, 2012). Additionally, the 2012 Order cited *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009), "noting that text messaging is a form of communication used primarily between telephones and is therefore consistent with the definition of a 'call.'" In 2015, the FCC stated:

> Month after month, unwanted robocalls and texts, both telemarketing and informational, top the list of consumer complaints received by the Commission. The Telephone Consumer Protection Act (TCPA) and our rules empower consumers to decide which robocalls and text messages they receive…With this Declaratory Ruling and Order, we act to preserve consumers' rights to stop unwanted robocalls, including both voice calls and texts[.]

*In re Rules and Regulations Implementing the Telephone Consumer Prot. Act of 1991 et al.* (the "2015 Order"), 30 FCC Rcd 7961, 7964 ¶ 1 (2015). Within this introductory paragraph, the FCC explained that it would "refer to calls that require consumer consent under the TCPA as 'robocalls,' 'covered calls and texts,' or 'voice calls and texts.' *Id.* at 7964 ¶ 1 n.1. Additionally, the FCC explained that "[e]xcept where context requires otherwise, our use of the term 'call' includes text messages." *Id.* at 7964 ¶ 1 n.3 (citing the 2003 Order). Indeed, the FCC confirmed that "[t]ext messages are 'calls' subject to the TCPA, as previously determined by the Commission." *Id.* at 7965 ¶ 2.

Most applicable is the FCC's 2023 Order which codified text messages into the DNC rules as applied through Section 227(c) of the TCPA. *See In re Targeting and Eliminating Unlawful Text Messages, Implementation of the Telephone Consumer*

*Protection Act of 1991, Advanced Methods To Target and Eliminate Unlawful Robocalls* (the "2023 Order"), FCC 23-107, No. 02-278 (2023). Prior to its enactment, "the Commission propose[d] ***to clarify*** that the National Do-Not-Call Registry protections apply to text messages as well as voice calls and to codify this clarification in the Commission's rules." *In re Targeting and Eliminating Unlawful Text Messages*, Further Notice of Proposed Rulemaking, FCC 23-21, 88 Fed. Reg. 20800, 20802 ¶ 6 (2023) (emphasis added). The FCC explained:

> Although the Commission has stated that text messages are calls for Telephone Consumer Protection Act (TCPA) purposes, it has not explicitly included text messages in the codified DNC rules that protect wireless phone subscribers…The Commission seeks comment on whether codifying the DNC protections to marketing texts further protect consumers from unwanted marketing text messages. We note that the DNC protections do not depend on whether the caller uses an autodialer, unlike some provisions of the TCPA."

*Id.* at 20802 ¶¶ 6-7. Noting that "[c]ommenters generally support this step," the FCC "adopt[ed] the proposal to codify the National DNC Registry's existing protections to text messages." 2023 Order at ¶¶ 26-27. The FCC provided sound reasoning:

> Consumers increasingly rely on text messaging to stay in touch with friends and family, to do business, communicate with their child's school, and get information from their government. On many devices, people immediately see some or all of the messages once received on the device, whereas they have the option to ignore unwanted calls. This causes consumers to open their texts quickly because texts are an expected trusted source of communications, not annoyance and scams. The rise of junk texts jeopardizes consumer trust in text messaging. The increase of unwanted and illegal texts also frustrate consumers, and scam texts can cause serious harm. Scam texts can contain links to phishing campaigns and load malware onto unsuspecting consumers' phones, leading to fraud and other harms.

*Id*. at ¶ 1. To be sure, the FCC's "action is consistent with federal court opinions and will deter both illegal texts and make DNC enforcement easier." *Id*. at ¶ 26.

Here, the FCC's directive is reasoned and clear: text messages apply to the TCPA's DNC protections which are promulgated through Section 227(c). And "when an agency exercises discretion granted by a statute," which the TCPA explicitly gives to the FCC, "judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1511 (2025). Under this standard, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Id*.; *see also McLaughlin Chiropractic Assocs. v. McKesson Corp.*, 606 U.S. 146, 155 n.2 (2025) ("Judicial review in enforcement proceedings of course may also include review of whether the rule or order was arbitrary and capricious under the APA or otherwise was unlawful"). The vast majority of courts (discussed in Section II.C. below) have already confirmed the reasonableness of this position. So too had the District Court here, calling Plaintiffs' position "an eminently reasonable one, particularly given the TCPA's purpose and the prevalence of text messaging in the U.S. today." ER 137. As the FCC has reasonably explained its position, there is nothing arbitrary or capricious in its codification of text messages. Indeed, "section 64.1200(e) of the Commission's rules explicitly applies its DNC regulations to wireless telephone numbers and it would be anomalous to conclude that text messages to wireless numbers are 'calls' for one part

of the Commission's TPCA rules but not for the DNC protections." 2023 Order at ¶ 26.

Because the FCC acted reasonably and consistently in reaching this conclusion, this Court should affirm the FCC's "reasoned decisionmaking." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). At minimum, this Court should look to the FCC's longstanding and consistent interpretation of the word "call" as an "informed judgment to which [it can] properly resort for guidance." *Id.* at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)).

## B. Statutory Interpretation Supports the Inclusion of Text Messages in Section 227(c) of the TCPA

As prefaced above, Section 227(c) of the TCPA is concerned with the protection of consumers' privacy rights "to avoid receiving ***telephone solicitations*** to which they object." 47 U.S.C. § 227(c)(1) (emphasis added). These solicitations are defined as a "telephone call or message." 47 U.S.C. § 227(a)(4).[2] While telephone solicitations are defined under the TCPA, the word "call," which appears in Sections 227(b) and 227(c)(5), is not.

"Reading statutory text through a wholistic lens—giving effect to the language Congress enacted into law and interpreting that language in the context of the full statutory scheme—is the cornerstone of proper statutory construction[.]" *U.S.*

---

[2] "Message" means "[a]ny notice, word, or communication, no matter the mode and no matter how sent, from one person to another." Black's Law Dictionary, 6th Ed. (1991).

*Venture, Inc. v. United States*, 2 F.4th 1034, 1036 (7th Cir. 2021). Unless otherwise defined, statutory text is given its "ordinary meaning" in the relevant context "at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019); *see also Perrin v. United States*, 444 U.S. 37, 42 (1979) ("words will be interpreted as taking their ordinary, contemporary, common meaning"). Additionally, "words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Courts "may also read statutory terms in light of the purpose of the statute." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953 (2009) ; *see also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole").

In *Satterfield*, the Ninth Circuit used these fundamental canons of construction to determine Congress's meaning of the word "call" in Section 227(b) of the TCPA. *Satterfield*, 569 F.3d at 953-54. Per the Court:

> Webster's defines "call" in this context as "to communicate with or try to get into communication with a person by a telephone." This definition suggests that by enacting the TCPA, Congress intended to regulate the use of an ATDS to communicate or try to get into communication with a person by a telephone. However, this law was enacted in 1991 when text messaging was not available.
>
> * * *
>
> We also consider the purposes of the TCPA… The TCPA was enacted in response to an increasing number of consumer complaints arising from the increased number of telemarketing calls. The consumers complained that such calls are a "nuisance and an invasion of privacy…" We hold

that a voice message or a text message are not distinguishable in terms of being an invasion of privacy.

*Id*. (internal citations omitted); *see also Gadelhak v. AT&T Servs.*, 950 F.3d 458, 462 (7th Cir. 2020) ("The harm posed by unwanted text messages is analogous to that type of intrusive invasion of privacy").

Here, there is no reason that the word "call" as applied under Section 227(c) would be different from that of 227(b). In fact, "[t]he normal rules of statutory construction give identical words used in different parts of the same act the same meaning." *Dawson v. Porch.com*, No. 2:20-cv-00604-RSL, 2024 U.S. Dist. LEXIS 206363, at *14 (W.D. Wash. Nov. 13, 2024) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995)). As the Supreme Court agrees that "[a] text message to a cellular telephone, it is undisputed, qualifies as a 'call'" under Section 227(b), it follows that the same should apply to 227(c)—perhaps even more as the latter is concerned with telephonic solicitations under DNC provisions. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016).

Moreover, through its affirmative acts, Congress adopted the FCC's rules and regulations recognizing that text messages fall under the purview of the TCPA. Specifically, after the FCC issued its 2003 Order, Congress amended the TCPA not once, but four times. *See* PUB. L. NO. 109-21 (July 9, 2005); PUB. L. NO. 111-331 (December 22, 2010) ; PUB. L. NO. 114-74 (November 2, 2015); PUB. L. NO. 116-105 (December 30, 2019). "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009).

In none of those instances did Congress upset the existing consensus and FCC rulings that text messages constitute calls under the Act. Accordingly, through its amendments and acquiescence, Congress adopted the FCC's interpretation of "calls" to include text messages. *See e.g.*, *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018) (citing *Lorillard v. Pons*,434 U.S. 575, 580 (1978)) (finding that Congressional decisions not to amend statutory definitions in order "to overrule the FCC's interpretation suggests Congress gave the interpretation its tacit approval").

Thus, not only does a plain reading of the statute through a contemporary lens demonstrate that calls encompass text messages, but the Supreme Court and Congress appear to agree. While Defendants may take the position that modern parlance should govern a distinction that did not exist over 30 years ago, the Supreme Court has warned that "modern intuition" does not always match "evidence of a term's meaning at the time of [a statute's] enactment." *Oliveira*, 586 U.S. at 114. Such is the case here, where "[t]he TCPA's text and legislative history reveal Congress's intent to give the Commission broad authority to enforce the protections from unwanted robocalls ***as new technologies emerge***." 2015 FCC Order at 8019 ¶ 113 (emphasis added). As this Circuit has recognized, "statutes must be permitted to apply to technologies not in existence when a statute was drafted." *Lozano*, 702 F. Supp. 2d at 1008 (citing *Squillacote v. United States*, 739 F.2d 1208, 1213 (7th Cir. 1984)). Accordingly, "while text messaging was not a capability in 1991, the plain meaning of the term 'call' at the time includes communications by phone, and does not prohibit application of the statute to text messaging." *Id*. at 1007; *see also Warciak*

*v. Subway Rests., Inc.*, 949 F.3d 354, 356 (7th Cir. 2020) ("Text messages to a cellular telephone qualify as a 'call' within the meaning of the statute").

**C.  The Vast Majority of Courts have Held that Text Messaging Applies to Section 227(c)**

Since *Satterfield*, Courts have routinely held that text messages apply to the TCPA and specifically to Section 227(c). *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 986 (9th Cir. 2023) (extending its position in *Satterfield*, finding that text messages constitute concrete injury under Section 227(c)); *Reimer v. Kohl's, Inc.*, No. 23-CV-597-JPS, 2023 U.S. Dist. LEXIS 168078, at *13 (E.D. Wis. Sept. 21, 2023) (finding that text messages apply to 227(c)); *Gulden v. Liberty Home Guard LLC*, No. CV-20-02465-PHX-JZB, 2021 U.S. Dist. LEXIS 33833, at *11 (D. Ariz. Feb. 23, 2021) ("numerous other district courts…have analyzed whether text messages violated § 64.1200(c)(2)…and concluded that 'telephone solicitations' are to be interpreted as including text messages"); *Pepper v. GVG Capital LLC*, 677 F. Supp. 3d 638, 643 (S.D. Tex. June 9, 2023) ("[Defendant] also argues that text messages are not actionable under the TCPA provisions at issue…This argument fails in the face of the statutory text, which refers to 'telephone call[s] or message[s],' 47 U.S.C. § 227(c), the applicable regulations, and the decisions of the various courts to consider the issue"); *Hudson*, 2024 U.S. Dist. LEXIS 165676 at *15-16 (finding that "the weight of the case law supports the conclusion that the receipt of text messages can establish an injury under § 227(c)(5)…[and] the statutory text and FCC regulations and guidance support the conclusion that text messages can establish the basis for a claim under §

227(c)(5)"); *Abboud v. Circle K Stores Inc.*, No. CV-23-01683-PHX-DWL, 2025 U.S. Dist. LEXIS 13605 at *12 (D. Ariz. 2025) ("A telephone solicitation can be a call or text message"); *Mantha v. Quotewizard.Com, LLC*, 347 F.R.D. 376, 387 (D. Mass. 2024) ("the texts from [defendant] amounted to 'telephone solicitations' within the meaning of the TCPA."); *Misner v. Empire Auto Protect, LLC,* No. 2:24-cv-1282, 2024 U.S. Dist. LEXIS 202146, at *7, 12 (S.D. Ohio Nov. 6, 2024) (receipt of unsolicited text messages supports a private right of action under Section 227(c)); *Stamper v. Manus-Northwestern Oral Health Ctr., Ltd.*, No. 23 C 05660, 2025 U.S. Dist. LEXIS 138094, at *3 n.1 (N.D. Ill. July 17, 2025) (citing *Hudson v. Ralph Lauren Corp.*, 385 F. Supp. 3d 639, 646 (N.D. Ill. May 1, 2019) (noting that the TCPA applies to both "voice calls and text calls to wireless numbers")); *Wilson v. Skopos Fin., LLC*, No. 6:25-cv-00376-MC, 2025 U.S. Dist. LEXIS 138638, at *13 (D. Or. July 21, 2025) ("It cannot be argued in good faith that text messages are so categorically different from phone calls that the former cannot be considered an invasion of consumer privacy when directed at numbers on the DNC Registry"); *Connor v. Servicequick Inc.*, No. 1:24-cv-02286-CNS-NRN, 2025 U.S. Dist. LEXIS 199578, at *3 (D. Colo. Oct. 8, 2025) (including text messages within 227(c)(5)); *Busbee v. Servicetoday!*, No. 4:24-cv-00364-P, 2024 U.S. Dist. LEXIS 181623, at *7 (N.D. Tex. Oct. 4, 2024) ("Text messages are included within the meaning of 'telephone calls' under the TCPA"); *Wilson v. MEDVIDI Inc.*, No. 5:25-cv-03996-BLF, 2025 U.S. Dist. LEXIS 198827 at *6 (N.D. Cal. Oct. 7, 2025) ("Congress was more concerned with the purpose of the telephone communications it proscribed in the TCPA than the form in which those

communications are transmitted"); *Bradshaw v. CHW Grp., Inc.*, 763 F. Supp. 3d 641, 649 n. 5 (2025) (Under 227(c)(5), "[t]ext messages are considered 'calls'"); *Barton v. Temescal Wellness, LLC*, 525 F. Supp. 3d 195, 198-99 (D. Mass. 2021) ("The overwhelming weight of precedent holds that text messages are calls for purposes of the TCPA").

Plaintiffs are only aware of one other case which held otherwise. *See Davis v. CVS Pharm., Inc.*, No. 4:24-cv-477-AW-MAF, 2025 U.S. Dist. LEXIS 167366 (N.D. Fla. Aug. 26, 2025). In *Davis*, the Court began with the plain language of 227(c)(5), noting that "Courts must interpret every statute 'in accord with the ordinary public meaning of its terms and the time of its enactment.'" *Id.* at *2. The Court, however, without any historical analysis of the word "call," stated that the "statutory text here *is* clear, and a text message is not a 'telephone call.'" *Id.* at *3. The Court quoted defendant's analysis:

> No normal person refers to a text message, or thinks of a text message, as a "call." No ordinary user of the English language would write the sentence "John called Sue" intending to mean "John sent a text message to Sue," nor would any ordinary reader interpret the sentence in that manner.

*Id.* Per this court, "[t]his conclusion—supported by the ordinary public meaning at the time of the provision's enactment—is enough to end this case." *Id.* However, the Court cited nothing to show that that had been the meaning at the time of the TCPA's enactment. In fact, the very example the Court uses speaks to a modern usage of the phrase, not a historical one. As demonstrated above, the general consensus is the opposite: a "call" constituted a *communication* by telephone. This falls in line with its

dictionary definition at the time and why the FCC, in 2003, referred to text messages as "text calls." Simply put, the Court—and the defendant—subverted historical context with modern parlance. *See e.g.*, *MEDVIDI*, 2025 U.S. Dist. LEXIS 198827 at *8 (Finding the inclusion of text messages as the "common-sense interpretation [which] is confirmed by the purpose and structure of the TCPA." Conversely, excluding text messages from 227(c) can only be found through "tortured reasoning" which has "no basis to depart from the plain meaning of the statutory text as it has been understood by consumers, the FCC, and courts since the TCPA's passage").

Next, the Court discounts Justice Ginsburg's statement in *Campbell-Ewald*, that "[a] text message to a cellular telephone, it is undisputed, qualifies as a 'call…'" *Id*. at *3-4 (citing *Cambell-Ewald*, 577 U.S. at 156). Instead, the Court fixated on *Duguid*, which stated in a footnote that because neither party disputed the issue, the Court "assume[s] that [text messages apply] without considering or resolving that issue." *Id*. (citing *Duguid*, 592 U.S. at 400 n.2). As astutely noted by a Massachusetts District Court, however:

> "[N]othing in Justice Ginsburg's analysis implies any hesitation or reservation over Campbell and Ewald's stipulation that text messages are calls for the purposes of the TCPA. Because the entire case was premised on text messaging, it is unlikely that the Court would stay silent about any serious concerns that robotexts were an invalid ground for TCPA recovery in a case construing the same statute. Furthermore, in the most recent term Justice Kavanaugh's plurality opinion in *Barr* cited the FCC's regulations applying the TCPA to text messages as the current applicable legal standard…The First, Second, Seventh, Ninth, and Eleventh Circuits have either adopted Judge Ginsburg's remark as black letter law rather than *dicta* or had already held that the TCPA included text messages before *Campbell-Ewald*.

*Barton*, 525 F. Supp. 3d at 199 (citations omitted).

Additionally, the *Davis* Court notes a distinction between the phrase "any call" as applied under Section 227(b) and "telephone call" under 227(c)(5)—implying, without any explanation, that the preceding terms modifies the definition of "call" in such a way that text messaging could apply to "any call" and not "telephone call." *Id*. There is no reason to make this distinction, and the Court cited none. Rather, the meaning of "call" is clear from neighboring provisions. Notably, there is only one other reference to "calls" in Section 227(c), and it has the same breadth as "telephone solicitations." In 227(c)(1)(D), Congress directed the FCC to assess whether it needed additional statutory authority "to further restrict telephone solicitations, including those *calls* exempted under subsection (a)(3)…" (emphasis added).[3] As this reference to "calls" encompasses the definition of "telephone solicitation," the difference between "any call" and "telephone call" is inapposite.[4] Similarly, Section 227(b)(1)(A), an autodialer provision, uses the word "call" several times to describe a prohibited transmission to both a "cellular telephone" and "a paging service." A typical paging

---

[3] In the original TCPA, subsection (a)(3) contained the statutory definition of "telephone solicitation." *See* Telephone Consumer Protection Act of 1991, Pub. L. 102-243, 105 Stat. 2394, § 3(a).

[4] To interpret a statutory term, courts "look to the meaning of the word at the time the statute was enacted, often by referring to dictionaries." *Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016); *see e.g.*, Webster's College Dictionary (1991) ("to communicate or try to communicate with by telephone"); The New Merriam-Webster Dictionary (1989) ("to get or try to get in communication with by telephone"); Oxford English Dictionary, 2d Ed. (1989) ("a summons or communication by telephone").

device in the early 1990s would have displayed an incoming message as written text, usually a phone number to call.[5]

Next, the Court substitutes its own judgment in lieu of Congressional intent to protect consumers against "telephone solicitations," stating that "Congress's use of the phrase 'telephone call or message' in a neighboring provision only undermines" plaintiffs position. *Id*. at *5-6. However, this again limits the historical context of the word "call" and ignores the intent of Section 227(c) to protect against "telephone solicitations." The Court disagrees with the latter, not believing "that limiting the private right of action to address a subset of prohibited conduct would contradict the statute's purpose…and more importantly—the court's role is not to look beyond clear language to ascertain Congress's purpose. *Id*. at *7-8. But again, the court has presupposed "clear language" by taking a modern interpretation of the word "call." Words and meanings change over time. This is especially true here where the word had been tied to emerging and evolving technology. As such, Congressional intent is analyzed in statutory construction to assess the proper definition of the word *at that time*. It is telling that the Court unilaterally concludes that the language is clear despite most every other court holding the contrary. Furthermore, Congress could not

---

[5] *See*, *e.g.*, Paging Network, Inc., Annual Report, at 8 (1993), available at https://digital.library.mcgill.ca/images/hrcorpreports/pdfs/6/639549.pdf (noting that 92 percent of the company's pagers could "transmit a numeric message such as a telephone or account number to the subscriber")

have limited this private right of action to exclude text messages precisely because text messages did not exist at the time.

Finally, the *Davis* Court ignores the FCC's 2023 Order, citing only the 2003 Order. The Court does not provide an analysis of the 2003 Order but merely notes that plaintiff misquoted *McLaughlin Chiropractic*. Ironically, it too erred and did not apply the "appropriate respect" *Mclaughlin Chiropractic* calls for (i.e., the arbitrary-and-capricious analysis under the APA). Accordingly, the *Davis* decision is not sound and should not be seriously considered over nearly every other Court that has taken up this issue.

Ultimately, "the overwhelming weight of precedent holds that text messages are calls" precisely because—as discussed herein—the opposite conclusion makes no sense. *Barton v. Temescal Wellness, LLC*, 525 F. Supp. 3d 195, 198-99 (D. Mass. 2021) . Congress, the FCC, the Supreme Court, and nearly every District Court have come to this reasonable and appropriate conclusion.

## D.     The Inclusion of Text Messages Supports Public Policy

The public policy implications of failing to interpret text messaging into Section 227(c) would be disastrous. As Plaintiffs previously stated in their Opposition to Defendant's Motion to Dismiss:

> Text messages are functionally equivalent to phone calls in their immediacy and personal intrusion—often more so, given the near-universal use of mobile devices and the disruption caused by unsolicited alerts. Eliminating liability under § 227(c) for unwanted texts would effectively gut a key deterrent against these intrusions, incentivizing businesses to flood consumers' phones with messages without their consent. Consumers would lose meaningful recourse, while companies would gain a low-cost, high-impact channel to bypass privacy

boundaries. In a digital age where communication is increasingly mobile, stripping the protections of § 227(c) from text messages would greatly undermine public policy.

ER 121. While text messaging did not exist in 1991, its modern role mirrors—and often exceeds—the intrusiveness of traditional voice calls. Unlike phone calls, text messages frequently appear on a device's home screen, often bypassing settings designed to filter unknown numbers. Additionally, consumers typically read texts immediately, as they are viewed as trusted sources of communication.

Congress wrote Section 227(c) to protect people's privacy rights with an emphasis on emerging communicative technologies. It tasked the FCC to build the most "effective and efficient" rules to effectuate this intent to protect this public interest. The FCC and Courts have spoken: text messaging—in line with Congressional intent to protect public privacy—constitutes a "call" under Section 227(c)(5) of the TCPA.

## III. The District Court Made Legal and Analytical Errors in its Ruling

As outlined above, text messages fall squarely within the scope of Section 227(c) of the TCPA. Nevertheless, the District Court reached the opposite conclusion. A careful analysis of the Court's reasoning is necessary to identify the errors in its interpretation and explain why its conclusion cannot stand.

The Court began its analysis by stating Congress's directive, through Section 227(c), "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." ER 132 (citing 47 U.S.C. § 227(c)(1)). After noting the FCC's implementing regulations under 47 C.F.R. § 64.1200(c) & (d),

the Court placed emphasis on the fact that Section 227(c)'s private right of action uses the term "telephone call." *Id*. (citing 47 U.S.C. § 227(c)(5)). The Court then stated that "only 'call', 'telephone call', and 'artificial or prerecorded-voice telephone call' appear in Section 227(c) and its implementing regulations." ER 133. The District Court is mistaken. Section 227(c) uses the defined term "telephone solicitation" eleven (11) times. *See* 47 U.S.C. §§ 227(c)(1)(C)-(D); (c)(3)(B), (F), (G), (L); (c)(4)(B)(i); (c)(5). Outside of the definitions section and 227(c), the term "telephone solicitation" is used in only one other portion of the TCPA, Section 227(f) which governs state law preemption and use of the National Do-Not-Call list, pursuant to 227(c)(3), in state-run databases. Furthermore, 227(c)'s implementing regulations refer to "telephone solicitations" seven (7) times, including in the first sentence of Section 64.1200(c). *See* 47 C.F.R. §§ 64.1200(c), (c)(2)(D)-(E); 64.1200(e).

Most glaring, however, is the District Court's omission of 47 C.F.R. § 64.1200(e) which codified text messages into the implementing regulations for the DNC protections of Section 227(c). The District Court seemed to imply that Plaintiffs had to primarily rely on the FCC's 2003 Order to "make clear that 'calls' encompass text messages." ER 133-134. However, Plaintiffs did not hyper-fixate upon the 2003 Order, but found the FCC's ***2023*** Report and Order, which amended 47 C.F.R. § 64.1200(e), to be most notable. ER 115. Rather, Plaintiffs repeatedly referenced the 2003 Order because of *Defendant's sole focus* on the 2003 Order and its mischaracterization of it. ER 116-117. And although the District Court mentions

Plaintiffs' arguments under existing case law and public policy, it did not address either in the entirety of its ruling.

In their opposition, Plaintiffs argued that the Court must defer to the FCC's Final Declaratory Rulings under the Administrative Orders Review Act (commonly referred to as the Hobbs Act), 28 U.S.C. § 2342. ER 114. However, after the parties briefed the issue, the Supreme Court issued *McLaughlin Chiropractic*, which, as the Court noted, "does not preclude district courts in enforcement proceedings from independently assessing whether an agency's interpretation of the relevant statute is correct." ER 134 (quoting *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025)). While the Court noted that "District courts are not bound by the agency's interpretation" and should "afford[] appropriate respect to the agency's interpretation," it mistakenly adopted "appropriate respect" as the governing standard of review for the FCC's Orders. ER 137. As noted in prior sections, the Supreme Court clarified the applicable framework in *Seven Cnty. Infrastructure Coal.*:

> As a general matter, when an agency interprets a statute, judicial review of the agency's interpretation is *de novo*. But when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard. Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained.

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1511 (2025) (internal citation omitted) . Here, because Congress expressly granted the FCC authority to implement regulations under Section 227(c) of the TCPA, the appropriate standard

is not mere "respect," but rather whether the FCC's Orders were "reasonable and reasonably explained." *Id*. In other words, the "appropriate respect" to give to the FCC should have been the Administrative Procedure Act's arbitrary-and-capricious standard. Indeed, "Congress vested the FCC with considerable authority to implement the [TCPA]." *Charvat v. Echostar Satellite, LLC*, 630 F.3d 459, 466 (6th Cir. 2010); *see also Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1123 (11th Cir. 2014) ("Congress has conferred upon the FCC general authority to make rules and regulations necessary to carry out the provisions of the TCPA"). Accordingly, the scope of review here is narrow and deferential: courts "must exercise appropriate deference to the FCC's decisionmaking and not substitute our own judgment for that of the Commission." *Zimmer Radio of Mid-Missouri, Inc. v. FCC*, 145 F.4th 828, 848 (8th Cir. 2025) (citing *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025)).

While the Court acknowledged that "the FCC has a level of expertise as to the various forms of communication" and should be "afford[ed] a certain amount of respect," it focused on the use of the term "telephone call" in Section 227(c)(5). ER 137. The Court then asserted that "the FCC's interpretation of call to include text messages is a complicated one, and potentially does not even apply to Section 227(c)(5)." *Id*. However, as explained in Section II.A., *supra*, the FCC's 2023 Order— which the District Court did not include in its analysis—explicitly confirms that the inclusion of text messages into 47 C.F.R. § 64.1200(e) was designed to "deter illegal texts and make DNC enforcement easier." *Commission's Second Report and Order*

*and Waiver Order*, 89 Fed. Reg. 5098, 5099 ¶ 6 (2023).[6] Despite overlooking this critical development, the Court nevertheless described Plaintiffs' position as *"an eminently reasonable one*, particularly given the TCPA's purpose and the prevalence of text messaging in the U.S. today. ER 137 (emphasis added). This conclusion— despite the Court's application of an incorrect standard—effectively supports the reasonableness of the FCC's interpretation and, under the appropriate arbitrary-and-capricious review standard, warrants deference to the FCC's Orders.[7]

Because the Court did not address the FCC's 2023 Order, it instead relied on a modern interpretation of the word "telephone call." ER 134-135. The Court correctly stated that it must analyze "what [the word] meant when the statute was enacted," but then immediately concluded that, because text messaging did not exist at the time, "under a plain reading, Section 227(c)(5) of the TCPA does not regulate text messages." ER 135. However, despite asserting the relevance of the statute's original meaning, the Court failed to engage in any actual historical analysis of the term "call"—instead, defaulting to "today's American parlance." *Id.*

That omission is critical. Courts interpreting the TCPA have repeatedly recognized that the word "call" had been defined as "to communicate with or to try to get into communication with a person by a telephone." *Satterfield v. Simon &*

---

[6] DNC or "do-not-call" enforcement is regulated by 47 C.F.R. §§ 64.1200(c)-(e) and promulgated *only* through 47 U.S.C. § 227(c).
[7] The 2023 Order is also reasonably explained. *See In re FCC Closes 'Lead Generator' Robocall Loophole & Adopts Robotext Rules*, 38 FCC Rcd 12247, 12248 ¶¶ 1-2.

*Schuster, Inc.*, 596 F.3d 946, 953-54 (9th Cir. 2009) ; *Lozano v. Twentieth Century Fox Films Corp.*, 702 F. Supp. 2d 999, 1007 (N.D. Ill. 2010) ; *Forrest v. Genpact Servs., LLC*, 962 F. Supp. 2d 734, 737 n.3 (M.D. Pa. 2013); *Saunders v. Dyck O'Neal, Inc.*, 319 F. Supp. 3d 907, 910 (W.D. Mich. 2018); *Ashland Hosp. Corp. v. SEIU*, 708 F.3d 737, 742 (6th Cir. 2013). This definition plainly encompasses text messaging, which is merely a different modality of telephonic communication.

In addition to overlooking this historical context, the Court failed to apply other fundamental canons of statutory construction. Specifically, it neglected the principles requiring courts to look at the overall statutory scheme and congressional intent. *Satterfield*, 569 F.3d at 953 (citations omitted) . Rather than considering the TCPA's broad remedial purpose—to protect consumer privacy from unwanted telephonic intrusions—the Court focused narrowly on the fact that Section 227(c) uses the phrase "telephone solicitation" and that the definition of that term in Section 227(a)(4) does not expressly include "text messages." ER 135. From this, the Court reasoned that "telephone call or message" in 1991 could not plausibly be read to include "text message," implying the non-existence of text messaging at the time.[8] But this reasoning inverts the logical meaning of the word. Congress did not define

---

[8] The District Court seemingly suggested that because text messages did not exist at the time, they could not apply to the TCPA. However, statutes are not "confined to the particular applications contemplated by the legislators." *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980); *see e.g., Hively v. Ivy Tech Cmty. Coll.*, 853 F.3d 339, 344-45 (7th Cir. 2017) (*en banc*). "While every statute's *meaning* is fixed at the time of enactment, *new applications* may arise in light of changes in the world." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018).

"telephone solicitation" as "telephone call or *voicemail* message"—a formulation that might have supported the Court's narrower view. Rather, it used the more general term "message," which—especially in the context of telephonic communications—encompasses a broad range of transmitted content. *See*, *supra*, n.3.

Ultimately, the Court committed several fundamental errors in its statutory analysis and failed to meaningfully engage with key aspects of Plaintiffs' briefing in opposition, including all supporting case law, differing interpretations of statutory construction, the FCC's 2023 Order, and an appeal to public policy (i.e., the purpose of the statute). Even without using the correct standard of deference to the FCC's Orders, a plain reading of the statute should have found that text messages apply under Section 227(c).

**CONCLUSION**

For the foregoing reasons, this Court should find the meaning of the word "call" in Section 227(c)(5) to include text messages such that the judgment of the District Court to grant Defendant's Motion to Dismiss should be reversed.

Date:  October 21, 2025

/s/  Ryan L. McBride
Ryan L. McBride
*Attorneys Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1) , I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and 7th Cir. R. 32(c) because the Introduction, Jurisdictional Statement, Issues Presented, Statement of the Case, Summary of the Argument, Argument and Conclusion sections (including their headers) of the brief contains 8,446 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 7th Cir. R. 32(b); and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 12-point font.

This brief complies with the appendix content requirements of 7th Cir. R. 30(d), I certify that the short appendix bound to this brief contains all materials required under 7th Cir. R. 30(a).

Date: October 21, 2025

/s/ Ryan L. McBride
Ryan L. McBride
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 21, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: October 21, 2025

/s/ Ryan L. McBride
Ryan L. McBride
*Attorneys for Plaintiffs*

**47 U.S.C.**
United States Code, 2018 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part I - Common Carrier Regulation
Sec. 227 - Restrictions on use of telephone equipment
From the U.S. Government Publishing Office, www.gpo.gov

**§227. Restrictions on use of telephone equipment**

**(a) Definitions**

As used in this section—

(1) The term "automatic telephone dialing system" means equipment which has the capacity—

(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

(B) to dial such numbers.

(2) The term "established business relationship", for purposes only of subsection (b)(1)(C)(i), shall have the meaning given the term in section 64.1200 of title 47, Code of Federal Regulations, as in effect on January 1, 2003, except that—

(A) such term shall include a relationship between a person or entity and a business subscriber subject to the same terms applicable under such section to a relationship between a person or entity and a residential subscriber; and

(B) an established business relationship shall be subject to any time limitation established pursuant to paragraph (2)(G)).[1]

(3) The term "telephone facsimile machine" means equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

(4) The term "telephone solicitation" means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization.

(5) The term "unsolicited advertisement" means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise.

**(b) Restrictions on use of automated telephone equipment**

**(1) Prohibitions**

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

(i) to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

(ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B);

(C) to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless—

(i) the unsolicited advertisement is from a sender with an established business relationship with the recipient;

(ii) the sender obtained the number of the telephone facsimile machine through—

(I) the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

(II) a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution,

except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before July 9, 2005; and

(iii) the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D),

except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E); or

(D) to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

**(2) Regulations; exemptions and other provisions**

The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission—

(A) shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent;

(B) may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe—

(i) calls that are not made for a commercial purpose; and

(ii) such classes or categories of calls made for commercial purposes as the Commission determines—

(I) will not adversely affect the privacy rights that this section is intended to protect; and

(II) do not include the transmission of any unsolicited advertisement;

(C) may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect;

(D) shall provide that a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph only if—

(i) the notice is clear and conspicuous and on the first page of the unsolicited advertisement;

(ii) the notice states that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the Commission, with such a request meeting the requirements under subparagraph (E) is unlawful;

(iii) the notice sets forth the requirements for a request under subparagraph (E);

(iv) the notice includes—

(I) a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender; and

(II) a cost-free mechanism for a recipient to transmit a request pursuant to such notice to the sender of the unsolicited advertisement; the Commission shall by rule require the sender to provide such a mechanism and may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, exempt certain classes of small business senders, but only if the Commission determines that the costs to such class are unduly burdensome given the revenues generated by such small businesses;

(v) the telephone and facsimile machine numbers and the cost-free mechanism set forth pursuant to clause (iv) permit an individual or business to make such a request at any time on any day of the week; and

(vi) the notice complies with the requirements of subsection (d);

(E) shall provide, by rule, that a request not to send future unsolicited advertisements to a telephone facsimile machine complies with the requirements under this subparagraph only if—

(i) the request identifies the telephone number or numbers of the telephone facsimile machine or machines to which the request relates;

(ii) the request is made to the telephone or facsimile number of the sender of such an unsolicited advertisement provided pursuant to subparagraph (D)(iv) or by any other method of communication as determined by the Commission; and

(iii) the person making the request has not, subsequent to such request, provided express invitation or permission to the sender, in writing or otherwise, to send such advertisements to such person at such telephone facsimile machine;

(F) may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, allow professional or trade associations that are tax-exempt nonprofit organizations to send unsolicited advertisements to their members in furtherance of the association's tax-exempt purpose that do not

contain the notice required by paragraph (1)(C)(iii), except that the Commission may take action under this subparagraph only—

(i) by regulation issued after public notice and opportunity for public comment; and

(ii) if the Commission determines that such notice required by paragraph (1)(C)(iii) is not necessary to protect the ability of the members of such associations to stop such associations from sending any future unsolicited advertisements;

(G)(i) may, consistent with clause (ii), limit the duration of the existence of an established business relationship, however, before establishing any such limits, the Commission shall—

(I) determine whether the existence of the exception under paragraph (1)(C) relating to an established business relationship has resulted in a significant number of complaints to the Commission regarding the sending of unsolicited advertisements to telephone facsimile machines;

(II) determine whether a significant number of any such complaints involve unsolicited advertisements that were sent on the basis of an established business relationship that was longer in duration than the Commission believes is consistent with the reasonable expectations of consumers;

(III) evaluate the costs to senders of demonstrating the existence of an established business relationship within a specified period of time and the

benefits to recipients of establishing a limitation on such established business relationship; and

    (IV) determine whether with respect to small businesses, the costs would not be unduly burdensome; and

(ii) may not commence a proceeding to determine whether to limit the duration of the existence of an established business relationship before the expiration of the 3-month period that begins on July 9, 2005; and

(H) may restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States.

### (3) Private right of action

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion,

increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

**(c) Protection of subscriber privacy rights**

**(1) Rulemaking proceeding required**

Within 120 days after December 20, 1991, the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. The proceeding shall—

(A) compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, special directory markings, industry-based or company-specific "do not call" systems, and any other alternatives, individually or in combination) for their effectiveness in protecting such privacy rights, and in terms of their cost and other advantages and disadvantages;

(B) evaluate the categories of public and private entities that would have the capacity to establish and administer such methods and procedures;

(C) consider whether different methods and procedures may apply for local telephone solicitations, such as local telephone solicitations of small businesses or holders of second class mail permits;

(D) consider whether there is a need for additional Commission authority to further restrict telephone solicitations, including those calls exempted under

subsection (a)(3) of this section, and, if such a finding is made and supported by the record, propose specific restrictions to the Congress; and

(E) develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section.

## (2) Regulations

Not later than 9 months after December 20, 1991, the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers.

## (3) Use of database permitted

The regulations required by paragraph (2) may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase. If the Commission determines to require such a database, such regulations shall—

(A) specify a method by which the Commission will select an entity to administer such database;

(B) require each common carrier providing telephone exchange service, in accordance with regulations prescribed by the Commission, to inform

subscribers for telephone exchange service of the opportunity to provide notification, in accordance with regulations established under this paragraph, that such subscriber objects to receiving telephone solicitations;

(C) specify the methods by which each telephone subscriber shall be informed, by the common carrier that provides local exchange service to that subscriber, of (i) the subscriber's right to give or revoke a notification of an objection under subparagraph (A), and (ii) the methods by which such right may be exercised by the subscriber;

(D) specify the methods by which such objections shall be collected and added to the database;

(E) prohibit any residential subscriber from being charged for giving or revoking such notification or for being included in a database compiled under this section;

(F) prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in such database;

(G) specify (i) the methods by which any person desiring to make or transmit telephone solicitations will obtain access to the database, by area code or local exchange prefix, as required to avoid calling the telephone numbers of subscribers included in such database; and (ii) the costs to be recovered from such persons;

(H) specify the methods for recovering, from persons accessing such database, the costs involved in identifying, collecting, updating, disseminating, and

selling, and other activities relating to, the operations of the database that are incurred by the entities carrying out those activities;

(I) specify the frequency with which such database will be updated and specify the method by which such updating will take effect for purposes of compliance with the regulations prescribed under this subsection;

(J) be designed to enable States to use the database mechanism selected by the Commission for purposes of administering or enforcing State law;

(K) prohibit the use of such database for any purpose other than compliance with the requirements of this section and any such State law and specify methods for protection of the privacy rights of persons whose numbers are included in such database; and

(L) require each common carrier providing services to any person for the purpose of making telephone solicitations to notify such person of the requirements of this section and the regulations thereunder.

### (4) Considerations required for use of database method

If the Commission determines to require the database mechanism described in paragraph (3), the Commission shall—

(A) in developing procedures for gaining access to the database, consider the different needs of telemarketers conducting business on a national, regional, State, or local level;

(B) develop a fee schedule or price structure for recouping the cost of such database that recognizes such differences and—

(i) reflect the relative costs of providing a national, regional, State, or local list of phone numbers of subscribers who object to receiving telephone solicitations;

(ii) reflect the relative costs of providing such lists on paper or electronic media; and

(iii) not place an unreasonable financial burden on small businesses; and

(C) consider (i) whether the needs of telemarketers operating on a local basis could be met through special markings of area white pages directories, and (ii) if such directories are needed as an adjunct to database lists prepared by area code and local exchange prefix.

**(5) Private right of action**

A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State—

(A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable

practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection. If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

**(6) Relation to subsection (b)**

The provisions of this subsection shall not be construed to permit a communication prohibited by subsection (b).

**(d) Technical and procedural standards**

**(1) Prohibition**

It shall be unlawful for any person within the United States—

(A) to initiate any communication using a telephone facsimile machine, or to make any telephone call using any automatic telephone dialing system, that does not comply with the technical and procedural standards prescribed under this subsection, or to use any telephone facsimile machine or automatic telephone dialing system in a manner that does not comply with such standards; or

(B) to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the

business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual.

**(2) Telephone facsimile machines**

The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which is manufactured after one year after December 20, 1991, clearly marks, in a margin at the top or bottom of each transmitted page or on the first page of each transmission, the date and time sent, an identification of the business, other entity, or individual sending the message, and the telephone number of the sending machine or of such business, other entity, or individual.

**(3) Artificial or prerecorded voice systems**

The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone. Such standards shall require that—

(A) all artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business, other entity, or individual; and

(B) any such system will automatically release the called party's line within 5 seconds of the time notification is transmitted to the system that the called

party has hung up, to allow the called party's line to be used to make or receive other calls.

**(e) Prohibition on provision of inaccurate caller identification information**

**(1) In general**

It shall be unlawful for any person within the United States, in connection with any telecommunications service or IP-enabled voice service, to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value, unless such transmission is exempted pursuant to paragraph (3)(B).

**(2) Protection for blocking caller identification information**

Nothing in this subsection may be construed to prevent or restrict any person from blocking the capability of any caller identification service to transmit caller identification information.

**(3) Regulations**

**(A) In general**

Not later than 6 months after December 22, 2010, the Commission shall prescribe regulations to implement this subsection.

**(B) Content of regulations**

**(i) In general**

The regulations required under subparagraph (A) shall include such exemptions from the prohibition under paragraph (1) as the Commission determines is appropriate.

**(ii) Specific exemption for law enforcement agencies or court orders**

The regulations required under subparagraph (A) shall exempt from the prohibition under paragraph (1) transmissions in connection with—

(I) any authorized activity of a law enforcement agency; or

(II) a court order that specifically authorizes the use of caller identification manipulation.

**(4) Repealed. Pub. L. 115–141, div. P, title IV, §402(i)(3), Mar. 23, 2018, 132 Stat. 1089**

**(5) Penalties**

**(A) Civil forfeiture**

**(i) In general**

Any person that is determined by the Commission, in accordance with paragraphs (3) and (4) of section 503(b) of this title, to have violated this subsection shall be liable to the United States for a forfeiture penalty. A forfeiture penalty under this paragraph shall be in addition to any other penalty provided for by this chapter. The amount of the forfeiture penalty determined under this paragraph shall not exceed $10,000 for each violation, or 3 times that amount for each day of a continuing violation, except that the

amount assessed for any continuing violation shall not exceed a total of $1,000,000 for any single act or failure to act.

### (ii) Recovery

Any forfeiture penalty determined under clause (i) shall be recoverable pursuant to section 504(a) of this title.

### (iii) Procedure

No forfeiture liability shall be determined under clause (i) against any person unless such person receives the notice required by section 503(b)(3) of this title or section 503(b)(4) of this title.

### (iv) 2-year statute of limitations

No forfeiture penalty shall be determined or imposed against any person under clause (i) if the violation charged occurred more than 2 years prior to the date of issuance of the required notice or notice or apparent liability.

### (B) Criminal fine

Any person who willfully and knowingly violates this subsection shall upon conviction thereof be fined not more than $10,000 for each violation, or 3 times that amount for each day of a continuing violation, in lieu of the fine provided by section 501 of this title for such a violation. This subparagraph does not supersede the provisions of section 501 of this title relating to imprisonment or the imposition of a penalty of both fine and imprisonment.

### (6) Enforcement by States

### (A) In general

The chief legal officer of a State, or any other State officer authorized by law to bring actions on behalf of the residents of a State, may bring a civil action, as parens patriae, on behalf of the residents of that State in an appropriate district court of the United States to enforce this subsection or to impose the civil penalties for violation of this subsection, whenever the chief legal officer or other State officer has reason to believe that the interests of the residents of the State have been or are being threatened or adversely affected by a violation of this subsection or a regulation under this subsection.

**(B) Notice**

The chief legal officer or other State officer shall serve written notice on the Commission of any civil action under subparagraph (A) prior to initiating such civil action. The notice shall include a copy of the complaint to be filed to initiate such civil action, except that if it is not feasible for the State to provide such prior notice, the State shall provide such notice immediately upon instituting such civil action.

**(C) Authority to intervene**

Upon receiving the notice required by subparagraph (B), the Commission shall have the right—

> (i) to intervene in the action;

> (ii) upon so intervening, to be heard on all matters arising therein; and

> (iii) to file petitions for appeal.

**(D) Construction**

For purposes of bringing any civil action under subparagraph (A), nothing in this paragraph shall prevent the chief legal officer or other State officer from exercising the powers conferred on that officer by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

**(E) Venue; service or process**

**(i) Venue**

An action brought under subparagraph (A) shall be brought in a district court of the United States that meets applicable requirements relating to venue under section 1391 of title 28.

**(ii) Service of process**

In an action brought under subparagraph (A)—

(I) process may be served without regard to the territorial limits of the district or of the State in which the action is instituted; and

(II) a person who participated in an alleged violation that is being litigated in the civil action may be joined in the civil action without regard to the residence of the person.

**(7) Effect on other laws**

This subsection does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

**(8) Definitions**

For purposes of this subsection:

**(A) Caller identification information**

The term "caller identification information" means information provided by a caller identification service regarding the telephone number of, or other information regarding the origination of, a call made using a telecommunications service or IP-enabled voice service.

**(B) Caller identification service**

The term "caller identification service" means any service or device designed to provide the user of the service or device with the telephone number of, or other information regarding the origination of, a call made using a telecommunications service or IP-enabled voice service. Such term includes automatic number identification services.

**(C) IP-enabled voice service**

The term "IP-enabled voice service" has the meaning given that term by section 9.3 of the Commission's regulations (47 C.F.R. 9.3), as those regulations may be amended by the Commission from time to time.

**(9) Limitation**

Notwithstanding any other provision of this section, subsection (f) shall not apply to this subsection or to the regulations under this subsection.

**(f) Effect on State law**

**(1) State law not preempted**

Except for the standards prescribed under subsection (d) and subject to paragraph (2) of this subsection, nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits—

(A) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

(B) the use of automatic telephone dialing systems;

(C) the use of artificial or prerecorded voice messages; or

(D) the making of telephone solicitations.

**(2) State use of databases**

If, pursuant to subsection (c)(3), the Commission requires the establishment of a single national database of telephone numbers of subscribers who object to receiving telephone solicitations, a State or local authority may not, in its regulation of telephone solicitations, require the use of any database, list, or listing system that does not include the part of such single national database that relates to such State.

**(g) Actions by States**

**(1) Authority of States**

Whenever the attorney general of a State, or an official or agency designated by a State, has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls or other transmissions to residents of that State in violation of this section or the regulations prescribed under this section,

the State may bring a civil action on behalf of its residents to enjoin such calls, an action to recover for actual monetary loss or receive $500 in damages for each violation, or both such actions. If the court finds the defendant willfully or knowingly violated such regulations, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under the preceding sentence.

**(2) Exclusive jurisdiction of Federal courts**

The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia shall have exclusive jurisdiction over all civil actions brought under this subsection. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this section or regulations prescribed under this section, including the requirement that the defendant take such action as is necessary to remove the danger of such violation. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

**(3) Rights of Commission**

The State shall serve prior written notice of any such civil action upon the Commission and provide the Commission with a copy of its complaint, except in any case where such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action. The Commission

shall have the right (A) to intervene in the action, (B) upon so intervening, to be heard on all matters arising therein, and (C) to file petitions for appeal.

**(4) Venue; service of process**

Any civil action brought under this subsection in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the violation occurred or is occurring, and process in such cases may be served in any district in which the defendant is an inhabitant or where the defendant may be found.

**(5) Investigatory powers**

For purposes of bringing any civil action under this subsection, nothing in this section shall prevent the attorney general of a State, or an official or agency designated by a State, from exercising the powers conferred on the attorney general or such official by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

**(6) Effect on State court proceedings**

Nothing contained in this subsection shall be construed to prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute of such State.

**(7) Limitation**

Whenever the Commission has instituted a civil action for violation of regulations prescribed under this section, no State may, during the pendency of

such action instituted by the Commission, subsequently institute a civil action against any defendant named in the Commission's complaint for any violation as alleged in the Commission's complaint.

**(8) "Attorney general" defined**

As used in this subsection, the term "attorney general" means the chief legal officer of a State.

**(h) Junk fax enforcement report**

The Commission shall submit an annual report to Congress regarding the enforcement during the past year of the provisions of this section relating to sending of unsolicited advertisements to telephone facsimile machines, which report shall include—

(1) the number of complaints received by the Commission during such year alleging that a consumer received an unsolicited advertisement via telephone facsimile machine in violation of the Commission's rules;

(2) the number of citations issued by the Commission pursuant to section 503 of this title during the year to enforce any law, regulation, or policy relating to sending of unsolicited advertisements to telephone facsimile machines;

(3) the number of notices of apparent liability issued by the Commission pursuant to section 503 of this title during the year to enforce any law, regulation, or policy relating to sending of unsolicited advertisements to telephone facsimile machines;

(4) for each notice referred to in paragraph (3)—

(A) the amount of the proposed forfeiture penalty involved;

(B) the person to whom the notice was issued;

(C) the length of time between the date on which the complaint was filed and the date on which the notice was issued; and

(D) the status of the proceeding;


(5) the number of final orders imposing forfeiture penalties issued pursuant to section 503 of this title during the year to enforce any law, regulation, or policy relating to sending of unsolicited advertisements to telephone facsimile machines;

(6) for each forfeiture order referred to in paragraph (5)—

(A) the amount of the penalty imposed by the order;

(B) the person to whom the order was issued;

(C) whether the forfeiture penalty has been paid; and

(D) the amount paid;


(7) for each case in which a person has failed to pay a forfeiture penalty imposed by such a final order, whether the Commission referred such matter for recovery of the penalty; and

(8) for each case in which the Commission referred such an order for recovery—

(A) the number of days from the date the Commission issued such order to the date of such referral;

(B) whether an action has been commenced to recover the penalty, and if so, the number of days from the date the Commission referred such order for recovery to the date of such commencement; and

(C) whether the recovery action resulted in collection of any amount, and if so, the amount collected.

(June 19, 1934, ch. 652, title II, §227, as added Pub. L. 102–243, §3(a), Dec. 20, 1991, 105 Stat. 2395; amended Pub. L. 102–556, title IV, §402, Oct. 28, 1992, 106 Stat. 4194; Pub. L. 103–414, title III, §303(a)(11), (12), Oct. 25, 1994, 108 Stat. 4294; Pub. L. 108–187, §12, Dec. 16, 2003, 117 Stat. 2717; Pub. L. 109–21, §§2(a)–(g), 3, July 9, 2005, 119 Stat. 359–362; Pub. L. 111–331, §2, Dec. 22, 2010, 124 Stat. 3572; Pub. L. 114–74, title III, §301(a), Nov. 2, 2015, 129 Stat. 588; Pub. L. 115–141, div. P, title IV, §402(i)(3), title V, §503(a)(1)–(4)(A), Mar. 23, 2018, 132 Stat. 1089, 1091, 1092.)

**47 CFR § 64.1200 - Delivery restrictions. (relevant portions)**

**(c)** No person or entity shall initiate any telephone solicitation to:

**(1)** Any residential telephone subscriber before the hour of 8 a.m. or after 9 p.m. (local time at the called party's location), or

**(2)** A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. Such do-not-call registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator. Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement if:

**(i)** It can demonstrate that the violation is the result of error and that as part of its routine business practice, it meets the following standards:

**(A)** Written procedures. It has established and implemented written procedures to comply with the national do-not-call rules;

**(B)** Training of personnel. It has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules;

**(C)** Recording. It has maintained and recorded a list of telephone numbers that the seller may not contact;

**(D)** Accessing the national do-not-call database. It uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and maintains records documenting this process.

NOTE TO PARAGRAPH (C)(2)(I)(D):

The requirement in paragraph 64.1200(c)(2)(i)(D) for persons or entities to employ a version of the national do-not-call registry obtained from the administrator no more than 31 days prior to the date any call is made is effective January 1, 2005. Until January 1, 2005, persons or entities must continue to employ a version of the registry obtained from the administrator of the registry no more than three months prior to the date any call is made.

**(E)** Purchasing the national do-not-call database. It uses a process to ensure that it does not sell, rent, lease, purchase or use the national do-not-call database, or any part thereof, for any purpose except compliance with this section and any such state or federal law to prevent telephone solicitations to telephone numbers registered on the national database. It purchases access to the relevant do-not-call data from the administrator of the national database and does not participate in any arrangement to share the cost of accessing the national database, including any arrangement with

telemarketers who may not divide the costs to access the national database among various client sellers; or

**(ii)** It has obtained the subscriber's prior express invitation or permission. Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed; or

**(iii)** The telemarketer making the call has a personal relationship with the recipient of the call.

**(d)** No person or entity shall initiate any artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

**(1)** *Written policy.* Persons or entities making artificial or prerecorded-voice telephone calls pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

**(2)** *Training of personnel.* Personnel engaged in making artificial or prerecorded-voice telephone calls pursuant to an exemption under paragraphs

(a)(3)(ii) through (v) of this section or who are engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

**(3) *Recording, disclosure of do-not-call requests.*** If a person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making such calls (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed ten (10) business days from the receipt of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the call is made, the person or entity on whose behalf the call is made will be liable for any failures to honor the do-not-call request. A person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) or any call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a call is made or an affiliated entity.

**(e)** The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or **text messages** to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, "Rules and Regulations Implementing the **Telephone Consumer Protection Act of 1991**."

[68 FR 44177, July 25, 2003, as amended at 68 FR 59131, Oct. 14, 2003; 69 FR 60316, Oct. 8, 2004; 70 FR 19337, Apr. 13, 2005; 71 FR 25977, May 3, 2006; 71 FR 56893, Sept. 28, 2006; 71 FR 75122, Dec. 14, 2006; 73 FR 40185, July 14, 2008; 77 FR 34246, June 11, 2012; 83 FR 1577, Jan. 12, 2018; 84 FR 10267, Mar. 20, 2019; 84 FR 11232, Mar. 26, 2019; 85 FR 56534, Sept. 14, 2020; 86 FR 2563, Jan. 13, 2021; 86 FR 11447, 11448, Feb. 25, 2021; 86 FR 17734,17735, Apr. 6, 2021; 86 FR 74375, Dec. 30, 2021; 87 FR 7044, Feb. 8, 2022; 87 FR 42944, July 18, 2022; 87 FR 51921, Aug. 24, 2022; 87 FR 69207, Nov. 18, 2022; 88 FR 3677, Jan. 20, 2023; 88 FR 21500, Apr. 11, 2023; 88 FR 43458, July 10, 2023; 89 FR 5104, Jan. 26, 2024; 89 FR 15062, Mar. 1, 2024; 89 FR 15762, Mar. 5, 2024; 89 FR 5104, Jan. 26, 2024; 89 FR 87983, Nov. 6, 2024; 89 FR 5105, Jan. 26, 2024; 89 FR 15762, Mar. 5, 2024; 89 FR 17762, Mar. 12, 2024]

No. 25-02398

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

---

Joseph Jones et al.,

*Plaintiffs-Appellants,*

v.

Blackstone Medical Services, LLC

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of Illinois
No. 1:24-CV-01074-JEH-RLH
Hon. Jonathan E. Hawley

---

# SHORT APPENDIX

---

Abbas Kazerounian (CA Bar No. 249203)
ak@kazlg.com
Ryan L. McBride (CA Bar No. 297557)
ryan@kazlg.com
*Kazerouni Law Group, APC*
*245 Fischer Avenue, Suite D1*
*Costa Mesa, CA 92626*
*(800) 400-6808*

*Interim Lead Attorneys for Plaintiffs-*
*Appellants and the Putative Class*

# TABLE OF CONTENTS

**<u>Page</u>**

Order Granting Blackstone's Motion to Dismiss,
Docket No. 37 (filed July 21, 2025)...................................................................................3

IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| JOSEPH JONES, SETH STEIDINGER, and NATASHA KOLLER, on behalf of themselves and all others similarly situated,<br>        Plaintiffs,<br><br>v.<br><br>BLACKSTONE MEDICAL SERVICES, LLC,<br>        Defendant. | Case No. 1:24-cv-01074-JEH-RLH |

**Order**

Now before the Court is Defendant Blackstone Medical Services, LLC's Motion to Dismiss Counts I-IV of the Consolidated Class Action Complaint (D. 32).[1]  For the reasons set forth, *infra*, the Motion is GRANTED.

**I**

On April 14, 2025, Plaintiffs Joseph Jones, Seth Steidinger, and Natasha Koller filed their Consolidated Class Action Complaint (D. 29) against Blackstone Medical Services, LLC (Blackstone) alleging violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, (Counts I-IV) and the Florida Telephone Solicitation Act (FTSA), FLA. STAT. § 501.059(5) (2023) (Count V).  The individually named Plaintiffs are consumers who received telemarketing text messages and calls to their telephones from Blackstone.  Defendant Blackstone is a Florida-based

---

[1] Citations to the electronic docket are abbreviated as "D. ___ at ECF p. ___."

S.A. 000001

company that sells home sleep tests. The Plaintiffs brought their class action as representatives/members of the following classes:

> **Internal Do Not Call List Class** (Jones, Steidinger, and Koller): All persons within the United States who, within the time frame(s) relevant to this action, (1) received two or more text messages from Blackstone or anyone acting on Blackstone's behalf, (2) within any 12-month period, (3) for the purpose of selling Blackstone's products and/or services, and (4) including at least one of those text messages being placed more than 30 days after such person requested that Blackstone stop calling and/or texting.

> **Do Not Call Registry Class** (Steidinger): All persons in the United States who from four years prior to the filing of this action (1) were sent text messages and/or telephone calls by or on behalf of Defendant; (2) more than one time within any 12-month period; (3) where the person's telephone number had been listed on the National Do Not Call Registry for at least thirty days; (4) for the purpose of encouraging the purchase or rental of Defendant's products and/or services; and (5) where either (a) Defendant did not obtain prior express written consent to message the person or (b) the called person previously advised Defendant to "STOP" messaging them.

> **FTSA Class** (Jones and Koller): All persons within the State of Florida who, (1) were sent a text message from Blackstone or anyone acting on Blackstone's behalf; (2) for the purpose of soliciting Defendant's goods and/or services, and (2) [sic] had previously communicated to Blackstone that they did not wish to receive Defendant's text messages.

(D. 29 at ECF pp. 3-4). Collectively, the Plaintiffs request the three putative classes receive monetary, injunctive, and declaratory relief for the alleged violations of the TCPA and FTSA.

2

Specifically, the Plaintiffs allege[2] Defendant Blackstone operates an aggressive telemarketing campaign where it repeatedly sends text messages and telephone calls to telephone numbers that have been placed on the National Do-Not-Call Registry for at least 30 days and over the messaged party's objections in order to sell home sleep tests. Plaintiff Steidinger is an Illinois resident who registered his residential cellular telephone number with the National Do-Not-Call Registry on April 18, 2018. He began receiving telephone calls and text messages to his telephone number after discussing potentially taking a home sleep test with his healthcare provider. During his first and only live conversation with Blackstone, the Plaintiff replied he was not interested in the home sleep test. After Plaintiff Steidinger's telephone number was added to the National Do-Not-Call Registry and after he advised the Defendant he was not interested in its home sleep tests and repeatedly messaged Blackstone to "STOP", the Defendant continued to place repeated telemarketing text messages. Plaintiff Koller is a Florida resident whose cellular telephone number, upon information and belief, Blackstone obtained from Koller's doctor; Koller did not give her doctor permission to convey to Blackstone her consent to its calls. Koller repeatedly requested Blackstone to "STOP" sending her its solicitation text messages but the Defendant continued to place repeated telemarketing text messages to her cellular telephone which she used as her residential telephone line. Plaintiff Jones, a Florida resident, received a barrage of text messages on his cellular telephone, which he used for personal and residential purposes, beginning in or around September 2022 despite never having given consent to be contacted and requesting the Defendant stop multiple

---

[2] When ruling on a motion to dismiss, the court must take all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Indep. Truck Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012).

S.A. 000003

times.   In Yelp reviews, other consumers complain about the Defendant's aggressive telemarketing and failure to abide by "stop" requests.

## II

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of claims for "failure to state a claim upon which relief can be granted".   A court may grant a Rule 12(b)(6) motion to dismiss only if a complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   A complaint sufficient on its face need not give "detailed factual allegations," but it must provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action".   *Id.* at 555.   The Court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff.   *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007).

## A

Defendant Blackstone seeks the dismissal of Counts I-IV of the Consolidated Class Action Complaint (CAC), arguing the provision of the TCPA pursuant to which the Plaintiffs bring their claims, 47 U.S.C. § 227(c), does not prohibit text messages.   The Plaintiffs bring Counts I and II pursuant to "47 U.S.C. § 227(c)(5), and 47 C.F.R. § 64.1200(c)(2)" and Counts III and IV pursuant to "47 U.S.C. § 227, et seq. and "47 C.F.R. § 64.1200(d) et seq."   Pls.' CAC (D. 29 at ECF pp. 30, 32, 33, 35).

## 1

"Voluminous consumer complaints about abuses of telephone technology . . . prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370-71 (2012).   Thus, under 47 U.S.C. § 227(b), it is "unlawful for any person . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone

4

dialing system or an artificial or prerecorded voice" to several specified types of telephones including, among others, emergency telephone lines and telephone numbers assigned to a cellular telephone service.  47 U.S.C. § 227(b)(1)(A)(i)-(iii).  The TCPA directs the Federal Communications Commission (FCC) "to prescribe regulations to implement the requirements of [Section 227(b)]."  47 U.S.C. § 227(b)(2).  Section 227(b)(3) provides for a private right of action based on a violation of Section 227(b) or the regulations prescribed under it.  47 U.S.C. § 227(b)(3).

Title 47 U.S.C. § 227(c), meanwhile, directed the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).  Pursuant to its authority to prescribe regulations to implement methods and procedures for protecting those privacy rights, 47 U.S.C. § 227(c)(2), the FCC established a National "Do Not Call" Registry.  *See* 47 U.S.C. § 227(c)(3) ("The regulations required by paragraph (2) may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase.").  Section 227(c)'s implementing regulation, 47 C.F.R. § 64.1200(c), provides in relevant part:

> No person or entity shall initiate any telephone solicitation to [] A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government.

47 C.F.R. § 64.1200(c)(2).  Another implementing regulation, 47 C.F.R. § 64.1200(d), provides in relevant part:

5

> No person or entity shall initiate any artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity.

47 C.F.R. § 64.1200(d).

Section 227(c)(5) provides for a private right of action by "A person who has received more than one *telephone call* within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under [Section 227(c)] . . . ." 47 U.S.C. § 227(c)(5) (emphasis added).

**2**

Defendant Blackstone argues that the phrases "text message" and "SMS message" are wholly absent from Section 227(c)(5) and its implementing regulations, 47 C.F.R. § 64.1200(c) and (d). Indeed, only "call", "telephone call", and "artificial or prerecorded-voice telephone call" appear in Section 227(c) and its implementing regulations. 47 U.S.C. § 227(c)(1)(D), (c)(5); 47 C.F.R. § 64.1200(c)(2)(iii), (d). The Defendant notes that the FCC clearly indicated its intent to regulate text messages or SMS messages under 47 C.F.R. § 64.1200(a) which was implemented under Section 227(b) only.[3] Section 64.1200(a)(9) states, "As used in this paragraph (a)(9), the term 'call' includes a text message, including a short message service (SMS) call." 47 C.F.R. § 64.1200(a)(9). In their CAC and Response (D. 36) to the Motion to Dismiss, the Plaintiffs rely upon the FCC's Report and Order, CG Docket No. 02-278, FCC 03-153, *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991* (2003 Order), wherein the FCC stated:

> We affirm that under the TCPA, it is unlawful to make *any call* using an automatic telephone dialing system or an artificial or prerecorded

---

[3] The Defendant states that 47 C.F.R. § 64.1200(a) is implemented under Section 227(b) only, *not* Section 227(c). The Plaintiffs do not contest that.

S.A. 000006

> message to any wireless telephone number.  Both the statute and our
> rules[] prohibit these calls, with limited exceptions, "to any telephone
> number assigned to a paging service, cellular telephone service,
> specialized mobile radio service, or other common carrier service, or
> any service for which the called party is charged."[]    This
> encompasses both voice calls and text calls to wireless numbers
> including, for example, short message service (SMS) calls, provided
> the call is made to a telephone number assigned to such service.

18 FCC Rcd. 14014, 14116 para. 165 (2003) (emphasis in original).  They say the

2003 Order, along with later FCC Orders, case law, and public policy make clear

that "calls" encompass text messages.

> The Supreme Court very recently explained:

> In an enforcement proceeding, a district court must independently
> determine for itself whether the agency's interpretation of a statute is
> correct.  District courts are not bound by the agency's interpretation,
> but instead must determine the meaning of the law under ordinary
> principles of statutory interpretation, affording appropriate respect to
> the agency's interpretation.

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 145 S. Ct. 2006, 2015 (2025)

(citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024)).[4]  Pursuant to

*McLaughlin* and *Loper Bright*, the Court agrees with the Defendant that based on a

plain reading of the TCPA and its implementing regulations, Section 227(c)(5) does

not apply to text messages.

Under the principles of statutory interpretation, a court must start with the

text of the statute to ascertain its plain meaning.  *U.S. v. Melvin*, 948 F.3d 848, 851

(7th Cir. 2020).  "Unless words are otherwise defined, they 'will be interpreted as

---

[4] The Supreme Court's opinion in *McLaughlin Chiropractic* was issued after the parties had already briefed the Motion to Dismiss in this case.  Relevant to the parties' positions in this case, *McLaughlin Chiropractic* held the Administrative Orders Review Act (or Hobbs Act), 28 U.S.C. § 2342, "does not preclude district courts in enforcement proceedings from independently assessing whether an agency's interpretation of the relevant statute is correct."  145 S. Ct. at 2013.

S.A. 000007

taking their ordinary, contemporary, common meaning.'" *Id.* at 852 (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014)). Section 227(c)(5) simultaneously explicitly refers to a "telephone call", a term not defined in the statute itself, and remains silent as to its application to text messages. Text messaging was not an available technology in 1991, and thus "telephone call" would not have included text messages or SMS messages. *See id.* ("We find words' ordinary, contemporary, common meaning by looking at what they meant when the statute was enacted . . . ."); Alex Fitzpatrick, *How Text Messages Are Being Killed and Replaced*, Time (Dec. 3, 2014), https://time.com/3612277/text-message-history-future/ ("The world's very first text message, sent Dec. 3, 1992, was a cheerful, if early, holiday greeting: 'Merry Christmas,' it read, short and sweet."). Moreover, in today's American parlance, "telephone call" means something entirely different from "text message". Thus, under a plain reading, Section 227(c)(5) of the TCPA does not regulate text messages. *See West v. Hoy*, 126 F.4th 567, 575 (7th Cir. 2025) (stating a court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous.") (quoting *BedRoc Ltd., LLC v. U.S.*, 541 U.S. 176, 183 (2004)); *Melvin*, 948 F.3d at 852 ("If the statutory language's plain meaning is unambiguous, [the court's] inquiry ends there.").

The fact that "telephone solicitation" appears in Section 227(c) and is defined earlier in Section 227(a) to mean "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person" does not change the plain meaning analysis. 47 U.S.C. § 227(a)(4). Section 227(a)(4) does not refer to "text message"; "telephone call or message" could not be interpreted in 1991 to telephone call or *text* message, contrary to the Plaintiffs' footnoted suggestion. Again, a statute's words are given their common meaning as of the time the statute was enacted. *Melvin*, 948 F.3d at 852.

8

As for the Plaintiffs' reliance upon the FCC's 2003 Order to bring "text message" within the purview of Section 227(c)(5), within the relied upon Paragraph 165, the FCC explicitly mentions "automatic telephone dialing system", "artificial or prerecorded message", and "automated or prerecorded telephone calls". 18 FCC Rcd. 14014, 14116 para. 165. In footnotes appearing within Paragraph 165, only 47 U.S.C. § 227(b) of the TCPA is cited along with 47 C.F.R. § 64.1200(a). Section 227(b), *not* 227(c), addresses restrictions on the use of "an automatic telephone dialing system or an artificial or prerecorded message", and, as already discussed, 47 C.F.R. § 64.1200(a) is the implementing regulation for Section 227(b), not Section 227(c). As the Defendant argues, the 2003 Order was only addressing text messages sent using an automatic telephone dialing system or an artificial or prerecorded message, and, thus, the 2003 Order does not even address the specific provisions of the TCPA and its regulations at issue in this case.

The Plaintiffs cobble together the FCC's 2003 Order and several later FCC Orders (dated 2012, 2015, 2016), which they describe as "unambiguous", together with 47 C.F.R. § 64.1200(e) in an effort to establish that text messages apply under Section 227(c) of the TCPA. *In re Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1832 para. 4 (2012); *In re Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 8016 para. 107 (2015); *In re Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 31 FCC Rcd. 9074, 9092 para. 40 (2016). The Plaintiffs' approach is problematic. First, on its face and as just detailed, the 2003 Order explicitly references only Section 227(b). Second, the portions of the FCC's later Orders the Plaintiffs discuss refer back to the 2003 Order which cites only Section 227(b) and themselves fail to include citation to Section 227(c). The 2016 Order merely speaks of "covered text messages" without

9

any reference to Section 227(c).  2016 Order, 31 FCC Rcd. 9074, 9092 para. 40.  Third, 47 C.F.R. § 64.1200(e) incorporates the 2003 Order:

> The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers *to the extent described in* the Commission's Report and Order, CG Docket No. 02–278, FCC 03–153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

47 C.F.R. § 64.1200(e) (emphasis added).  Again, the 2003 Order addressed only Section 227(b).  By limiting Section 64.1200(e)'s application in such a manner, the FCC presents a complicated rather than simplified legal interpretation of "telephone call" for purposes of Section 227(c)(5).

The Court understands the FCC has a level of expertise as to the various forms of communication existing at the time of the TCPA's enactment as well as now.  *See Loper Bright*, 603 U.S. at 402 ("[An agency's] expertise has always been one of the factors which may give an Executive Branch interpretation particular 'power to persuade, if lacking power to control.'") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  While the Court affords a certain amount of respect to the FCC's interpretation of the terms used in the TCPA, the fact remains that Section 227(c)(5) of the TCPA includes "telephone call" and does not mention text messages or SMS messages, and nowhere does the TCPA define "telephone call" to include text and/or SMS messages.  As illustrated above, the FCC's interpretation of call to include text messages is a complicated one, and potentially does not even apply to Section 227(c)(5).

The Plaintiffs' position – that text messages are calls as the latter term is used in the TCPA – is an eminently reasonable one, particularly given the TCPA's purpose and the prevalence of text messaging in the U.S. today.  Nevertheless, "[i]n the business of statutory interpretation, if [an interpretation] is not the best,

10

it is not permissible." *Loper Bright*, 603 U.S. at 400.  The "ordinary" principle of statutory interpretation – to start with the text of the statute to ascertain its plain meaning – provides the answer.  *See id.* at 392 ("Under the [Administrative Procedure Act], it thus 'remains the responsibility of the court to decide whether the law means what the agency says.'") (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).  It is not for a court to legislate by reading into the TCPA something that is not there[5]:

> The better presumption is therefore that Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch. And to the extent that Congress and the Executive Branch may disagree with how the courts have performed that job in a particular case, they are of course always free to act by revising the statute.

*See Loper Bright*, 603 U.S. at 403.  It is for Congress to respond to the issues presented in this case and to address the realities of today's technology (and the intrusions caused therefrom) which is commonplace in American life in 2025.  The Court confines itself to its assigned role which does not include legislating.

The Court finds that the Plaintiffs have failed to state claims for violations of Section 227(c) of the TCPA, 47 C.F.R. § 64.1200(c), and 47 C.F.R. § 64.1200(d) given that allegedly "violative text messages" stand "at the core of Plaintiffs' factual allegations".  Pls.' Resp. (D. 36 at ECF p. 2 n.1).  Indeed, the Plaintiffs' reference to receipt of telephone calls in violation of the TCPA are few compared to their reference to text messages and inclusion of text message screenshots; the

---

[5] For these reasons, the Court need not delve into the cases the Plaintiffs discuss as support for their position that text messages are calls within the TCPA.  The Court also notes that the cases included in their CAC are not binding on this Court.  *See OSF Healthcare Sys. v. Insperity Grp. Health Plan*, 82 F. Supp. 3d 860, 865 (C.D. Ill. 2015) (quoting *U.S. v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994)) (providing that out-of-circuit precedent is not binding, though it is entitled to "respectful consideration[]").  The Plaintiffs' cited cases, *Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099 (W.D. Mo. 2020), and *Doohan v. CTB Invs., LLC*, 427 F. Supp. 3d 1034 (W.D. Mo. 2019), do not persuade the Court to find as Plaintiffs argue.

11

crux of the CAC is that their receipt of repetitive text messages prompted them to seek relief pursuant to the TCPA. The Court's finding is fatal to the Plaintiffs' requests for injunctive and declaratory relief, and the Defendant's argument that the Court has no jurisdiction to entertain those requests is therefore moot.

### B

Because of the Court's finding that the Plaintiffs' TCPA claims must be dismissed, no federal claims remain in this case. Only Count V pursuant to Florida law remains. "A district court has 'supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.'" *West*, 126 F.4th at 575 (quoting 28 U.S.C. § 1367(a)). However, a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) [of Section 1367] if . . . the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). The Court declines to exercise supplemental jurisdiction over the Plaintiffs' remaining claim under the FTSA.

### III

For the reasons set forth, *supra*, Defendant Blackstone Medical Services, LLC's Motion to Dismiss Counts I-IV of the Consolidated Class Action Complaint (D. 32) is GRANTED. The entirety of the Plaintiffs' Consolidated Class Action Complaint (D. 29) is DISMISSED WITHOUT PREJUDICE. If the Plaintiffs choose to file an amended consolidated class action complaint, they must do so within 21 days of the date of this Order.

*It is so ordered.*

Entered on July 21, 2025

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE

12