No. 25-2398

# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

SETH STEIDINGER, ET AL.,

*Plaintiffs-Appellants*,

v.

BLACKSTONE MEDICAL SERVICES, LLC,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Central District of Illinois
Case No. 1:24-cv-01074-JEH-RLH
Hon. Jonathan E. Hawley

## BRIEF OF *AMICUS CURIAE* THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE

Maria C. Monaghan
Mariel A. Brookins
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062

Russell B. Balikian
Andrew Y. Ebrahem
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8535
RBalikian@gibsondunn.com
AEbrahem@gibsondunn.com

Counsel for *Amicus Curiae*

| Save As | Clear Form |

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2398

Short Caption: Steidinger v. Blackstone Med. Servs., LLC

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    The Chamber of Commerce of the United States of America (the "Chamber")

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Gibson, Dunn & Crutcher LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        The Chamber has no parent corporation

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        No publicly held company has 10% or greater ownership in the Chamber

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

---

Attorney's Signature: /s/ Russell B. Balikian    Date: 12/29/2025

Attorney's Printed Name: Russell B. Balikian

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑ **No** ☐

Address: 1700 M Street, N.W., Washington, D.C. 20036

Phone Number: 202-955-8535    Fax Number: 

E-Mail Address: RBalikian@gibsondunn.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2398

Short Caption: Steidinger v. Blackstone Med. Servs., LLC

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    The Chamber of Commerce of the United States of America (the "Chamber")

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Gibson, Dunn & Crutcher LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        The Chamber has no parent corporation

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        No publicly held company has 10% or greater ownership in the Chamber

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Andrew Y. Ebrahem     Date: 12/29/2025

Attorney's Printed Name: Andrew Y. Ebrahem

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 1700 M Street, N.W., Washington, D.C. 20036

Phone Number: 202-777-9403     Fax Number:

E-Mail Address: AEbrahem@gibsondunn.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2398

Short Caption: Steidinger v. Blackstone Med. Servs., LLC

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    The Chamber of Commerce of the United States of America (the "Chamber")

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Gibson, Dunn & Crutcher LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

       The Chamber has no parent corporation

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       No publicly held company has 10% or greater ownership in the Chamber

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Maria C. Monaghan    Date: 12/30/2025

Attorney's Printed Name: Maria C. Monaghan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address: 1615 H Street, N.W.

    Washington, D.C. 20062

Phone Number: 202-463-5337    Fax Number: 866-463-5302

E-Mail Address: mmonaghan@uschamber.com

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2398

Short Caption: Steidinger v. Blackstone Med. Servs., LLC

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Chamber of Commerce of the United States of America (the "Chamber")

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Gibson, Dunn & Crutcher LLP

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

     The Chamber has no parent corporation

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

     No publicly held company has 10% or greater ownership in the Chamber

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Mariel A. Brookins    Date: 12/30/2025

Attorney's Printed Name: Mariel A. Brookins

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: 1615 H Street, N.W.

Washington, D.C. 20062

Phone Number: 202-463-5337    Fax Number: 866-463-5302

E-Mail Address: mbrookins@uschamber.com

rev. 12/19 AK

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...............................................................ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* .............................1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................3

ARGUMENT ................................................................................6

I.    A Text Message Is Not A "Telephone Call" Under
§ 227(c)(5). .................................................................6

    A.    The text, history, and structure of § 227(c)(5)
clearly establish that a text message is not a
"telephone call." ..........................................6

       1.    "Telephone call" refers to a voice call. .................7

       2.    Plaintiffs' contrary reading is incorrect.............. 13

    B.    The FCC's interpretation of the term "any call" in
a different subsection is not entitled to deference....... 17

       1.    *Chevron* deference is unavailable. ...................... 19

       2.    Plaintiffs correctly do not rely on *Skidmore*....... 22

    C.    Plaintiffs' remaining arguments are meritless. .......... 26

II.    Plaintiffs' Interpretation Would Harm Businesses And
Consumers ................................................................. 29

CONCLUSION ........................................................................... 33

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACA Int'l v. FCC,*
  885 F.3d 687 (D.C. Cir. 2018)..............................................................2

*Arobelidze v. Holder,*
  653 F.3d 513 (7th Cir. 2011)................................................................23

*Barton v. Temescal Wellness, LLC,*
  525 F. Supp. 3d 195 (D. Mass. Mar. 8, 2021)....................................28

*Bradshaw v. CHW Grp., Inc.,*
  763 F. Supp. 3d 641 (D.N.J. 2025) ....................................................29

*Busbee v. ServiceToday!,*
  2024 WL 4428989 (N.D. Tex. Oct. 4, 2024)......................................29

*Campbell-Ewald Co. v. Gomez,*
  577 U.S. 153 (2016)......................................................................26, 27

*Chevron U.S.A. Inc. v. NRDC, Inc.,*
  467 U.S. 837 (1984)............................................................................19

*Connor v. Servicequick, Inc.,*
  2025 WL 2855393 (D. Colo. Oct. 8, 2025) ........................................29

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
  539 U.S. 23 (2003)..............................................................................12

*Davis v. CVS Pharmacy, Inc.,*
  797 F. Supp. 3d 1270 (N.D. Fla. 2025)........................................14, 27

*Davis v. Mich. Dep't of Treasury,*
  489 U.S. 803 (1989)............................................................................11

*Delaware v. Pennsylvania,*
  598 U.S. 115 (2023)............................................................................16

*Dep't of Navy v. FLRA,*
  975 F.2d 348 (7th Cir. 1992)........................................................3, 33

*Dilanyan v. Hugo Boss Fashions, Inc.,*
  2025 WL 3549868 (C.D. Cal. Dec. 3, 2025)..........................................27

*EEOC v. AIC Sec. Investigations, Ltd.,*
  55 F.3d 1276 (7th Cir. 1995).............................................................17

*Facebook, Inc. v. Duguid,*
  592 U.S. 395 (2021)...........................................3, 6, 11, 17, 27, 33

*FTC v. Mandel Brothers, Inc.,*
  359 U.S. 385 (1959).........................................................................13

*Gadelhak v. AT&T Servs.,*
  950 F.3d 458 (7th Cir. 2020).............................................................27

*Glasser v. Hilton Grand Vacations Co., LLC,*
  948 F.3d 1301 (11th Cir. 2020)..........................................................25

*Gulden v. Liberty Home Guard LLC,*
  2021 WL 689912 (D. Ariz. Feb. 23, 2021) ..........................................28

*Gulomjonov v. Bondi,*
  131 F.4th 601 (7th Cir. 2025) ...........................................................19

*Hall v. Smosh Dot Com, Inc.,*
  72 F.4th 983 (9th Cir. 2023) .............................................................28

*Loper Bright Enterprises v. Raimondo,*
  603 U.S. 369 (2024).....................................5, 11, 18, 19, 21, 22, 25, 28

*Lozano v. Twentieth Century Fox Films Corp.,*
  702 F. Supp. 2d 999 (N.D. Ill. 2010)...........................................14, 16

*Mantha v. QuoteWizard.com, LLC,*
  347 F.R.D. 376 (D. Mass. 2024).........................................................29

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989)..........................................................................21

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*,
606 U.S. 146 (2025).................................................................5, 19

*In re MCP Nol. 185*,
124 F.4th 993 (6th Cir. 2025) ...........................................11

*Misner v. Empire Auto Protect, LLC*,
2024 WL 4688940 (S.D. Ohio Nov. 6, 2024)...................29

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*,
522 U.S. 479 (1998)..............................................................12

*Order of Ry. Conductors of Am. v. Swan*,
152 F.2d 325 (7th Cir. 1945)..............................................24

*Pepper v. CVG Cap. LLC*,
677 F. Supp. 3d 638 (S.D. Tex. 2023).............................28

*Reimer v. Kohl's, Inc.*,
2023 WL 6161780 (E.D. Wis. Sept. 21, 2023)................28

*S.W. Airlines Co. v. Saxon*,
596 U.S. 450 (2022)..............................................................14

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (2009)........................................................16, 28

*Sayed v. Naturopathica Holistic Health, Inc.*,
2025 WL 2997759 (M.D. Fla. Oct. 24, 2025)..................27

*Servotronics, Inc. v. Rolls-Royce PLC*,
975 F.3d 689 (7th Cir. 2020)..............................................12

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
605 U.S. 168 (2025)...................................................5, 20, 21

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)............................................5, 6, 22, 24, 25

*Stamper v. Manus-Nw. Oral Health Ctr., Ltd.*,
2025 WL 2044093 (N.D. Ill. July 17, 2025).....................29

iv

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012) .................................................................. 16

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) .................................................................... 14

*Warciak v. Subway*,
949 F.3d 354 (7th Cir. 2020) ................................................... 27

*Wis. Cent. Ltd. v. United States*,
585 U.S. 274 (2018) ............................................................... 7, 11

*Ysleta Del Sur Pueblo v. Texas*,
596 U.S. 685 (2022) .................................................................. 12

**Statutes**

5 U.S.C. §706 ...................................................................... 5, 20, 21

47 U.S.C. §227(a) ..................................................................... 4, 13

47 U.S.C. §227(b) .................................................................... 18, 23

47 U.S.C. §227(c)...................... 1, 2, 3, 4, 5, 6, 7, 11, 13, 14, 16, 17, 18, 19,
20, 21, 23, 26, 27, 28, 29, 31, 32

47 U.S.C. §227(e) ........................................................................ 11

47 U.S.C. § 227(i) ...................................................................... 12

Pub. L. No. 111-331, 124 Stat. 3572 (2010)............................. 11

RAY BAUM's Act of 2018, Pub. L. No. 115-141,
132 Stat. 348 (2018) ............................................................... 32

**Other Authorities**

A. Scalia & B. Garner, *Reading Law* (2012) ........................... 15

*American Heritage Dictionary* (1983) ...................................... 8

Alex Perry, *Hey Gen Z, This Is a Pager, and in the '90s They
Were Everywhere* .................................................................. 15

*Black's Law Dictionary* (6th ed. 1991)......................................................13

Carolyn Henson, *SMS Celebrates 20th Anniversary*,
Wall St. J. (Dec. 3, 2012) ............................................................10

David Pogue, *Some Plans That Offer More Than Minutes*,
N.Y. Times (Feb. 14, 2002) ..........................................................8

Jonathan Rabinovitz, *Teen-Agers' Beepers: Communications
as Fashions*, N.Y. Times (Mar. 8, 1991)....................................15

Lisa W. Foderaro, *Young Cell Users Rack Up Debt, a
Message at a Time*, N.Y. Times (Jan. 9, 2005)...........................9

Mark Hamstra, *How Top Brands Are Turning SMS Text
Messaging into a Bona Fide Sales & Marketing Channel*,
U.S. Chamber of Commerce (July 12, 2022)...............................30

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1999) .......................8

Navid Ashroff, *Unlock Business Growth with SMS: Why
Texting Is Essential*, Forbes (June 6, 2024).............................30

*Oxford English Dictionary* (2d ed. 1989)................................................8

*Pick The Plan You Want. Only Pay for What You Need*,
Verizon (last visited Dec. 16, 2025)..........................................9

Sammi Caramela, *Why Text Message Payments Might Be
Good For Your Business*, U.S. Chamber of Commerce
(July 14, 2022)............................................................................31

*Webster's Ninth New Collegiate Dictionary* (1990) ............................7, 8

Zoe Kleinman, *'Merry Christmas': 30 Years of the Text
Message*, BBC (Dec. 2, 2022)...................................................10

**Rules**

Fed. R. App. P. 29 ....................................................................................1

Fed. R. App. P. 32 ....................................................................................1

## Administrative Orders

*Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report & Order, CG Docket No. 92-90, 7 FCC Rcd 8752 (Oct. 16, 1992)..........................................25

*Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report & Order, CG Docket No. 02-278, 18 FCC Rcd 14014 (July 3, 2003) .................. 18, 22, 23, 25

*Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report & Order, CG Docket No. 02-278, 27 FCC Rcd 1830 (Feb. 15, 2012) ...................................23

*Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order, CG Docket No. 02-278, 30 FCC Rcd 7961 (July 10, 2015).................. 24, 31

*Targeting & Eliminating Unlawful Text Messages*, Second Report & Order, CG Docket No. 21-402, 38 FCC Rcd 12247 (Dec. 18, 2023) .......................................................24

**IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]**

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the Nation's business community.

The Chamber's members have a strong interest in ensuring that courts correctly interpret and apply the Telephone Consumer Protection Act ("TCPA"), including its cause of action for persons who receive more than one prohibited "telephone call" within a 12-month period.  47 U.S.C. § 227(c)(5).  Many Chamber members communicate with customers via

---

[1] All parties consent to the filing of this brief.  No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  *See* Fed. R. App. P. 29(a)(2), (4)(E).

text message, which customers often prefer. Many members have also faced unwarranted or vexatious litigation from plaintiffs improperly seeking to expand the scope of liability under the TCPA, which authorizes statutory damages as high as $1,500 per violation and has yielded verdicts exceeding $200 million. The question whether the term "telephone call" includes text messages under § 227(c)(5) is thus an issue of great importance to the Chamber, its members, and consumers. The Chamber has filed numerous *amicus* briefs in cases involving the TCPA.[2]

Beyond the TCPA, many members of the Chamber are subject to statutes and regulatory schemes administered by federal agencies, including the Federal Communications Commission ("FCC"). The Chamber therefore has a strong interest in ensuring that courts fulfill their proper role by applying the correct standards of statutory interpretation, rather than deferring to agency interpretations that improperly expand regulatory burdens on businesses.

---

[2] *See Facebook, Inc. v. Duguid*, No. 19-511 (U.S.) (filed Nov. 20, 2019); *see also*, *e.g.*, *Charter Commc'n, Inc. v. Gallion*, No. 19-575 (U.S.) (filed Dec. 2, 2019); *Borden v. eFinancial, LLC*, No. 21-35746 (9th Cir.) (filed Feb. 9, 2022); *Lindenbaum v. Realgy, LLC*, No. 20-4252 (6th Cir.) (filed Mar. 24, 2021); *Gadelhak v. AT&T Servs., Inc.*, No. 19-1738 (7th Cir.) (filed Aug. 22, 2019). The Chamber was also a petitioner in *ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The role of courts "is to interpret statutes as they are written, and not to revise them by reading into them policies [they] deem advisable." *Dep't of Navy v. FLRA*, 975 F.2d 348, 356 (7th Cir. 1992). That basic principle is dispositive here.

In 1991, Congress enacted the TCPA to "address the 'proliferation of intrusive, nuisance calls' … from telemarketers." *Facebook, Inc. v. Duguid*, 592 U.S. 395, 399 (2021). Section 227(c) of the TCPA authorizes the FCC to adopt rules that "protect residential telephone subscriber[s]" from "receiving telephone solicitations to which they object," including by establishing a Do-Not-Call Registry. 47 U.S.C. § 227(c)(1), (3). Section 227(c)(5) creates a private cause of action for persons who receive more than one unsolicited "telephone call" within a 12-month period in violation of these rules.

The question in this case is whether a text message is a "telephone call" under § 227(c)(5). Statutory text, history, and structure all point to the same commonsense answer: A text message is not a telephone call.

The ordinary meaning of "telephone call" has always been a *voice* call, not a text message. Carriers and customers alike have consistently

distinguished calls from texts. History confirms that the term "telephone call" cannot refer to text messages: When Congress enacted the TCPA in 1991, text messaging was not an available technology. Statutory structure reinforces the point. When Congress has addressed text messages in § 227, it has amended § 227 to do so expressly—including by adopting a definition of "text message" in § 227(e)(8)(C), and by adopting provisions that expressly distinguish "a call using a voice service" from a "text message sent using a text-messaging service." Accepting Plaintiffs' arguments would nullify these provisions and require giving the term "call" in subsection (e) a different meaning than it has in subsection (c).

Plaintiffs do not meaningfully engage with this statutory text, history, and context. They note that § 227(c)(5) at times uses the word "telephone solicitation," defined to include *either* a "telephone call" or "message," 47 U.S.C. § 227(a)(4). But even if the word "message" could refer to a *text* message, that underscores that text messages *cannot* support a claim under § 227(c)(5): Section 227(c)(5)'s cause of action is triggered only by receipt of a "telephone call," not by a "message" or other "telephone solicitation."

4

Plaintiffs principally ask this Court to defer to a 2003 FCC order stating that the term "any call" in § 227(b)—not "telephone call" in § 227(c)(5)—encompasses text messages. But this Court cannot defer to the FCC's interpretation; *Chevron* has been overruled. Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), this Court must determine the best reading of the TCPA *de novo*. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155 (2025).

In arguing otherwise, Plaintiffs misapply the arbitrary-and-capricious standard of the Administrative Procedure Act ("APA"). That standard governs judicial review of agency actions carrying out a statutory function—a fact-dependent, policy-laden inquiry into whether an agency has appropriately "exercise[d] discretion granted by a statute." *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 179-80 (2025). It does not apply to issues of statutory interpretation, which are questions of law for courts to decide *de novo*. *Id.* at 179; 5 U.S.C. § 706.

Nor does Plaintiffs' single-sentence reference to *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), support giving weight to the FCC's interpretation. The FCC has never interpreted the phrase "telephone call" in § 227(c)(5), and in any event, the 2003 interpretation lacks the indicia

that would lead a court to give it persuasive weight: The interpretation was unreasoned, incorrect, not contemporaneous with the TCPA's enactment, departed from past practice, and lacked any exercise of the FCC's technical expertise. *Skidmore*, 323 U.S. at 139-40.

If Congress believes a private cause of action for unsolicited text messages is warranted, it is free to amend § 227, as it has done before. Congress is well-positioned to weigh competing policy concerns and enact a tailored legislative solution. But this Court should not create a new cause of action based on Plaintiffs' misreading of § 227(c)(5). Plaintiffs' reading would incentivize abusive litigation and chill legitimate businesses from reaching consumers by text—a convenient method of communication that consumers have come to rely on.

The district court correctly held that a text message is not a "telephone call" under § 227(c)(5). This Court should affirm.

## ARGUMENT

### I. A Text Message Is Not A "Telephone Call" Under § 227(c)(5).

#### A. The text, history, and structure of § 227(c)(5) clearly establish that a text message is not a "telephone call."

The starting point for interpreting the TCPA is its plain text. *Duguid*, 592 U.S. at 402. It is "a fundamental canon of statutory

construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning … at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) (quotation marks omitted). Here, that straightforward principle yields a straightforward conclusion: A text message is not a "telephone call." Plaintiffs' contrary reading is unsound.

### 1. "Telephone call" refers to a voice call.

Section 227(c)(5) creates a private cause of action for persons who have "received more than one *telephone call* within any 12-month period … in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5) (emphasis added). The ordinary meaning of "telephone call" is now, and has always been, a *voice* call.[3] The term has never referred to text messages or other written communications.

When Congress enacted the TCPA in 1991, a "call" meant (as it does today) the act of placing a voice call by "calling on the telephone," *Call*, *Webster's Ninth New Collegiate Dictionary* 197 (1990), and a "telephone"

---

[3] Telephone calls are distinguished from other voice-based communications by technological and other factors, but resolving this case does not require the Court to define precisely which voice communications constitute a "telephone call" under the TCPA. For purposes of this case, it is sufficient to hold that a "telephone call" does not include text messages.

7

was defined by its ability to make *voice* calls by "reproducing *sounds* at a distance," *Telephone*, *Webster's Ninth*, *supra*, at 1212 (emphasis added); *see also Telephone*, *Oxford English Dictionary* 728 (2d ed. 1989) ("An apparatus for reproducing *sound*, esp. that of the voice, at a great distance." (emphasis added)); *Telephone*, *American Heritage Dictionary* 699 (1983) ("An electronic device or system that transmits *voice or other acoustic signals* to remote locations" (emphasis added)). Similarly, to "call" someone was (and is) "to *speak* to or attempt to reach" that person "by telephone." *Call*, *Merriam-Webster's Collegiate Dictionary* 162 (10th ed. 1999) (emphasis added); *see also Call*, *Oxford English Dictionary*, *supra*, at 786 ("To make a telephone call"); *Call*, *American Heritage*, *supra*, at 99 (1983) ("To telephone"). And to "telephone" someone was (and is) "*speaking* to [someone] by telephone." *Telephone*, *Webster's Ninth*, *supra*, at 1212 (emphasis added).

As these definitions make clear, carriers and consumers alike have always distinguished telephone calls from text messages. When text messaging reached consumers in the early 2000s, for example, phone plans often included a set number of minutes for telephone calls and charged separately (often $0.10) for each text message. *See* David Pogue,

8

*Some Plans That Offer More Than Minutes*, N.Y. Times (Feb. 14, 2002) (carriers provide "short-text messaging" as an "added-cost optio[n]" to cellphone plans)[4]; Lisa W. Foderaro, *Young Cell Users Rack Up Debt, a Message at a Time*, N.Y. Times (Jan. 9, 2005) ("sending a text message usually costs 10 cents").[5] Today, carriers continue to distinguish between the technologies, advertising that their plans include "unlimited calling and texting." *E.g.*, *Pick the Plan You Want. Only Pay for What You Need*, Verizon (last visited Dec. 16, 2025).[6] Simply put, ordinary users of the English language have never used the term "telephone call" to refer to text messages or other written forms of communication, such as e-mails, faxes, or telegraphs.

Historical context strongly confirms that the term "telephone call" does not include text messages. Text messaging was not an available mode of communication when the TCPA was enacted in 1991. S.A. 8. The first text message was sent nearly a year after the TCPA's

---

[4] https://www.nytimes.com/2002/02/14/technology/state-of-the-art-some-plans-that-offer-more-than-minutes.html.

[5] https://www.nytimes.com/2005/01/09/technology/young-cell-users-rack-up-debt-a-message-at-a-time.html.

[6] https://perma.cc/4GQJ-L5PN.

enactment, on December 3, 1992.  *Id.*  That text message, which read "Merry Christmas," was sent by a Vodafone engineer as part of an experiment "to test out the tech."  Zoe Kleinman, *'Merry Christmas': 30 Years of the Text Message*, BBC (Dec. 2, 2022).[7]  And it was sent from a computer to a Vodafone executive on his Orbitel 901 phone, which weighed more than 4.5 pounds (and could not respond to the message).  *The First Text Message Celebrates 25 Years*, NPR (Dec. 4, 2017).[8]  It was not until 1999 that text messages could cross networks, and they did not become a popular mode of communication until the early 2000s.  Carolyn Henson, *SMS Celebrates 20th Anniversary*, Wall St. J. (Dec. 3, 2012).[9]

Given this historical backdrop, Congress could not have used "telephone call" in 1991 to refer to text messaging—a form of communication that did not yet exist and could not create nuisances for telephone subscribers.  And courts do not have license to depart from the meaning of a statute in order to modernize it; the "whole point of having written

---

[7] https://perma.cc/QM7E-TK8M.

[8] https://perma.cc/37V4-RVFM.

[9] https://www.wsj.com/articles/BL-TEB-4980.

statutes" is that the "statute's meaning is fixed at the time of enactment." *Loper Bright*, 603 U.S. at 400 (quoting *Wis. Cent.*, 585 U.S. at 284).

The "statutory context" further establishes that § 227(c)(5) means what it says. *Duguid*, 592 U.S. at 405; *see Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (words of a statute "must be read in their context and with a view to their place in the overall statutory scheme"). When Congress wanted to refer to a "text message" in § 227, it amended the statute to do so expressly.

In 2018, Congress amended § 227(e)'s prohibition against misleading or inaccurate caller ID information to expand it from covering only voice calls to covering both "a call made using a voice service" and "*a text message* sent using a text messaging service." 47 U.S.C. § 227(e)(8)(A)-(B) (emphasis added); *see id.* § 227(e)(1) (covering "any voice service or text messaging service").[10] Congress even defined "[t]he term 'text message'" as a "message consisting of text, images, sounds or

---

[10] Section 227(e), also called the Truth in Caller ID Act, originally covered only voice calls, *i.e.*, "a call made using a telecommunications service or IP-enabled voice service." Pub. L. No. 111-331, sec. 2, § 227(e)(1), (8)(A)-(B), 124 Stat. 3572, 3572, 3574 (2010); *see also In re MCP Nol. 185*, 124 F.4th 993, 1007 (6th Cir. 2025) ("telephone services" are the "paradigmatic example of telecommunications service").

other information that is transmitted to or from" a device with a "10-digit telephone number or N11 service code," including "a short message service (commonly referred to as 'SMS') message and a multimedia message service (commonly referred to as 'MMS') message." *Id.* § 227(e)(8)(C); *see also id.* § 227(i)(2) (cross-referencing this definition of "text message" in subsequent amendment).

Interpreting "telephone call" to include a "text message" would render these amendments and this statutory definition a nullity. Courts should avoid interpreting one statutory term so broadly that it "assumes the same meaning as another statutory term." *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022) (quotation marks omitted); *see also Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 35 (2003) ("A statutory interpretation that renders another statute superfluous is of course to be avoided."). Interpreting "telephone call" to include a text message would also require giving "call" in § 227(c) a different meaning than "call" in § 227(e)—even though "[i]dentical words or phrases used in different parts of the same statute (or related statutes) are presumed to have the same meaning." *Servotronics, Inc. v. Rolls-Royce PLC*, 975 F.3d 689, 694-95 (7th Cir. 2020); *accord Nat'l Credit Union Admin. v. First*

*Nat'l Bank & Trust Co.*, 522 U.S. 479, 501 (1998) ("similar language contained within the same section of a statute must be accorded a consistent meaning"); *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959) (courts construe statutes to "fit, if possible, all parts into an harmonious whole").

For all these reasons, the term "telephone call" in § 227(c)(5) cannot include a text message. The statute means what it says: A cause of action is available only to a person who receives more than one prohibited "telephone call"—*i.e.*, more than one voice call—in a 12-month period.

### 2. Plaintiffs' contrary reading is incorrect.

Plaintiffs do not meaningfully engage with the text of § 227(c)(5), its history, or its surrounding provisions. They briefly note that § 227(c)(1) includes a reference to the term "telephone solicitation," which the TCPA defines to encompass both "a telephone call *or message*" for certain advertising purposes. 47 U.S.C. § 227(a)(4), (c)(1)-(3) (emphasis added); *see* Opening Br. 8, 15. And they observe in a footnote that the word "message," unlike the word "call," can refer to "[a]ny notice, word, or communication, no matter the mode and no matter how sent, from one person to another." Opening Br. 15 n.2 (quoting *Black's Law Dictionary* (6th ed. 1991)).

13

But Plaintiffs do not dwell on this distinction between "call" and "message," and for good reason—it "undermines [their] position." *Davis v. CVS Pharmacy, Inc.*, 797 F. Supp. 3d 1270, 1274 (N.D. Fla. 2025). Even assuming the word "message" could encompass text-messaging technology that was "not in existence when [the] statute was drafted" in 1991, Opening Br. 18 (quoting *Lozano v. Twentieth Century Fox Films Corp.*, 702 F. Supp. 2d 999, 1008 (N.D. Ill. 2010)), that reading would *confirm* that § 227(c)(5)'s private cause of action does *not* extend to text messages. The cause of action in § 227(c)(5) is expressly limited to persons who have "received more than one *telephone call*," not more than one "telephone solicitation" or "message." 47 U.S.C. § 227(c)(5) (emphasis added).

Reading "telephone call" synonymously with "telephone solicitation" would also render the latter superfluous. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (courts should avoid interpretations that render statutory language "void" or "superfluous"). And it would contravene the rule that when Congress "'use[s] one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.'" *S.W. Airlines Co. v. Saxon*, 596 U.S. 450, 457-58

14

(2022) (quoting A. Scalia & B. Garner, *Reading Law* 170 (2012)).  By distinguishing between a "telephone call" and a "telephone solicitation" and picking the former, Congress purposefully limited § 227(c)(5)'s private cause of action to cases involving multiple voice calls.

Plaintiffs' "pager" argument similarly undermines their point. Opening Br. 23-24.  Section 227(b)(1)(A)(iii) prohibits using an autodialer to make "any call" to a "telephone number assigned to a paging service." But contrary to Plaintiffs' suggestion, that provision does not suggest that Congress intended for the TCPA to cover text messages and other written forms of communication.  It simply reflects the technological reality that when the TCPA was enacted, a pager, like a phone, could be reached by placing a *voice call*—and it was therefore typical to refer to "calling" a pager.[11]    That Congress prohibited using an autodialer to

---

[11] *See* Jonathan Rabinovitz, *Teen-Agers' Beepers: Communications as Fashions*, N.Y. Times (Mar. 8, 1991) ("The telephone pagers will signal incoming calls with a high-pitched chirp, and then the owner can look at the beeper to read the number of the person who is calling."), available at https://www.nytimes.com/1991/03/08/nyregion/teen-agers-beepers-communications-as-fashion.html?smid=url-share; *see also* Alex Perry, *Hey Gen Z, This Is a Pager, and in the '90s They Were Everywhere*, Mashable (Aug. 31, 2019) ("[P]eople would give out their individual pager numbers to those who needed them[.] … A sender could call that number and type in a numeric code on their phone or give a message to an operator."), available at https://perma.cc/5GTP-C87Z.

15

place a *call* to a "telephone number assigned to a paging service" in § 227(b) does not suggest that a *text message* is a "telephone call" for purposes of § 227(c)(5).

Plaintiffs also note that, before *Chevron* was overruled, some courts referenced dictionaries defining the term "call" to refer to "communications by phone," and observed that this definition does not expressly "*prohibit* application of the statute to text messaging." Opening Br. 18 (quoting *Lozano*, 702 F. Supp. 2d at 1007) (emphasis added); *see id.* at 16-17 (citing *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953 (2009)). But saying that a dictionary definition does not squarely *prohibit* an interpretation for purposes of deferring to an agency is entirely different from saying that the interpretation reflects the statute's "ordinary, contemporary, common meaning." *Delaware v. Pennsylvania*, 598 U.S. 115, 128 (2023). The mere fact that "a [dictionary] definition is broad enough to encompass one sense of a word does not establish … that the word is *ordinarily* understood in that sense." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012) (emphasis in original).

Without a textual hook for their argument, Plaintiffs contend that "telephone call" should be stretched to include a text message because

that result purportedly aligns with Congress's broad purposes. But arguments about broad remedial purposes "cannot trump" an interpretation based on "the structure and logic of [a] statut[e]." *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1282 (7th Cir. 1995). Indeed, the Supreme Court has refused to use the TCPA's legislative goals to overcome its "narrow statutory design" and stretch it to cover technologies not covered by the statutory text. *Duguid*, 592 U.S. at 408 ("That Congress was broadly concerned about intrusive telemarketing practices, however, does not mean it adopted a broad autodialer definition.").

\* \* \*

In short, the plain text, history, and statutory context of § 227 make clear that a text message is not a "telephone call" under § 227(c)(5). The district court was therefore correct to hold that Plaintiffs cannot base a private cause of action under § 227(c)(5) on receipt of text messages.

## B. The FCC's interpretation of the term "any call" in a different subsection is not entitled to deference.

Rather than engaging with the statutory text, Plaintiffs principally argue that the FCC has "reasonabl[y]" interpreted the word "call" in the TCPA to include text messages, and that this interpretation is "entitled to deference." Opening Br. 5; *see id*. at 14-15. That argument falters out

of the gate: The FCC has never construed the phrase "telephone call" in § 227(c)(5), and in fact "decline[d] to make any determination about the specific contours of the TCPA's private right of action" under § 227(c)(5) in the relevant order. *Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report & Order, CG Docket No. 02-278, 18 FCC Rcd 14014, ¶ 206 (July 3, 2003) ("2003 Order").[12]

More fundamentally, Plaintiffs' plea for deference is squarely foreclosed by *Loper Bright*, which holds that courts "must exercise independent judgment in construing statutes administered by agencies" and "may not defer to an agency interpretation of the law simply because a statute is ambiguous." 603 U.S. at 394, 406, 413. Plaintiffs' efforts to avoid *Loper Bright* are unpersuasive.

---

[12] Elsewhere in the 2003 Order, the FCC asserted in a single, unreasoned sentence that the term "any call" in a different provision of the TCPA—the autodialer prohibition, 47 U.S.C. § 227(b)(1)(A)—applies to both voice calls and text messages. 2003 Order ¶ 165 ("We affirm that under the TCPA, it is unlawful to make *any call* using an automatic telephone dialing system or an artificial or prerecorded message to any wireless telephone number. … This encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls, provided the call is made to a telephone number assigned to [a covered] service." (citing 47 U.S.C. § 227(b)(1))). Plaintiffs contend that this sentence "stands for the proposition that, under the TCPA, text messages qualify as 'calls,'" and ask the Court to defer to it. Opening Br. 11.

### 1. *Chevron* deference is unavailable.

In *Loper Bright*, the Supreme Court overruled *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), and held that "courts must exercise independent judgment in determining the meaning of statutory provisions." 603 U.S. at 394. Rather than "mechanically afford[ing] binding deference to agency interpretations," as *Chevron* required, courts must determine the "best reading" of the statute—"the reading the court would have reached if no agency were involved." *Id.* at 399-400 (quotation marks omitted). Courts interpreting the TCPA thus are "not bound by the [FCC]'s interpretation, but instead must determine the meaning of the law under ordinary principles of statutory interpretation." *McLaughlin*, 606 U.S. at 155; *see Gulomjonov v. Bondi*, 131 F.4th 601, 609 (7th Cir. 2025) (*Chevron* "is no longer operative").

Under *Loper Bright*, the question whether "telephone call" in § 227(c)(5) includes a text message is a question of statutory interpretation for this Court to decide independently. So even if the FCC had addressed this provision of the TCPA, *but see supra*, at 18 & n.12, the Court could not defer to its interpretation.

Despite this precedent, Plaintiffs insist that "the scope of review here is narrow and deferential" and that the Court "must exercise appropriate deference to the FCC's decisionmaking and not substitute [its] own judgment for that of the Commission." Opening Br. 29 (quoting marks omitted); *see id.* at 5, 14, 28-29. According to Plaintiffs, because the TCPA gives the FCC a measure of "discretion" to adopt rules curtailing unwanted telephone solicitations (such as creating a Do-Not-Call Registry), 47 U.S.C § 227(c)(1)-(3), the Court must apply the APA's "deferential arbitrary-and-capricious standard" to the *legal* question whether "telephone call" includes a text message. *Id.* at 14 (quoting *Seven County*, 605 U.S. at 179). This argument fundamentally misapprehends the judicial function under *Loper Bright*, *Seven County*, and the APA—and if accepted, it would amount to resurrecting *Chevron*.

The APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). But the arbitrary-and-capricious standard does not apply to "questions of law" or disputes about how to "interpret … statutory provisions." *Id.* § 706. Instead, "the reviewing court shall decide" these legal questions

*de novo*.  *Id.*; *see Seven County*, 605 U.S. at 179 (courts apply "*de novo*" review to agency interpretations of statutes (citing *Loper Bright*, 603 U.S. at 391-92)).

The arbitrary-and-capricious standard applies when a court is reviewing whether an agency has appropriately "exercise[d] discretion granted by a statute," which "involves primarily issues of fact."  *Seven County*, 605 U.S. at 179, 181 (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989)).  In *Seven County*, for instance, the Court reviewed whether an environmental impact statement complied with the National Environmental Policy Act ("NEPA").  *Id.* at 172.  The Court held that this "fact-dependent, context-specific, and policy-laden" inquiry warranted "substantial deference" to the agency, especially because "NEPA is a purely procedural statute" and "imposes no substantive constraints on the agency's" decisionmaking.  *Id.* at 180, 183 (emphasis removed).

The question here, by contrast, is a pure question of statutory interpretation: whether a text message is a "telephone call" within the meaning of § 227(c)(5).  Under *Loper Bright*, the Court must independently determine the "best reading" of that term in § 227(c)(5).

21

603 U.S. at 400. The arbitrary-and-capricious standard plays no role in that inquiry.

**2. Plaintiffs correctly do not rely on *Skidmore*.**

While *Loper Bright* forbids courts from deferring to agency interpretations of statutes, courts may of course consider agency interpretations as inputs into their independent statutory-interpretation process, consulting them for whatever persuasive value they may offer. *Loper Bright*, 603 U.S. at 394 (citing *Skidmore*, 323 U.S. at 134). Under *Skidmore*, the persuasive value of an agency's interpretation depends on: (1) "the thoroughness evident in its consideration," (2) "the validity of its reasoning," (3) "its consistency with earlier and later pronouncements," (4) whether the interpretation is "based upon … specialized experience," and (5) "all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 139-40. Plaintiffs do not engage with the *Skidmore* factors, and each of them cuts against affording the FCC's 2003 Order persuasive weight here.

As an initial matter, the 2003 Order does not even purport to interpret the phrase "telephone call" in § 227(c)(5)'s private right of action. It

addresses the phrase "any call" in the TCPA's autodialer provision, codi-fied in subsection (b).  47 U.S.C. § 227(b)(1)(A); *supra*, at 18 & n.12.

Even if the FCC's interpretation of "call" in the 2003 Order were relevant to the phrase "telephone call" in § 227(c)(5), the Order was not thoroughly reasoned.  It simply asserted without explanation that "any call" includes "voice calls and text calls … for example, short message service (SMS) calls."  2003 Order ¶ 165 (emphasis removed).  The 2003 Order failed to address the fact that ordinary users of the English lan-guage do not refer to text messages as "text calls."  Nor did it explain how a "text" can be a "call" or otherwise elaborate on this novel, self-contra-dictory term.  Such unexplained *ipse dixit* lacks power to persuade. *Arobelidze v. Holder*, 653 F.3d 513, 521 (7th Cir. 2011) (agency interpre-tation that "occupied all of a paragraph of thought" lacked persuasive weight under *Skidmore*).

The FCC's later orders are a house of cards:  They did not backfill the 2003 Order's lack of explanation but merely cross-referenced its un-reasoned assertion.[13]  While Plaintiffs highlight a 2023 FCC order,

---

[13] *Rules & Regulations Implementing the Telephone Consumer Protec-tion Act of 1991*, Report & Order, CG Docket No. 02-278, 27 FCC Rcd 1830, 1832 ¶ 4 & n.12 (Feb. 15, 2012) (cross-referencing 2003 Order);

Opening Br. 12-13, that order did not interpret the word "call" at all. *See Targeting & Eliminating Unlawful Text Messages*, Second Report & Order, CG Docket No. 21-402, 38 FCC Rcd 12247 (Dec. 18, 2023) ("2023 Order"). Rather, the 2023 Order extended the Do-Not-Call Registry's rules to text messages based on the FCC's prior, unexplained conclusion that for purposes of the TCPA, text messages are included in the term "call," and because doing so purportedly would "further the objectives of the TCPA." *Id.* ¶ 26, 62.

The FCC's interpretation similarly lacks "validity of … reasoning," *Skidmore*, 323 U.S. at 139-40, because it is "contrary to the plain meaning of the statute" for all the reasons already explained, *Order of Ry. Conductors of Am. v. Swan*, 152 F.2d 325, 329 (7th Cir. 1945); *supra*, at 6-17. And the FCC did not rely on technical expertise or "specialized experience" in conflating telephone calls and text messages. *Skidmore*, 323 U.S. at 139-40. The differing nature of telephone calls and text messages is well-known to consumers. And in any event, statutory interpretation

---

*Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order, CG Docket No. 02-278, 30 FCC Rcd 7961, ¶¶ 1, 2 & n.1 (July 10, 2015) (same).

falls within the expertise of courts, not agencies. *Loper Bright*, 603 U.S. at 374 (it is for "courts to handle technical statutory questions").

The FCC's 2003 interpretation also was not adopted contemporaneously with the TCPA—it departed from a settled understanding of the statute more than a decade after its 1991 enactment. *Loper Bright*, 603 U.S. at 394; *Skidmore*, 323 U.S. at 139-40. The FCC's original 1992 order implementing the TCPA did not define "telephone call" to include written communications; it consistently used the word "call" to refer to "voice" calls, including autodialed calls involving "an artificial or prerecorded voice" and "live voice solicitations." *Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report & Order, CG Docket No. 92-90, 7 FCC Rcd 8752, ¶ 2, (Oct. 16, 1992). The 2003 Order's new interpretation was unexplained and reflected a transparent effort to fill a perceived "legislative gap." *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1308-09 (11th Cir. 2020) (Sutton, J., sitting by designation).

In short, none of the *Skidmore* factors supports deference to the 2003 Order, which did not address § 227(c)(5)'s use of the term "telephone

call" in any event. The Court should give the term "telephone call" its plain, ordinary meaning.

### C. Plaintiffs' remaining arguments are meritless.

Plaintiffs raise a handful of additional arguments for interpreting the term "telephone call" to include text messages. Each is meritless.

Unable to ground their argument in the text of the statute Congress enacted, Plaintiffs ask the Court to draw inferences from what Congress did *not* say. They argue that Congress must have implicitly adopted the FCC's interpretation because it amended the TCPA without upsetting that interpretation. Opening Br. 17-18. But the FCC has never interpreted the term "telephone call" in § 227(c)(5), *see supra*, at 18 & n.12, so Congress could not have endorsed any FCC interpretation as to that term. And regardless, Congress did upset the FCC's interpretation—its amendments to § 227 contradict Plaintiffs' view by *distinguishing* between calls and text messages. *See supra*, at 11-13.

Plaintiffs also suggest that the Supreme Court has already held that a text message is a "telephone call" under § 227(c)(5). Opening Br. 17. Not so. The Supreme Court's decision in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016), simply assumed that text messages could be

treated as "call[s]" for purposes of the TCPA autodialer provision because that issue was "undisputed" by the parties. *Id.* at 156 (discussing § 227(b)). This Court has similarly assumed that the TCPA applies to text messages, yet has never held that a text message is a telephone call under § 227(c)(5). *See, e.g.*, *Warciak v. Subway*, 949 F.3d 354, 356 (7th Cir. 2020) (citing *Campbell-Ewald*); *Gadelhak v. AT&T Servs.*, 950 F.3d 458, 462 (7th Cir. 2020) (same). The Supreme Court has since confirmed that the question whether a text message is a "call" for purposes of the autodialer provision is still an open, unresolved question. *Duguid*, 592 U.S. at 400 n.2. And neither these *Chevron*-era decisions nor any other precedential opinion has interpreted the TCPA to hold that a text message is a "telephone call" for purposes of § 227(c)(5). Indeed, following *Loper Bright*, a growing number of district courts have rejected Plaintiffs' interpretation, including the court below. *See* S.A. 11-12; *Davis*, 797 F. Supp. 3d at 1274; *Sayed v. Naturopathica Holistic Health, Inc.*, 2025 WL 2997759 (M.D. Fla. Oct. 24, 2025); *see also Dilanyan v. Hugo Boss Fashions, Inc.*, 2025 WL 3549868, at *2, *4 (C.D. Cal. Dec. 3, 2025) (agreeing that "the ordinary meaning of 'telephone call' … exclude[s] 'text

27

message,'" and urging Ninth Circuit to "reexamine" precedent deferring to the FCC).

Plaintiffs also rely heavily on another *Chevron*-era autodialer case decided by the Ninth Circuit. *Satterfield*, 569 F.3d at 946. But in that decision, the court concluded that the "statute [was] silent" and, under *Chevron*, deferred to the FCC's interpretation. *Id.* at 954. The Ninth Circuit did not "exercise [its] independent judgment" in determining whether a text message is a "call" under the TCPA. *Loper Bright*, 603 U.S. at 412. *Satterfield*'s reflexive deference to the FCC is precisely the type of judicial analysis that *Loper Bright* forbids.

Finally, Plaintiffs cite a number of district-court decisions (and another Ninth Circuit decision) that they claim support their position. Opening Br. 19-21. But all these cases are inapt. Many did not even address § 227(c)(5).[14] And for most of the others, the question whether

---

[14] *See Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 989 n.6 (9th Cir. 2023); *Reimer v. Kohl's, Inc.*, 2023 WL 6161780, at *2-4 (E.D. Wis. Sept. 21, 2023); *Pepper v. CVG Cap. LLC*, 677 F. Supp. 3d 638, 643 (S.D. Tex. 2023); *Gulden v. Liberty Home Guard LLC*, 2021 WL 689912, at *1 (D. Ariz. Feb. 23, 2021); *Barton v. Temescal Wellness, LLC*, 525 F. Supp. 3d 195, 198-99 (D. Mass. Mar. 8, 2021).

text messages are "telephone calls" under § 227(c)(5) was not contested.[15] The remaining cases are unpublished district-court decisions, all of which are unconvincing. Like Plaintiffs, these courts conflated "telephone call" with "telephone solicitation," misinterpreted the term "call," or grounded their interpretation in policy considerations.

## II. Plaintiffs' Interpretation Would Harm Businesses And Consumers

Reading "telephone call" to include text messages is not just legally unsupported; it would also have profoundly negative consequences for businesses and consumers.

Consumers rely on text messages to receive important notifications from the businesses they transact with. From appointment reminders to transaction alerts, from breaking-news updates to order confirmations and promotions, text messages play an important role in the everyday lives of ordinary people. Market research shows that "[c]onsumers prefer

---

[15] *Bradshaw v. CHW Grp., Inc.*, 763 F. Supp. 3d 641, 649 (D.N.J. 2025); *Stamper v. Manus-Nw. Oral Health Ctr., Ltd.*, 2025 WL 2044093, at *1 (N.D. Ill. July 17, 2025); *Connor v. Servicequick, Inc.*, 2025 WL 2855393, at *2 & n.3 (D. Colo. Oct. 8, 2025); *Misner v. Empire Auto Protect, LLC*, 2024 WL 4688940, at *3 (S.D. Ohio Nov. 6, 2024); *Mantha v. QuoteWiz-ard.com, LLC*, 347 F.R.D. 376, 382-83 (D. Mass. 2024); *Busbee v. Ser-viceToday!*, 2024 WL 4428989, at *3 (N.D. Tex. Oct. 4, 2024).

receiving messages from businesses via SMS for its convenience, speed, and unobtrusiveness, with 9 out of 10 consumers favoring this channel." James Anthony, *48 SMS Marketing Statistics You Must See: 2024 Market Share Analysis & Data*, Finance Online (last modified July 11, 2025) ("*SMS Marketing Statistics*").[16]  And 54% of consumers in one survey "said they want to receive coupons, discounts, and promotional offers via text."  Mark Hamstra, *How Top Brands Are Turning SMS Text Messaging into a Bona Fide Sales & Marketing Channel*, U.S. Chamber of Commerce (July 12, 2022).[17]

These consumer preferences are unsurprising.  Text messages are "[l]ess intrusive than a phone call," Navid Ashroff, *Unlock Business Growth with SMS: Why Texting Is Essential*, Forbes (June 6, 2024),[18] and do not require "download[ing] a brand's app to receive notifications," *SMS Marketing Statistics*, *supra*.  Text messaging is also asynchronous, meaning that texts can be checked and responded to whenever is

---

[16]  https://perma.cc/GE4A-54Y7.

[17]  https://perma.cc/8CEK-N8RN.

[18]  https://www.forbes.com/councils/forbestechcouncil/2024/06/06/unlock-business-growth-with-sms-why-texting-is-essential/.

convenient.  Sammi Caramela, *Why Text Message Payments Might Be Good For Your Business*, U.S. Chamber of Commerce (July 14, 2022).[19] And many phones allow individuals to filter text messages in ways that are not possible for calls.  *See, e.g.*, *Screen, Filter, Report, and Block Text Messages on iPhone*, Apple (last visited Dec. 10, 2025).[20]

Adopting a broad reading of § 227(c)(5) would interfere with consumers' reliance on text messaging by incentivizing abusive TCPA litigation and thereby chilling businesses from sending beneficial messages. The TCPA authorizes up to $500 in damages for "each" violation, and up to $1,500 per "willfu[l] or knowin[g]" violation.  47 U.S.C. § 227(c)(5)(B). The TCPA has thus generated staggering liability exposure for legitimate businesses, leading one former FCC Commissioner to describe the TCPA as "the poster child for lawsuit abuse."  *Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order, CG Docket No. 02-278, 30 FCC Rcd 7961, 8073 (July 10, 2015) (dissenting statement of Commissioner Ajit Pai).  For instance, in 2020 and 2021, 4,000 total lawsuits were filed under the TCPA—and more

---

[19]  https://perma.cc/7WTP-HEVF.

[20]  https://perma.cc/VC44-LDXG.

than half were filed by the same 10 law firms. U.S. Chamber of Commerce Institute for Legal Reform, *Expanding Litigation Pathways: TCPA Lawsuit Abuse Continues in the Wake of Duguid* 2, 26-29 (Apr. 2024) ("*TCPA Lawsuit Abuse*").[21] Businesses facing these lawsuits often feel pressure to settle "to avoid the enormous damages that can accrue, regardless of the merit of the claim." *Id.* at 15.

Reading § 227(c)(5) to authorize a private right of action for receiving multiple *text messages* within a 12-month period would only increase the potential for abuse in ways Congress never intended. Congress tied the cause of action to "telephone call[s]," not text messages. 47 U.S.C. § 227(c)(5). Disregarding that legislative judgment could discourage the use of text messages as a means of communicating with customers, to the detriment of consumers who value its efficiency and convenience.

Nor is there any need for this Court to judicially expand § 227(c)(5). Congress has amended § 227 many times, including by adopting provisions that specifically address text messages. *E.g.*, RAY BAUM's Act of 2018, Pub. L. No. 115-141, Div. P, sec. 503, 132 Stat. 348, 1091-92 (2018) (adding definition of "text message" and related provisions at § 227(e)(8)).

---

[21] https://perma.cc/J9BP-KQSS.

If Congress believes that a private cause of action should be created for unsolicited text messages under § 227(c), it is well equipped to weigh the interests of consumers and businesses and enact a tailored solution. If Congress does not do so, Plaintiffs' "quarrel is with Congress," not this Court. *Duguid*, 592 U.S. at 409. The role of the Court is simply to interpret the terms of the TCPA as it finds them, not to "revise them." *FLRA*, 975 F.2d at 356.

## CONCLUSION

For these reasons, the Court should affirm the judgment of the district court.

Dated: December 29, 2025

Respectfully submitted,

/s/ *Russell B. Balikian*

Maria C. Monaghan
Mariel A. Brookins
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062

Russell B. Balikian
Andrew Y. Ebrahem
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8535
RBalikian@gibsondunn.com
AEbrahem@gibsondunn.com

Counsel for *Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Seventh Circuit Rule 29 because it contains 5864 words, excluding the parts exempted by Fed. R. App. P. 32(f).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as amended by Seventh Circuit Rule 32(b), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook typeface.

/s/ *Russell B. Balikian*
Russell B. Balikian

December 29, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit via the Court's CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Russell B. Balikian*
Russell B. Balikian

December 29, 2025