No. 25-02398

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

Joseph Jones et al.,

*Plaintiffs-Appellants,*

v.

Blackstone Medical Services, LLC

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of Illinois
No. 1:24-CV-01074-JEH-RLH
Hon. Jonathan E. Hawley

---

**APPELLANT'S REPLY TO BRIEF OF APPELLEE BLACKSTONE
MEDICAL SERVICES, LLC**

---

Abbas Kazerounian (CA Bar No. 249203)
ak@kazlg.com
Ryan L. McBride (CA Bar No. 297557)
ryan@kazlg.com
*Kazerouni Law Group, APC*
*245 Fischer Avenue, Suite D1*
*Costa Mesa, CA 92626*
*(800) 400-6808*

*Interim Lead Attorneys for Plaintiffs-
Appellants and the Putative Class*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2398

Short Caption: Steidinger et al v. Blackstone Medical Services

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Joseph Jones, Natasha Koller, and Seth Steidinger, individually and on behalf of all others similarly situated.

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Kazerouni Law Group, APC.

_____

(3)    If the party, amicus or intervenor is a corporation:

   i)       Identify all its parent corporations, if any; and

        N/A

   ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Ryan L. McBride          Date: 02/02/26

Attorney's Printed Name:  Ryan L. McBride

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☒  **No** ☐

Address:  2221 Camino Del Rio S., Suite 101

    San Diego, CA 92108

Phone Number: (800) 400 - 6808          Fax Number:  (800) 520 - 5523

E-Mail Address: ryan@kazlg.com

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2398

Short Caption: Steidinger et al v. Blackstone Medical Services

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Joseph Jones, Natasha Koller, and Seth Steidinger, individually and on behalf of all others similarly situated.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Kazerouni Law Group, APC.

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

      N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Seyed Abbas Kazerounian     Date: 2/2/26

Attorney's Printed Name: Seyed Abbas Kazerounian

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐   **No** ☒

Address: 245 Fischer Ave., Suite D1

Costa Mesa, CA 92626

Phone Number: (800) 400 - 6808     Fax Number: (800) 520 - 5523

E-Mail Address: ak@kazlg.com

rev. 12/19 AK

**TABLE OF CONTENTS**

**Page**

ARGUMENT.................................................................................................. 1

    I.      The Purpose and Language of the TCPA Support Text Messages.........1

    II.    Surrounding Statutory Provisions Support Text Messaging in 227(c) ..5

    III.   The FCC has Consistently Interpreted "Calls" to Include Texts ..........9

    IV.   *Duguid* is Distinguishable.................................................................14

    V.    Public Policy Warrants Protection Against Intrusive Text Messaging 17

    VI.   Amicus Briefs .....................................................................................18

        A.     Chamber of Commerce ................................................................. 19

        B.     NRCC and NRSC ........................................................................ 24

        C.     Fashion Nova ............................................................................... 26

CONCLUSION ........................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Alvarez v. Fiesta Nissan, Inc.*,
No. 7:25-cv-00343,
2026 U.S. Dist. LEXIS 14155 (S.D. Tex. Jan. 27, 2026)............................ 3, 12

*Campbell-Ewald Co. v. Gomez*,
577 U.S. 153 (2016).................................................................... 10, 27

*Castro v. Green Tree Servicing LLC*,
959 F. Supp. 2d 698 (S.D.N.Y. 2013)............................................... 2

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984)................................................................ 11, 13

*Dickson v. Direct Energy, LP*,
69 F.4th 338 (6th Cir. 2023)........................................................... 1

*Dobronski v. CHW Grp., Inc.*,
No. 24-cv-11649,
2025 U.S. Dist. LEXIS 162742 (E.D. Mich. Aug. 21, 2025)............................ 26

*Facebook, Inc. v. Duguid*,
592 U.S. 395 (2021)............................................................ 14, 15, 17

*Ferrell v. Colourpop Cosmetics, LLC*,
2025 U.S. Dist. LEXIS 140893 (C.D. Cal. July 22, 2025)................................ 26

*Harriel v. Bealls, Inc.*,
No. 8:25-cv-1165-TPB-SPF,
2025 U.S. Dist. LEXIS 158157 (M.D. Fla. Aug. 15, 2025) .............................. 25

*Krakauer v. Dish Network L.L.C.*,
168 F. Supp. 3d 843 (M.D. N.C. Aug. 5, 2016) ................................................ 2

*Krakauer v. Dish Network, L.L.C.*,
925 F.3d 643 (4th Cir. 2019) ...........................................1, 10, 11, 18

*Lirones v. Leaf Home Water Sols., LLC*,
23-2087,
2024 U.S. Dist. LEXIS 165900 (N.D. Ohio Sept. 16, 2024)............................ 26

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024).........................................................11, 13, 26

*Lorillard v. Pons,*
        434 U.S. 575 (1978) ............................................................................................ 8

*Loudermilk v. Maelys Cosmetics USA, Inc.,*
        No. 1:24-cv-1866-AT,
        2025 U.S. Dist. LEXIS 258097 (N.D. Ga. Dec. 10, 2025) ........................... 24, 25

*Lozano v. Twentieth Century Fox Film Corp.,*
        702 F. Supp. 2d 999 (N.D. Ill. 2010) ................................................................. 3

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.,*
        606 U.S. 146 (2025) ..................................................................................... 11, 25

*Mims v. Arrow Fin. Servs., LLC,*
        565 U.S. 368 (2012) ....................................................................................... 1, 6

*Physicians Healthsource, Inc. v. A-S Medication Sols., LLC,*
        950 F.3d 959 (7th Cir. 2020) ............................................................................ 1

*Porter v. Bd. Of Trs. Of Manhattan Beach Unified Sch. Dist.,*
        307 F.3d 1064 (9th Cir. 2002) .......................................................................... 8

*Satterfield v. Simon & Schuster, Inc.,*
        569 F.3d 946 (9th Cir. 2009) ............................................................................ 3

*Schmitendorf v. Juicy's Vapor Lounge, Inc.,*
        No. 22-cv-02293-TC-GEB,
        2025 U.S. Dist. LEXIS 208110 (D. Kan. Oct. 21, 2025) .................................. 26

*Skidmore v. Swift & Co.,*
        323 U.S. 134 (1944) ..................................................................................... 20, 21

*Squillacote v. United States,*
        739 F.2d 1208 (7th Cir. 1984) .......................................................................... 3

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
        566 U.S. 560 (2012) ..................................................................................... 19, 20

*Toney v. Quality Res., Inc.,*
        75 F. Supp. 3d 727 (N.D. Ill. 2014) .................................................................. 2

*Van Patten v. Vertical Fitness Group, LLC,*
        847 F.3d 1037 (9th Cir. 2017) .......................................................................... 1

*Warciak v. Subway Rests., Inc.,*
        949 F.3d 354 (7th Cir. 2020) ............................................................................ 27

*Wilson v. Hard Eight Nutrition LLC,*
No. 6:25-cv-00144-AA,
2025 U.S. Dist. LEXIS 122504 (D. Or. June 27, 2025) .................................... 26

*Wilson v. Skopos Fin., LLC,*
2025 U.S. Dist. LEXIS 138638 (D. Or. Jul 21, 2025) ................................. 12, 13

*Wis. Cent. Ltd. v. United States,*
585 U.S. 274 (2018) ............................................................................................ 4

**Statutes**

42 U.S.C. § 12101(b)(4) ........................................................................................ 15

42 U.S.C. §§ 12101–12213 ................................................................................... 15

47 U.S.C § 227(a) .................................................................................................. 15

47 U.S.C. § 225 ..................................................................................................... 15

47 U.S.C. § 225(a)(3) ............................................................................................ 16

47 U.S.C. § 225(d) ................................................................................................ 16

47 U.S.C. § 225(d)(1)(D) ...................................................................................... 16

47 U.S.C. § 227 ......1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, 16, 18, 21, 24, 25, 27, 28, 29

47 U.S.C. § 227(a)(1) ............................................................................................ 14

47 U.S.C. § 227(a)(4) ......................................................................................... 5, 6

47 U.S.C. § 227(b) ...................................................................................... 1, 17, 25

47 U.S.C. § 227(b)(1)(A)(iii) ................................................................................... 1

47 U.S.C. § 227(b)(1)(C) ......................................................................................... 1

47 U.S.C. § 227(c) ................................................. 2, 4, 5, 10, 13, 15, 17, 18, 25

47 U.S.C. § 227(c)(1)(E) ....................................................................................... 10

47 U.S.C. § 227(c)(2) ............................................................................................ 17

47 U.S.C. § 227(c)(3) ....................................................................................... 10, 17

47 U.S.C. § 227(c)(3)(F) ....................................................................................... 10

47 U.S.C. § 227(c)(5) ................................... 5, 6, 7, 8, 9, 11, 16, 18, 21, 23, 24, 26, 29

47 U.S.C. § 227(e) ................................................................................................ 6, 8

47 U.S.C. § 227(e)(1) ................................................................................................ 7

47 U.S.C. § 227(e)(8) ................................................................................................ 8

47 U.S.C. § 227(e)(8)(D) ........................................................................................... 8

Consolidated Appropriations Act,
2018, H.R. 1625, 115th Cong.,
Pub. L. No. 115-141; 132 Stat. 348 ................................................................ 7, 8

Do Not Call Implementation Act,
108 P.L. 10, 117 Stat. 557 (2003) ................................................................ 21, 23

Telephone Consumer Protection Act of 1991,
Pub. L. No. 102-243, § 2, 105 Stat. 2394 (1991). ................................................ 5

**Other Authorities**

*Americans are getting 2.5 billion robocalls a month – the highest level in years,*
Mary Cunningham, CBS News (October 17, 2025) ........................................ 18

*GSM Association Roaming Database, Structure and Updating,*
GSMA (June 20, 2024) ................................................................................. 27

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,*
17 FCC Rcd 17459 (September 18, 2022) ................................................... 21, 22

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,*
18 FCC Rcd. 14014 (2003) ....................................... 9, 10, 14, 20, 22, 23

*In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,*
30 FCC Rcd 7961 (2015) ............................................................................. 28

Oxford English Dictionary, 2d Ed. (1989) ...................................................... 3

*Report on the State of Text Messaging,*
Steve Pociask, FCC Consumer Advisory Committee ...................................... 18

*SMS Interoperability Guidelines,*
CTIA (Jan. 15, 2015) ................................................................................... 28

*SMS, texts, mobile calls: The most preferred modes people use to keep in touch with
their loved ones,*
Lesly Simeon, YouGov ................................................................................... 4

*Switching and signaling, and associated measurements and tests,*
International Telecommunications Union ................................................ 27

*Technical report on SS7 vulnerabilities and mitigation measures for digital financial services transactions,*
International Telecommunications Union (2019) ................................... 27

*The Interpretation and Application of Statutes,*
R. Dickerson (1975) ................................................................................ 3

The New Merriam-Webster Dictionary (1989) ............................................ 3

TTY and TTY Relay Services,
National Association of the Deaf:
https://www.nad.org/resources/technology/telephone-and-relay-services/tty-and-tty-relay-services/ ...................................................... 16

Webster's College Dictionary (1991) ........................................................ 3

*WhatsApp Encryption Overview,*
WhatsApp(August 19, 2024): https://tinyurl.com/bdd98fus ............... 28

## Rules

7th Cir. R. 32(b) ........................................................................................ 1

7th Cir. R. 32(c) ........................................................................................ 1

Fed. R. App. P. 32(a)(5) .............................................................................. 1

Fed. R. App. P. 32(a)(6) .............................................................................. 1

Fed. R. App. P. 32(a)(7)(B)(i) .................................................................... 1

## Regulations

47 C.F.R. § 64.1200(c) .......................................................................... 10, 24

47 C.F.R. § 64.1200(d) .......................................................................... 10, 24

47 C.F.R. § 64.1200(e) ................................................................................ 10

## Legislative Materials

137 Cong. Rec. S18784 (1991) ................................................................... 4

**ARGUMENT**

## I. The Purpose and Language of the TCPA Support Text Messages

Words in statutes are interpreted by function, not frozen technology. The TCPA's concern was not limited to sound waves transmitted by voice. *See* 47 U.S.C. §§ 227(b)(1)(A)(iii); (b)(1)(C) (creating restrictions on paging services and telephone facsimile machines, respectively). Rather, Congress sought to protect consumers from unwanted communications that invaded their privacy. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370-71 (2012); *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019) ("the law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls…"); *Dickson v. Direct Energy, LP*, 69 F.4th 338, 346 (6th Cir. 2023) ("courts have found invasion-of-privacy-like harms flowing from unwanted telephonic communications"); *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) ("telemarketing text messages…present the precise harm and infringe the same privacy interests Congress sought to protect in enacting the TCPA"). To that effect, "[t]he TCPA is a remedial statute that we must liberally construe in favor of consumer protection." *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 967 (7th Cir. 2020).

Defendant hopes to escape this broad remedial purpose and construe the TCPA's private right of action through an anachronistic, narrow lens. Take Defendant's purported definition of a "telephone call"—one made using sound waves transmitted by voice. Should a telemarketer make such a telephone call, with the intent for oral communication, but the call is left unanswered by the recipient, would

1

this be an actionable "telephone call" under section 227(c)? To most courts, the answer would be yes. *See e.g.*, *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 746 (N.D. Ill. 2014) (finding plausible a Section 227(c) cause of action with one answered call and three unanswered calls); *Castro v. Green Tree Servicing LLC*, 959 F. Supp. 2d 698, 720 (S.D.N.Y. 2013) (holding it immaterial whether the plaintiff answered the defendants' calls or whether the calls went to voicemail); *Krakauer v. Dish Network L.L.C.*, 168 F. Supp. 3d 843, 845 (M.D. N.C. Aug. 5, 2016) ("unwanted telemarketing calls are a disruptive and annoying invasion of privacy," and even unheard and unanswered calls create "a risk of an invasion of a class member's privacy"). The reason for this is obvious: the initiation of the call and its appearance on the recipient's phone invades the privacy of the recipient. Any subsequent action by the recipient goes to the degree of invasion rather than its existence in and of itself. This is especially true when individuals repeatedly, and to no avail, ask the calling entity to stop, as has happened in the instant action. *See* Appellant's Opening Brief ("O.B.") at 3-4 (citing the Consolidated Class Action Complaint). Thus, a call made by voice transmission is the same exact harm done as a call made by text transmission. Indeed, text messages are functionally the same as traditional telephone calls: they are initiated to a telephone number; they use the telephone network; they invade the recipient's privacy; they impose costs and burdens on recipients; and they are unsolicited communications initiated by a sender telemarketer. *See e.g.*, *Alvarez v. Fiesta Nissan, Inc.*, No. 7:25-cv-00343, 2026 U.S. Dist. LEXIS 14155, at *11-14 (S.D.

Tex. Jan. 27, 2026) (finding "there is nothing in the meaning of 'telephone' that excludes the function of a text message").

The fact that text messages did not exist when Congress enacted the TCPA does not foreclose their applicability to the term "telephone call." For starters, around the time of the TCPA's enactment, the term "call" had been defined as a *communication* by telephone. *See e.g.*, Webster's College Dictionary (1991) ("to communicate or try to communicate with by telephone"); The New Merriam-Webster Dictionary (1989) ("to get or try to get in communication by telephone"); Oxford English Dictionary, 2d Ed. (1989) ("a summons or communication by telephone"); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009). Text messaging falls squarely within this definition. Still, "statutes must be permitted to apply to technologies not in existence when a statute was drafted." *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1008 (N.D. Ill. 2010). This Court previously explained how holding otherwise "leads to an absurd result":

> Given plaintiffs' interpretation, statutes could never apply to circumstances not in existence at the time of enactment of the original statute, so that, e.g., "a 1925 statute dealing with 'news media' could not apply to television, and a 1930 statute dealing with 'motor cars' could not apply to Volkswagons."

*Squillacote v. United States*, 739 F.2d 1208, 1213 (7th Cir. 1984) (citing R. Dickerson, *The Interpretation and Application of Statutes* 129 (1975)). More recently, the Supreme Court reiterated this concept:

> While every statute's *meaning* is fixed at the time of enactment, new *applications* may arise in light of changes in the world. So "money," as used in this statute, must always mean a "medium of exchange." But what *qualifies* as a "medium of exchange" may depend on the facts of the

3

day. Take electronic transfers of paychecks. Maybe they weren't common in 1937, but we do not doubt they would qualify today as "money remuneration" under the statute's original public meaning. The problem with the government's and the dissent's position today is not that stock and stock options weren't common in 1937, but that they were not then—and are not now—recognized as mediums of exchange.

*Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018).

Here, the term "call," had been defined in and around 1991 as a communication by telephone. Today, however, text messaging is the predominant form of communication by telephone.[1] As this Court and the Supreme Court have both noted, terms are not and cannot be confined to the precise technologies known at the time of enactment. This is especially prescient given the TCPA's emphasis on responding to emerging telephonic technologies. *See e.g.*, 137 Cong. Rec. S18784 (1991) (statement of Sen. Hollings) ("The FCC is given the flexibility to consider what rules should apply to future technologies as well as existing technologies."). In 1991, to "call" someone necessarily involved *dialing* a telephone. Today, phones no longer have dials—yet no one argues that modern calls are not "calls" because the literal mechanism has changed. The word "dial" survives even though the technology it described no longer exists because the word refers to the function of initiating contact, not the mechanical process. As described above, text messaging fits that same pattern and must be included as a "telephone call" under section 227(c). To say as Defendant

---

[1] Lesley Simeon, *SMS, texts, mobile calls: The most preferred modes people use to keep in touch with their loved ones*, YouGov, https://yougov.com/articles/48872-sms-texts-mobile-calls-the-most-preferred-modes-people-use-to-keep-in-touch-with-their-loved-ones (last accessed 1/2/2026).

4

does, that Congress could not have intended "telephone call" to encompass non-voice technology that had not yet been created mistakes Congress's lack of foresight for a lack of intent.

## II.    Surrounding Statutory Provisions Support Text Messaging in 227(c)

Defendant claims that Congress did not intend to provide a private right of action for text messages because of the surrounding provisions of the TCPA. Defendant cites section 227(a)(4), asserting that "telephone solicitation" bifurcates a "telephone call" from "message." Brief of Appellee ("A.B.") at 14-15. Despite again conflating intent with foresight, Defendant's claim also rests on the false premise that a "message" in section 227(a)(4) is completely excluded from "call" in section 227(c)(5).

The definition of "telephone solicitation" in section 227(a)(4) is deliberately broad because it establishes the regulatory framework undergirding the Act. Congress enacted the TCPA to prevent unwanted telephone solicitations and specifically did not create a separate definition for "telephone call" as used in section 227(c)(5). In fact, upon enactment, Congress noted "that residential telephone subscribers consider automated or prerecorded telephone *calls*, regardless of the content or the initiator of the *message*, to be a nuisance and an invasion of privacy." P.L. 102-243, § 2, 105 Stat. 2394 (emphasis added). Rather than refer to the "content of the call" or "initiator of the call," Congress deliberately chose the word "message"— conflating the two words as they both constituted communications by telephone. As such, Congress used "telephone call or message" in section 227(a)(4), to ensure that all forms of solicitations delivered via the telephone system—whatever their format—

fell within it and the FCC's authority. Nothing in the definition states that text messaging is categorically distinct from a "telephone call" for all purposes. To the contrary, the statutory scheme assumes that some "messages" are delivered by means of a telephone call, depending on how the technology operates. Indeed, one cannot send a voicemail message without first initiating a telephone call. Thus, the language "telephone call" must refer to the act of transmission by means of telephone. Text messages are initiated through a telephone number, routed through the telephone network, and delivered to a telephone—precisely the attributes that make them telephone calls in functional terms. The inclusion of "message" in section 227(a)(4) expands coverage; it does not narrow the meaning of "call" elsewhere.

Furthermore, section 227(c)(5)'s phrasing reflects a remedial choice, not a definitional one. Section 227(c)(5) does not redefine "telephone call." It merely identifies conduct for which Congress hoped consumers might obtain a meaningful remedy from unwanted telemarketing. *Mims*, 565 U.S. at 384. The question is therefore not whether Congress used the word "message," but whether a text message qualifies as a telephone call. Nothing in the text suggests Congress intended "telephone call" to mean "voice-only call." Reading that limitation into the statute would add words Congress did not include.

Defendant points to section 227(e), which uses the term "text message" and "text messaging service," to suggest a distinction between text messaging and a "telephone call" as that term is used in section 227(c)(5) . A.B. at 16-18. That argument is flawed for several reasons. First, Congress's decision to define "caller

6

identification" to include text messaging underscores—rather than undermines—the functional equivalence between a call and a text. In modern telecommunications, there is no meaningful distinction between caller identification and texter identification; the "caller" is the person who initiates the text message. Congress's use of the term "caller" in this context reflects a recognition that text messages are initiated calls in a different form.

Second, section 227(e)(1) does not distinguish between a "telephone call" and text messages; rather, it delineates "any *voice* service" from any "text messaging service." (emphasis added). The choice of language is telling. By using the term "voice service" rather than "telephone call," Congress demonstrated that when it wished to limit a provision to voice communications, it did so expressly. The absence of such limiting language in Section 227(c)(5) confirms that "telephone call" was intended as a broader term encompassing communications initiated through the telephone system, not merely voice calls.

Third, Defendant's contention that the 2018 Amendment to the TCPA "br[ought] text messages within its scope" mischaracterizes the Amendment's purpose. The Amendment did not create new coverage for text messages; it "expand[ed] and clarif[ied]" the existing caller identification provisions. Consolidated Appropriations Act, 2018, H.R. 1625, 115th Cong., Pub. L. No. 115-141; 132 Stat. 348. Specifically, Congress expanded this provision to cover "[c]ommunications from outside the United States" and clarified its coverage of "telecommunication services" to that of text messaging and voice services. *Id*. These changes confirm Congress's

7

understanding that text messaging already fell within the TCPA's regulatory framework. Indeed, Congress did not in 2018—and has not since—amended the TCPA to provide for a narrower definition of "telephone call" under section 227(c)(5). *See Porter v. Bd. Of Trs. Of Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064, 1072 (9th Cir. 2002) (Courts "presume that when Congress amends a statute, it is knowledgeable about judicial decisions interpreting the prior legislation"); *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

Fourth, Defendant relies on section 227(e)(8) to argue that Congress distinguished "a call made using a voice service" from text messaging. A.B. at 17. But that provision reinforces the opposite conclusion. By modifying the noun "call" with the phrase "using a voice service," Congress necessarily acknowledged that the term "call" is broader than voice-only communications. Moreover, section 227(e)(8)(D) defines a "text messaging service" in relation to "a service provided as part of or in connection with a voice service," further demonstrating Congress's view that text messaging is integrally linked to—and not categorically distinct from—telephone calling.

Finally, Defendant's argument ignores that when Congress enacted section 227(e), Congress directed that nothing therein "shall be construed to modify, limit, or otherwise affect any rule or order adopted by the [FCC] in connection with [the TCPA]." Pub. L. No. 115-141, div. P, § 503, 105 Stat. 348, 1094. This includes the FCC

rules and orders that interpreted "call" to include text messages. Taken together, Congress's consistent use of "call" as a broad, technology-neutral term confirms that text messages fall squarely within the meaning of a "telephone call" under Section 227(c)(5).

## III. The FCC has Consistently Interpreted "Calls" to Include Texts

As a preliminary matter, Appellants need not rely on the twenty-three years of consistent guidance the FCC has provided when finding that a text message constitutes a call under the TCPA. Nor do Appellants need to principally rely on the years of unanimous Court decisions finding these rulings consistent with the purpose and statutory text of the TCPA. Appellants have already demonstrated that under traditional principles of statutory interpretation, the broad term "call…encompasses both voice calls and text calls." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* (the "2003 Order"), 18 FCC Rcd. 14014 ¶ 165 (2003). Indeed, Congress's silence on the matter in the face of *decades* of consensus speaks volumes.

Defendants nevertheless contend that the FCC attempted to update the TCPA in a way that Congress had not intended. This, however, presupposes that "telephone call" had been a limiting term of art that Congress conveniently chose not to define. Furthermore, it misconstrues the FCC's intent in its 2003 Order. The FCC had not revised the term "call." Instead, it merely noted that the term "call…encompasses both voice calls and text calls." 2003 Order ¶ 165. In other words, it provided its guidance and interpretation of the word "call" under the TPCA—an interpretation

which countless courts and even the Supreme Court found to be "undisputed." *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016). Twenty years later, the FCC would again clarify that the term "call" encompasses text messaging and codified this provision under 47 C.F.R. § 64.1200(e).[2] It stands to reason that the FCC, which Congress provided considerable authority "to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of" section 227(c) would be in the best position to determine the plain meaning of a "telephone call" as used in that section. *See* 47 U.S.C. § 227(c)(1)(E).

Furthermore, Congress gave authority for the FCC to create the now National Do-Not-Call registry, which would "prohibit any person from making or transmitting a *telephone solicitation* to the telephone number of any subscriber included in such database." 47 U.S.C. § 227(c)(3)(F). It would make no sense for Congress to provide a private cause of action to some individuals on this registry and not others based on similar violations of privacy. Indeed, the entire purpose of section 227(c) is the protection of privacy rights to avoid receiving telephonic solicitations. 47 U.S.C. § 227(c)(1). In *Krakauer*, the Fourth Circuit Court of Appeals highlights this provision of the TCPA:

---

[2] Defendant attempts to discredit this provision's applicability to section 227(c) because—despite its explicit ties to 47 C.F.R. § 64.1200(c)-(d) which are *only* promulgated through 227(c)—it incorporates the 2003 Order. Plaintiffs thoroughly addressed this argument in their Response in Opposition to Defendant's Motion to Dismiss. ER 116-117 ("Because the original purpose of 64.1200(e) had been to give wireless customers protection under the FCC's do-not-call provisions, its incorporation of the 2003 Order had merely been to qualify when a wireless customer may not be considered a 'residential subscriber' under the rules. *See* 2003 Order ¶ 36").

10

> Within the federal government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the telephone solicitations that can be made to that number…Barring an exception, however, telemarketers are expected to check the list and avoid bothering those who have asked to be left alone. In addition to the national registry, companies are also expected to keep individual Do-Not-Call lists, reflecting persons who have directly told the company that they do not wish to receive further solicitations.

* * *

> This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people. The law empowers each person to protect his own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace.

*Krakauer*, 925 F.3d at 649-50. The FCC understood its assignment and provided a reasonable interpretation of "telephone call" to include text messaging, as any other interpretation runs afoul to the purpose and contemporary dictionary definition of "call."

Defendant asserts that Plaintiffs "rely almost entirely on pre-*Loper Bright* and *McLaughlin Chiropractic* case law for the premise that federal courts are virtually unanimous in their finding that section 227(c)(5) includes text messages. A.B. at 20. Defendant then implies, without evidence, that these Courts may have had "differing views" on the FCC's interpretation but felt bound to defer to the FCC. *Id*. At the very least, given *Chevron* deference, these courts recognized the reasonableness of this interpretation.

11

In fact, numerous recent opinions, including one from the Ninth Circuit Court of Appeals, have already upheld this longstanding interpretation. *See Howard v. Republican Nat'l Comm.*, No. 23-3826, 2026 U.S. App. LEXIS 787, at *9-15 (9th Cir. Jan. 13, 2026) (reaffirming that text messages constitute "calls" under the TCPA); *Mujahid v. Newity, LLC*, No. 25 C 8012, 2025 U.S. Dist. LEXIS 2221088 at *7 (N.D. Ill. Nov. 10, 2025) (finding that "nothing in the text, structure, or purpose of the TCPA suggests a distinction between an unsolicited voice call and an unsolicited written text message"); *Alvarez*, 2026 U.S. Dist. LEXIS at *9-12 ("But this Court is cognizant that a usage which seems obvious *now* is not always a reflection of the *original* meaning of the statute…Indeed, the term 'text message' only seems distinct from the idea of a 'telephone call' today because the former term developed in our language specifically to distinguish a text communication from a voice communication"); *Wilson v. Better Mortg. Corp.*, No. 25 Civ. 5503 (PAE), 2025 U.S. Dist. LEXIS 251694, at *21 (S.D.N.Y. Dec. 5, 2025) ("The FCC's consistent interpretation that the TCPA applies to text messages accords, as noted, with the statute's text, purpose, and context, and is informed by the agency's subject matter expertise"); *Wilson v. MEDVIDI Inc.*, No. 5:25-cv-03996-BLF, 2025 U.S. Dist. LEXIS 198827 at *9 (N.D. Cal. Oct. 7, 2025) (same); *Mey v. Liberty Home Guard, LLC*, 2026 U.S. Dist. LEXIS 739 at *15-20 (N.D.W. Va. Jan. 5, 2026) (same); *Esquivel v. Mona Lee, Inc.*, No. 3:25-cv-00607-H-BLM, 2025 U.S. Dist. LEXIS 230841, at *8 (S.D. Cal. Nov. 24, 2025) (similar); *Duron v. Kings Cap. Holding LLC*, No. 3:25-cv-00149-DCG, 2026 U.S. Dist. LEXIS 6340, at

*12-13 (W.D. Tex. Jan. 13, 2026) (similar); *Wilson v. Skopos Fin., LLC*, 2025 U.S. Dist. LEXIS 138638, at *10-12 (D. Or. July 21, 2025) (similar).

Lastly, Defendants argue that the APA's arbitrary and capricious standard of review need not apply because it would ignore the Supreme Court's abdication of *Chevron* deference and the TCPA does not grant the discretion required for this standard to control. To first address the latter, Congress delegated broad authority to the FCC to create the rules from which the TCPA's private rights of action hold any meaning. Indeed, section 227(c) "explicitly delegates such authority[.]" *Wilson v. Skopos Fin., LLC*, 2025 U.S. Dist. LEXIS 138638 at *11-12.

As to the former, oftentimes "the best reading of a statute is that it delegates discretionary authority to an agency." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). Courts thus still afford deference to agency interpretations when a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term," tasks an agency "to fill up the details of a statutory scheme," or tells an agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Id.* at 394-95. In those cases, a court's role is merely to "fix[] the boundaries" of agency authority and ensure "reasoned decisionmaking" within them. *Id.* Section 227(c) is an express delegation of that sort. Alternatively, the FCC's interpretation should—at the very least—be accorded "great weight." *Id.* at 388. The FCC's position is grounded in the agency's expertise, consistent over decades, and well-reasoned. Those are the hallmarks of agency action with the "power to persuade." *Id.*

Should this Court find that the arbitrary and capricious standard not apply, Appellants simply request the Court look to the FCC (the expert in telecommunications) for guidance as it relates to statutory construction. Indeed, as early as 2003, the FCC construed text messaging as a type of call. *See* 2003 Order ¶ 165.

## IV. *Duguid* is Distinguishable

Defendant and Amici incorrectly contend that the Supreme Court's opinion in *Facebook v. Duguid*, is sufficiently analogous to the questions at issue herein. In *Duguid*, the Supreme Court addressed the meaning of an "automatic telephone dialing system" and "whether that definition encompasses equipment that can 'store' and dial telephone numbers, even if the device does not 'us[e] a random or sequential number generator.'" *Facebook, Inc. v. Duguid*, 592 U.S. 395, 399 (2021). Holding that it does not, the Court began its analysis with the definition of an autodialer as explicitly defined by Congress under Section 227(a)(1). *Id.* at 402. Per the Court, "Congress defined an autodialer in terms of what it must do ('store or produce telephone numbers to be called') and how it must do it ('using a random or sequential number generator')." *Id.* The Court also found that "[t]he statutory context confirms that the autodialer definition excludes equipment that does not 'us[e] a random or sequential number generator.'" *Id.* at 405. Indeed, the TCPA's "prohibitions [against autodialers] target a unique type of telemarketing equipment that risks dialing emergency lines random or tying up all the sequentially numbered lines at a single entity." *Id.* Furthermore, the Court noted "that, as a matter of ordinary parlance, it

14

is odd to say that a piece of equipment 'stores' numbers using a random number 'generator.'" *Id.* at 407. However, "it is less odd as a technical matter." *Id.* Ultimately, the Court found that "Duguid's quarrel is with Congress, which did not define an autodialer as malleably as he would have liked." *Id.* at 409.

Here, unlike *Duguid*, Congress did not include a separate definition of "telephone call" in Section 227(a) as it did with the term "automatic telephone dialing system." Thus, Courts—in line with the FCC—have repeatedly used standard methods of statutory construction to conclude that the term encompasses a "communication" by telephone. And as *Duguid* analyzed the narrow purpose of the autodialer provision, so too should Section 227(c) be analyzed under "the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object" *See* 47 U.S.C. § 227(c)(1). Moreover, "as a technical matter" the term "telephone call" in 1991 *could have* included situations where an individual communicated through text.

In 1990, Congress passed the Americans with Disabilities Act (ADA) which sought, *inter alia*, "to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4). One of these areas included protection for individuals who could not use standard telephonic voice communication services. As part of the ADA, Congress enacted 47 U.S.C. § 225, which required widespread availability of "telecommunication relay services." These services are defined as:

"telephone transmission services that provide the ability for an individual who is deaf, hard of hearing, deaf-blind, or who has a speech disability to engage in communication by wire or radio with one or more individuals, in a manner that is functionally equivalent to the ability of a hearing individual who does not have a speech disability to communicate using voice communication services by wire or radio."

47 U.S.C. § 225(a)(3).

At that time, an individual with such disabilities would typically employ a teletypewriter (TTY), allowing them to communicate without audible sound. *See* TTY and TTY Relay Services, National Association of the Deaf (https://www.nad.org/resources/technology/telephone-and-relay-services/tty-and-tty-relay-services/) ("The TTY relay service communication assistant (CA) connects TTY relay calls with people who communicate by telephone. The CA converts voice-to-text and text-to-voice communication. The text is displayed on the user's TTY… More than 100 years after the invention of the telephone, deaf and hard of hearing people could finally make a telephone call to anyone."). Because TTY technology employed a type of text-based call, Congress necessarily had to distinguish the terms "voice communication services" from the much broader term, "calls." *See* 47 U.S.C. § 225(d)(1)(D). In fact, Congress refers to TTY text-based telephone communications as "calls" four times in Section 225(d) alone. As such, at least a year before the passage of the TCPA, Congress itself recognized that TTY technology, which allows deaf and hard-of-hearing individuals to communicate through text, provided such persons the ability to receive "calls" in a "functionally equivalent" manner to "voice services."

Accordingly, not only does the statutory construction of 227(c)(5) encompass "communications by telephone," but other statutes create a clear distinction between

16

communications by voice and "calls." In line with *Duguid*, Defendant's quarrel lies with Congress, which—despite almost a quarter century having passed since the FCC and courts first recognized text messages as encompassed within "calls"—has declined to adopt a narrow definition of the term "telephone call."

**V.      Public Policy Warrants Protection Against Intrusive Text Messaging**

Defendant asserts that Plaintiffs' public policy argument is itself "suspect" because "Congress could have reasonably concluded that unwanted telephone calls are more intrusive than unwanted text messages…" A.B. at 29. This is an odd conclusion given that Defendant's arguments are premised on the non-existence of text messages in 1991. That said, Congress *did* craft narrow protections for autodialers and the use of pre-recorded and artificial voices in telemarketing calls. Whereas Section 227(b) focuses on these narrow protections, 227(c) focuses on broad protections against "telephone solicitations" for those who request not to be contacted either through the national do-not-call registry or through "company-specific 'do not call' systems." 47 U.S.C. § 227(c)(1) -(3) .

Defendant also believes that it is "speculative" to suggest that consumers will be inundated with unlawful text communications if the private right of action is deemed inapplicable to text messaging. Yet the FCC—whom Defendant casually suggests could shoulder enforcement responsibility for the tens of millions of

unsolicited automated calls and texts each day[3]—has previously acknowledged an "escalating number of complaints about unwanted and illegal texts[.]" *See* Steve Pociask, *Report on the State of Text Messaging*, FCC Consumer Advisory Committee (adopted August 30, 2022) (https://www.fcc.gov/ecfs/document/1083135018370/1). That this escalation occurred against the backdrop of a broad consensus that text messaging falls within the scope of Section 227(c) strongly suggests that disturbing that consensus would only exacerbate the harm to consumers.

Accordingly, public policy considerations both reflect and reinforce the purpose of the TCPA's private right of action under 227(c)(5). Indeed, the facts of this case alone demonstrate the harm inflicted on consumers who were repeatedly hounded by a company despite expressly instructing it to cease further contact. Absent this private right of action—and under a narrowed, modern interpretation of "telephone call"—consumers would be left without meaningful recourse to be made whole for unwanted telephonic solicitations. As noted by the Fourth Circuit Court of Appeals, "[i]t would be dispiriting beyond belief if courts defeated Congress' obvious attempt to vindicate the public interest with interpretations that ignored the purpose, text, and structure of this Act at the behest of those whose abusive practices the legislative branch had meant to curb." *Krakauer*, 925 F.3d 643 at 663.

## VI. Amicus Briefs

---

[3] *See* Mary Cunningham, *Americans are getting 2.5 billion robocalls a month – the highest level in years CBS News* (October 17, 2025); https://www.cbsnews.com/news/robocalls-on-the-rise-heres-why/

Plaintiffs note that much of the Amicus briefing submitted by four highly biased organizations overlaps with Defendant's arguments. Accordingly, Plaintiffs will only address those arguments sufficiently distinct or novel. Additionally, some of the arguments brought up are not at issue in this Appeal and need not be adjudicated upon. Nevertheless, and out of an abundance of caution, Plaintiffs will briefly address these unripe arguments. Finally, the argument that the NRCC and NRSC make regarding political organizations will not be addressed by Plaintiffs as this argument is entirely removed from the scope of both this appeal and the factual concerns of the litigation itself.

### A. Chamber of Commerce

The Chamber of Commerce takes issue with Plaintiff's use of contemporary dictionary definitions of the word "call." In so doing, it mischaracterizes the relevance of these definitions. The point is not merely that dictionaries failed to *forbid* application of "call" to text messages, but that the ordinary meaning of "call" at the time of enactment was functionally broader than voice-only communication and centered on initiating telephonic contact. In support, the Chamber of Commerce cites *Taniguchi v. Kan Pac. Saipan, Ltd.*, which held that a single dictionary definition could not suffice to overturn the common meaning of "interpreter" which only included one who translates spoken, as opposed to written, communication. *Taniguchi*, 566 U.S. 560, 575 (2012). The Court first remarked on a plethora of contemporary and older dictionaries which adhered to that definition. *Id.* at 566-67. Conversely, "respondent reli[ed] almost exclusively on" a single dictionary definition

19

which "defined 'interpreter' as 'one that translates; esp: a person who translates orally for parties conversing in different tongues.'" *Id.* at 567-68. The Court immediately noted the "sense divider denoting the most common usage[.]" *Id.* at 568. The Court further highlighted that other dictionaries deemed that the broader definition had been "deemed obsolete[.]" *Id.* at 569. Moreover, the Court found the statutory context did not "even hint[] that Congress intended to go beyond the ordinary meaning of 'interpreter' and to embrace the broadest possible meaning that the definition of the word can bear." *Id.*

Here, unlike *Taniguchi*, Plaintiffs have proffered several reputable definitions that conform to a "communication by phone." Moreover, these definitions do not qualify their broad definitions. Finally, the statutory context (and history of enactment) undoubtedly encourages the broadest possible reading as explained above.

Additionally, the Chamber of Commerce seeks to discredit the FCC's interpretation a "call" as one that encompasses both "voice calls and text calls." 2003 FCC Order ¶ 165. Plaintiffs, as explained earlier, need not rely on the FCC's consistent interpretations as the statutory text, purpose, and surrounding provisions independently support this interpretation—one that Congress has not overturned and Courts have repeatedly upheld. Nevertheless, the Chamber of Commerce cites *Skidmore*, where the Supreme Court described an agency's power of persuasion:

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for

guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

In 2003, Congress amended the TCPA through the Do Not Call Implementation Act (DNCIA), which expanded the FCC's authority to "issue a final rule pursuant to the rulemaking proceeding that it began on September 18, 2022, under the Telephone Consumer Protection Act." 108 P.L. 10, 117 Stat. 557, Sec. 3 (2003). In this Notice of Proposed Rulemaking, the FCC explained that since 1992, "[n]ew technologies ha[d] emerged that allow[ed] telemarketers to better target potential customers and make it more cost effective to market using telephones and facsimile machines." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 17 FCC Rcd 17459, 17460 (September 18, 2022). The FCC conspicuously defined the term "telemarketer" to refer to "any person or entity making a *telephone solicitation* or using the *telephone network* to deliver an unsolicited advertisement (*regardless of the precise means used to place such a call*). *Id.* at 17460 n.3 (emphasis added). Per the FCC, its goals—as endorsed by Congress—had been "to enhance consumer privacy protections while avoiding imposing unnecessary burdens on the telemarketing industry, consumers, and regulators." *Id.* at 17461. And when referencing section 227(c)(5), the FCC noted that the "TCPA permits consumers to file suit" against unwanted "telephone solicitation[s]." *Id.* at 17462 n.10; 17486.

21

Among many questions on how best to protect consumers against unwanted *telephonic solicitations*, the FCC sought "comment on whether consumers with hearing and speech disabilities often may be unable to convey a request not to be called to telemarketers." *Id.* at 17469; *see also* n.67 (citing an FTC proceeding which indicated "that these consumers often receive calls from telemarketers that are not equipped to handle TTY calls"). Indeed, writing in a separate statement, Chairman Michael K. Powell explained that "maximizing consumer welfare and protecting consumer interests are key Commission priorities." *Id.* at 17504.

These priorities undergird the FCC's interpretation of "call" as a broad term encompassing "voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls, provided the call is made to a telephone number assigned to such service." 2003 FCC Order ¶ 165. The Chamber of Commerce argues that this Order "failed to address the fact that ordinary users of the English language do not refer to text messages as 'text calls'" and that the FCC did not "explain how a 'text' can be a 'call.'" But the FCC's interpretation—issued shortly after the advent of text messaging—is self-evident. In addressing a novel telephonic technology that enabled communication via telephone numbers, the FCC reasonably understood such communications to fall within the concept of a "telephone call." For that reason, the FCC did not merely list "voice calls" and "texts," but instead classified each as a type of call—specifically, "text calls" and "short message service (SMS) calls." The FCC further emphasized that these services must be tied to specific telephone numbers,

reinforcing its understanding of a "call" as a communication made by telephone. Later Orders by the FCC only reinforce this common-sense conclusion.

Despite the FCC's core expertise in telecommunications technology, networks, and practices, the Chamber of Commerce asserts—without explanation—that "the FCC did not rely on technical expertise or 'specialized experience.'" This assertion is internally inconsistent. At the same time, the Chamber contends that the "differing nature of telephone calls and text messages" is "well-known to consumers." The problem with this statement is twofold: (1) as a practical matter voice calls and text messages share fundamentally similar characteristics; and (2) any linguistic distinction modern consumers draw between the two is itself a product of evolving usage, not an immutable truth. Indeed, the FCC's 2003 Order reflects the contemporaneous understanding of text messaging at the time it emerged, underscoring that this purported distinction was neither settled nor commonplace when the agency exercised its expertise. And because Congress endorsed this rulemaking through the DNCIA, the FCC acted well within its authority in adopting this interpretation.

Finally, the Chamber of Commerce suggests that adherence to Plaintiffs interpretation would actually harm businesses and consumers. Dkt. 27 at 29-33. While the Chamber of Commerce makes a valiant attempt to safeguard the interests of telemarketers, their argument cannot be squared with reality. Section 227(c)(5) does not simply prevent businesses from sending text messages altogether; rather, it prohibits *two* or more during any 12-month period, typically when an individual is on

the national do-not-call registry or specifically requests the business to cease contact. *See* 47 C.F.R. §§ 64.1200(c)-(d). Essentially, it protects the individual who has expressly requested not to be made a victim of telemarketing while still giving businesses the ability to send one solicitation every year. It *does not* prevent business communications to and from consumers who have provided consent. Moreover, section 227(c)(5) provides an affirmative defense to any defendant that "has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations[.]" It is a well-written law that substantively gives businesses the benefit of the doubt and protects consumers against *unwanted* solicitations—not those which they have requested.

### B. NRCC and NRSC

The NRCC and NRSC argue that this Court should affirm the District Court's judgment on the alternative theory that cellular telephones are not "residential telephones." Dkt. 24 at 13-19. The Court, if it chooses rule on this novel issue, should find as other courts and the FCC have, that the TCPA "protects the privacy interests of a certain type of *subscriber*, not a certain type of *technology*." *Loudermilk v. Maelys Cosmetics USA, Inc.*, No. 1:24-cv-1866-AT, 2025 U.S. Dist. LEXIS 258097, at *7 (N.D. Ga. Dec. 10, 2025).

In *Loudermilk*, the defendant moved to dismiss "based solely on the argument that Plaintiff, a cell phone user, is not protected by the TCPA because the TCPA's do-not-call rules apply only to 'residential telephone subscribers,' not to cellular

telephone subscribers." *Id.* at *4. The defendant wanted the Court to "disregard the FCC's position and the agency's regulation extending the TCPA's protections to wireless subscribers" in lieu of an "independent analysis of the TCPA's language[.]" *Id.* at *5. The Court explained that following *McLaughlin*, "Chief District Judge May conducted an independent statutory analysis of this same question" and "concluded that [the text and purpose of the TCPA] indicate that the type of phone technology – cellular or landline – is not determinative[.]" *Id.* at*7. The Court also noted that a separate district judge agreed with Judge May ultimately held "that the plain text of the TCPA indicates that it protects the privacy interests of a certain type of *subscriber*, not a certain type of *technology*." *Id.*

The Court explained that "Congress used the term 'residential telephone *line*' in other sections of the TCPA that regulate specific types of technology" such that "had Congress intended to limit the protections of Section 227(c)…it would have done so by using the term 'residential telephone *line*' in this section instead." *Id.* at *7-8 (citing 47 U.S.C. § 227(b)). Furthermore, the practical realities of widespread cellphone usage would make a contrary conclusion "inconsistent with the 'government interest articulated in the legislative history of the Act,' which was to broadly protect residential privacy." *Id.* at *8 (citations omitted). Indeed, "since *Mclaughlin*, various other courts across the nation have also reached the same determination." *Id.* at *8-9 (citing *Harriel v. Bealls, Inc.*, No. 8:25-cv-1165-TPB-SPF, 2025 U.S. Dist. LEXIS 158157, at *2 (M.D. Fla. Aug. 15, 2025); *Wilson v. Hard Eight Nutrition LLC*, No. 6:25-cv-00144-AA, 2025 U.S. Dist. LEXIS 122504, at *4-6 (D. Or.

25

June 27, 2025); *Dobronski v. CHW Grp., Inc.*, No. 24-cv-11649, 2025 U.S. Dist. LEXIS 162742, at *6 (E.D. Mich. Aug. 21, 2025)).

It appears that the NRCC and NRSC forgot about the human element in their analysis—attempting to define a "residential telephone" as opposed to a "residential telephone *subscriber*." Congress did not care to protect telephones as inanimate objects; they wanted to protect the subscribers of those telephones. This is why other courts have defined "residential telephone subscribers" as "people 'who make regular payments to *use* a telephone service at home, that is, people who use a telephone for a personal or private purpose—a *use* traditionally tied to the home—as opposed to a commercial or business use.'" *Schmitendorf v. Juicy's Vapor Lounge, Inc.*, No. 22-cv-02293-TC-GEB, 2025 U.S. Dist. LEXIS 208110, at *20 (D. Kan. Oct. 21, 2025) (citing *Wilson*, 2025 U.S. Dist. LEXIS 122504 at *5; *Lirones v. Leaf Home Water Sols., LLC*, 23-2087, 2024 U.S. Dist. LEXIS 165900, at *6 (N.D. Ohio Sept. 16, 2024)); *see also Ferrell v. Colourpop Cosmetics, LLC*, 2025 U.S. Dist. LEXIS 140893, at *18 (C.D. Cal. July 22, 2025) ("Under § 227(c)(5), it is a violation of the resulting *regulations*, not a violation of the statute itself, that is the basis for the private cause of action. Given the special role that Congress has created for the FCC in this context, its interpretations are entitled to deferential review, even under *Loper*."). In other words, "the proper inquiry is whether he or she used the cell phone for purposes associated with the home." *Id*.

**C. Fashion Nova**

While Fashion Nova suggests that "the Seventh Circuit has not interpreted the term 'telephone call' in the 35 years since the TCPA was passed," this is misleading. In 2020, this Court affirmed the position held in *Campbell-Ewald Co.*, that "[t]ext messages to a cellular telephone qualify as a 'call' within the meaning of the statute. *Warciak v. Subway Rests., Inc.*, 949 F.3d 354, 356 (7th Cir. 2020).

Additionally, Fashion Nova claims that "if Appellants are correct in their expansive view, 'telephone call' would subject virtually all modern communication to the TCPA..." Dkt. 28 at 13. This, however, is not true. Plaintiffs' definition is and has been the default standard, and Fashion Nova's fears have not come to pass. Moreover, there are distinct similarities between voice calls and text messages that differentiate them from "app-to-app messages, push notifications, and emails." *Id*. First, both voice calls and text messages (SMS) rely on the same core cellular infrastructure: base stations, radio spectrum licensed to the carrier, core network that authenticates users, routes traffic, and bills usage, and SIM-based identity.[4] Both services even

---

[4] *See* International Telecommunications Union, *Switching and signaling, and associated measurements and tests*, Q.700 through Q.799 (SS7 Signal System No. 7 series), https://www.itu.int/rec/T-REC-Q/en (defining SS7 signaling used for SMS and voice call setup);
GSMA, *GSM Association Roaming Database, Structure and Updating* (June 20, 2024), https://www.gsma.com/newsroom/wp-content/uploads//IR.21-v17.0-2.pdf (showing SMS dependence on HLR, VLR, MSC, and MAP signaling);
International Telecommunications Union, *Technical report on SS7 vulnerabilities and mitigation measures for digital financial services transactions* (2019), https://www.itu.int/en/ITUT/extcoop/figisymposium/Documents/Technical%20report%20on%20SS7%20vulnerabilities%20and%20mitigation%20measures%20for%20Digital%20Financial%20Services%20transactions.pdf (explaining how SMS can be intercepted/spoofed via SS7, demonstrating it uses the same signaling as voice)

start the same way, where a phone registers with the network, the network authenticates the SIM, and then the phone maintains a signaling connection so the network can reach it. Indeed, everything about setting up, managing, and tearing down a voice call uses the same signaling mechanisms that SMS relies upon. Neither necessarily involve an internet service nor packet data in the modern sense.[5] Text messaging essentially piggybacked off call control infrastructure and many SMS protocols are just extensions of voice signaling protocols. Accordingly, voice calls and SMS are not separate "apps" on the network.[6] They are two services built on the same signaling-heavy cellular architecture (i.e., communications made *by telephone*).

Lastly, it appears that Fashion Nova and other Amici appear intent on undermining the TCPA itself, relying on former FCC Commissioner Ajit Pai's dissent from the FCC's 2015 Order. Notably, neither Defendant nor Amici address the specific factual allegations concerning Plaintiffs (and others) when asserting purported "abuses" of the TCPA. That omission is telling. Confronting those facts would expose the very injustice suffered by individuals who repeatedly—and unsuccessfully—demanded that Defendant cease contacting them, conduct the TCPA was expressly enacted to prevent and remedy. This Court should not take an axe to

---

[5] CTIA, *SMS Interoperability Guidelines* (1/15/2015), https://api.ctia.org/docs/default-source/default-document-library/sms_interoperability_guidelines_v3-2-2_jan_2015-as-posted.pdf (noting the existence and functionality of traditional carrier-offered text messaging)
[6] *See WhatsApp Encryption Overview* (August 19, 2024), https://tinyurl.com/bdd98fus; (showing that internet-based chat applications do not use PSTN)

the TCPA when it already contains numerous safeguards and protects *all individuals* from the excesses of telemarketing abuse.

## CONCLUSION

For the foregoing reasons, this Court should find the meaning of the word "call" in Section 227(c)(5) to include text messages such that the judgment of the District Court to grant Defendant's Motion to Dismiss should be reversed.


Date:  February 2, 2026



/s/  Ryan L. McBride
Ryan L. McBride
*Attorneys Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1) , I certify that:

This brief complies with the type-volume limitation pursuant to this Court's January 29, 2025 Order (See ECF No. 46) extending the limits of Fed. R. App. P. 32(a)(7)(B)(i) and 7th Cir. R. 32(c) from 7,000 to 8,000 words, because this brief (including headers and footnotes) contains 7,461 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 7th Cir. R. 32(b); and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 12-point font.

Date:  February 2, 2026

/s/ Ryan L. McBride
Ryan L. McBride
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: February 2, 2026

/s/ Ryan L. McBride
Ryan L. McBride
*Attorneys for Plaintiffs*